699 A.2d 596

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
NATHANIEL HARVEY, DEFENDANT–APPELLANT.

Argued April 29, 1996—Decided July 30, 1997.

122

*Michael B. Jones* and *Stephen A. Caruso,* Assistant Deputies Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney).

*Nancy A. Hulett,* Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

Defendant, Nathaniel Harvey, appeals directly from a judgment of conviction and sentence of death for the purposeful-or-knowing murder of Irene Schnaps. A jury originally convicted defendant of Schnaps's murder and sentenced him to death in October 1986. This Court reversed that conviction because of errors in the admission of defendant's confession and in the failure of the trial court to give a *"Gerald* charge." *State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990) (*Harvey I*), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991). The phrase *"Gerald* charge" refers to a charge that distinguishes murder when the defendant intended to kill from murder when the defendant intended only to cause serious bodily injury that resulted in death. *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). Neither error occurred in the second trial.

In the absence of defendant's confession, the State relied substantially on DNA evidence to establish that defendant was Schnaps's killer. Again, a jury convicted defendant and imposed the death penalty. On this appeal, defendant raises numerous points, including challenges to the admission of the DNA evidence and to the jury charge. After careful review of all of defendant's arguments, we affirm his conviction and death sentence.

- I -

A. *Discovery of the Body and the Crime Scene*

Schnaps, age thirty-seven, lived alone in a ground-floor apartment at the Hunter's Glen complex in Plainsboro, New Jersey.

After she failed to appear at work on June 17, 1985, a concerned coworker went to her apartment and entered through an unlocked doorway. On discovering Schnaps's lifeless body, he immediately called for assistance.

Investigating police detected no signs of forced entry. The bedroom, however, was a scene of obvious struggle. Blood stains were on the carpet and throughout the room. Schnaps's naked body lay face-up on the floor. She had sustained severe head and facial wounds. Despite the extensive head wounds, no bloodstains were present on Schnaps's chest and stomach.

The matting of several small hairs to the victim's body and the absence of blood on her torso suggested that someone had attempted to wipe the body clean. The carpeting around the body was wet from water. Schnaps's back was covered with blood.

A white pillowcase bore a bloody sneaker-print with a chevron pattern and the letters "PON." Although the bedding appeared clean, blood stained the mattress, the underlying box spring, a cardboard box that protruded from under the bed, and a towel.

The bedroom also included an empty Seiko–LaSalle watch box, an empty Olympus camera box, and an empty jewelry box. In the bathroom, the investigators found Schnaps's pocketbook. The pocketbook was open and did not contain any money.

## B. *The Autopsy*

On June 18, 1985, Dr. Marvin Shuster, the Middlesex County medical examiner, conducted an autopsy. He determined that Schnaps had sustained approximately fifteen blows to the head. The largest wound, six inches long and one inch wide, extended from the front of her forehead to the top of her head. In general, the skull wounds were either curving or linear. The curving wounds were likely caused by hammer blows, and the linear wounds could have been caused by an item akin to a tire iron, a two-by-four, or a dull hatchet or axe. Some of the blows fractured Schnaps's skull and caused direct injury to the brain. Blows had

been delivered from both the right and left sides, some from the front, but most from behind.

Triangular pressure marks appeared on both sides of the neck. Some of the victim's teeth were knocked out, and her jaw was broken. The right sides of the neck, jaw, cheek, and forehead were bruised, and she was cut behind one ear.

Unable to attribute death to any particular wound, Dr. Shuster concluded that the combination of the blows had killed Schnaps. Schnaps had bled profusely and died within a matter of minutes.

### C. *The Apprehension and Interrogation of Nathaniel Harvey*
#### 1. *October 28, 1985*

Throughout the summer and autumn of 1985, West Windsor police looked for the perpetrator of a series of unsolved burglaries and sexual assaults. Based on eyewitness descriptions, they believed that the perpetrator was a stocky black male, under five-feet three-and-a-half inches tall, who usually travelled on foot or by bicycle. The police also believed that the perpetrator of those other crimes might be responsible for Schnaps's murder. Defendant fit the physical description.

On October 28, 1985, police investigating three burglaries arrested defendant after he was sighted standing with his bicycle at the edge of a soybean field in West Windsor. One of the burglary victims identified defendant at a subsequent "show-up."

During questioning by West Windsor police on October 28, defendant confessed to committing a number of burglaries in West Windsor, as well as a sexual assault. Defendant also agreed to accompany the police on a car tour to point out the locations of his crimes.

#### 2. *October 29, 1985*

At 10:00 a.m. on the following morning, defendant accompanied two detectives on a car tour of West Windsor. At 1:15 p.m., defendant consented to a search of his car and his Jamesburg apartment for evidence related to an unrelated sexual assault.

Although defendant gave as his address his father's apartment in Jamesburg, he lived with his estranged wife in West Windsor. Apparently, defendant feared that his wife would lose her welfare benefits if he revealed that he lived with her. After defendant signed the consent form, police transferred him to the Mercer County Detention Center.

While searching defendant's car, the officers discovered two watches, including a Seiko–LaSalle like the one missing from Schnaps's apartment. They notified the Plainsboro Police Department. After obtaining a search warrant, a Plainsboro officer seized the watch. The search of Harvey's Jamesburg apartment did not yield any evidence.

### 3. *October 30, 1985*

Following defendant's arraignment for the murder of Schnaps, investigating officers resumed questioning him. At one point, defendant said that "he would tell [them] about the murder but first wanted to speak to his father." After defendant spoke with his father, police failed to administer new *Miranda* warnings. Shortly thereafter, defendant confessed to murdering Schnaps.

### D. *The First Trial*

On November 19, 1985, a Middlesex County grand jury returned a three-count indictment charging defendant with the purposeful-or-knowing murder of Schnaps, contrary to *N.J.S.A.* 2C:11–3 (count one), second-degree robbery, contrary to *N.J.S.A.* 2C:15–1 (count two), and second-degree burglary, contrary to *N.J.S.A.* 2C:18–2 (count three). Two days later, on November 21, 1985, the Middlesex County Prosecutor filed a Notice of Aggravating Factors pursuant to *Rule* 3:13–4(a) and *N.J.S.A.* 2C:11–3c(2), making defendant's case a capital prosecution. The State alleged the following aggravating factors:

1. The murder was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim

[*N.J.S.A.* 2C:11–3c(4)(c).]

2. The murder was committed for the purpose of escaping detection, apprehension, trial, imprisonment or confinement for robbery and burglary committed by the defendant

[*N.J.S.A.* 2C:11–3c(4)(f).]

3. The murder was committed while the defendant was engaged in the commission of or an attempt to commit, or flight after committing robbery and burglary

[*N.J.S.A.* 2C:11–3c(4)(g).]

The prosecution relied heavily on defendant's confession. *Harvey I, supra,* 121 *N.J.* at 415–17, 581 *A.*2d 483. The jury found defendant guilty of purposeful-or-knowing murder, first-degree robbery, second-degree burglary, and felony murder, for which he had not been indicted. At a penalty-phase hearing, the same jury found the presence of all three alleged aggravating factors and returned a sentence of death.

### E. *Harvey I*

On direct appeal, this Court reversed defendant's conviction and remanded for a new trial. The Court held that the trial court's jury instructions on murder did not comport with *Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, which required that a jury must be instructed separately on the crimes of intentional murder and serious-bodily-injury murder (SBI murder). At the time of Harvey's trial, a conviction for SBI murder did not render a defendant death-eligible. In his confession, Harvey claimed that the victim struck him and that he then struck her only once. Relying in part on statements in his confession, the Court concluded that the evidence provided a rational basis for a jury to have concluded that defendant intended only to injure Schnaps. *Harvey I, supra,* 121 *N.J.* at 413, 581 *A.*2d 483.

The Court further held that Harvey's confession had been procured in violation of *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986). *Hartley* provides that after invoking the right to silence, a defendant must receive new *Miranda* warnings before interrogation can resume. The Court ruled that, by asking to speak with his father, Harvey had invoked his right to silence. *Harvey I, supra,* 121 *N.J.* at 418–20, 581 *A.*2d 483. Consequently, the police

should have advised him again of his constitutional rights before resuming interrogation. The failure of the police to abide by that bright-line test rendered defendant's confession inadmissible. *Id.* at 422, 581 *A.*2d 483.

### F. *The Interim Between Trials*

Faced with the prospect of retrying Harvey without his confession, the prosecution hired Cellmark Diagnostics Laboratory (Cellmark) to conduct DNA tests on the blood recovered from the crime scene. Cellmark, the first commercial laboratory accredited by the American Society of Crime Laboratory Directors, conducts DNA tests exclusively. It analyzed a bloodstained section of Schnaps's box spring, a bloodstained piece of cardboard, and a sample of both Schnaps's and defendant's blood.

### G. *The Retrial*

Defendant's retrial, from the pretrial motions to the return of the death sentence, lasted from November 25, 1992, to December 16, 1994. The trial court denied a motion for a new trial on January 30, 1995.

#### 1. *Pretrial Motions*

Following a hearing, the trial court denied defendant's motion to suppress evidence seized from defendant's car, ruling that defendant had consented to the search. The defendant also moved to exclude the State's DNA evidence. After a three-day *New Jersey Rule of Evidence* 104 (*Rule* 104) hearing, the trial court denied defendant's motion and held that the State's DNA evidence was admissible.

#### 2. *Guilt Phase*

After a lengthy jury-selection process, the guilt phase began on November 29, 1994.

##### a. *State's Case*

The State adduced evidence about the crime scene, including fifty-two photographs and various items of physical evidence.

Investigating officers testified to the discovery of the bloody sneaker print, the empty Seiko–LaSalle watch box, the empty jewelry box, and the empty Olympus camera box, all of which were admitted into evidence.

Philip Beesley, a forensic scientist employed by the New Jersey State Police, testified that blood work done on control samples from both the defendant and Schnaps revealed that Schnaps's blood was type "one plus, one minus" for the genetic marker PGM, and type "1" for the enzyme CA II. Defendant was type "one plus, one plus" for PGM and type "2–1" for CA II. Beesley further revealed that bloodstains found on the box spring and on the piece of cardboard tested as "one plus, one plus" for PGM and type "2–1" for CA II. He concluded that those stains were consistent with Harvey's blood, therefore, not Schnaps's. Beesley also testified that CA II of phenotype 2–1 is found only in African Americans.

Dr. Marvin Shuster testified about the nature of the wounds suffered by Schnaps and the cause of her death. *See supra* part I.B. Theodore Mozer, a forensic scientist employed by the New Jersey State Police, testified that one of the hairs recovered from Schnaps's back did not belong to her. Mozer testified that this hair had "Negroid" characteristics that were consistent with a control hair taken from Harvey.

Mozer also examined two pairs of sneakers seized from Harvey's ex-wife's West Windsor apartment and the size 6 1/2 "Pony" sneakers that Harvey was wearing when he was arrested. Aided by six enlarged photographs of the bloody footprint left at the crime scene, Mozer explained that Harvey's "Pony" sneakers were consistent with the sneaker impression. Although Harvey's sneakers "could" have left the bloody mark, Mozer could not conclude definitively that they had done so.

In support of the admission of the DNA evidence, the State presented two witnesses from Cellmark, Julie Cooper, a senior molecular biologist, and Dr. Charlotte Word, a microbiologist and supervisor of forensic casework. They testified generally that

DNA tests conducted on the blood samples recovered at the crime scene were genetically comparable to defendant's DNA. Defendant's genotypes for the genetic markers examined were common to only one–in–1,400 African Americans.

### b. *Defendant's Case*

Defendant did not testify.

His case consisted of only two witnesses. A witness from Seiko testified that it had made thousands of watches like the one seized from the trunk of defendant's car. Dr. Robert Shaler, Director of Forensic Biology for the Office of the Chief Medical Examiner for the City of New York, testified that he believed that the DNA tests were "scientifically indefensible." In the course of his testimony, he pointed out the imbalances in the dots on the strips. He found imbalances at the GYPA, HBGG, and GC loci. Dr. Shaler testified that at the GYPA locus an individual's genes could cause a difference in dot intensity. He further disputed the one–in–1,400 calculation and asserted that he believed that the genetic makeup of the blood recovered from the crime scene could be found in approximately one in fifty to one in 200 African Americans.

### c. *The Verdict*

In its jury instructions, the court included a *Gerald* charge. Consistent with *State v. Purnell,* 126 *N.J.* 518, 530–34, 601 *A.*2d 175 (1992), the court also charged on the unindicted count of felony murder. After deliberating for three and one-half hours, the jury returned its verdict finding defendant guilty of purposeful-or-knowing murder, felony murder, first-degree robbery, and second-degree burglary.

### 3. *Penalty Phase*

### a. *State's Case*

The State relied exclusively on the evidence adduced at the guilt phase to support proof of three aggravating factors: the murder involved aggravated assault of the victim, *N.J.S.A.* 2C:11–3c(4)(c); the murder was committed to escape detection, *N.J.S.A.* 2C:11–

3c(4)(f); and the murder was committed during the course of a robbery and burglary, *N.J.S.A.* 2C:11–3c(4)(g).

### b. *Defendant's Case*

Pursuant to *N.J.S.A.* 2C:11–3c(5)(c) and (h), defendant alleged ten mitigating factors: the age of the defendant at the time of the murder; the defendant was traumatized at a young age when he witnessed the death of his older sister; defendant was uprooted from his home and sent to live with his grandparents who abused him; defendant suffered feelings of abandonment when his parents moved north and failed to send for him; he was exposed to domestic violence in the home of his grandparents; he was exposed to domestic violence in the home of his parents; he is a caring and loving father; his continuing relationship with his children including financial contributions; his relationship with his mentally disabled brother and his mentally disabled daughter; and all factors which relate to the defendant's childhood and family background.

Professor Richard Moran, a criminologist specializing in the correlation between age and crime, testified that if defendant were sentenced to prison rather than death, he could not be eligible for parole prior to age 64, by which time he would be in the age group least likely to commit violent crime. Therefore, the chances of defendant committing another violent crime would be minute.

A forensic social worker testified about defendant's social history. Defendant was raised in poverty. His often-absent father was a sharecropper and a migrant worker. As a two-year old, defendant had been injured in an automobile accident, but did not receive medical treatment. When defendant was four, he and his five-year old sister were left in an unheated home. While trying to light a stove, defendant's sister spilled some kerosene on her nightgown. When defendant lit a match, she burned to death.

Defendant's parents later moved to New Jersey, leaving defendant in the care of his grandparents for seven years. During his childhood, defendant was abused by both his grandfather and father.

Various family members testified that defendant was a loving and caring father, who also comforted his developmentally-disabled brother. Defendant's family asked the jury not to sentence defendant to death.

### c. *The Verdict*

After deliberating for two and one-half hours, the jury returned a unanimous verdict that defendant had committed the murder for the purpose of avoiding apprehension, *N.J.S.A.* 2C:11–3c(4)(f), and in the course of a robbery and burglary, *N.J.S.A.* 2C:11–3c(4)(g). It did not find aggravating factor *N.J.S.A.* 2C:11–3c(4)(c), that the murder involved aggravated assault to the victim. The jury further found that the aggravating factors outweighed all of the mitigating factors and that each aggravating factor alone outweighed all of the mitigating factors. The trial court sentenced defendant to death.

Later, the trial court sentenced defendant as a persistent offender on the non-capital counts of first-degree robbery and second-degree burglary. Accordingly, defendant received a sentence of life with a twenty-five year parole bar on the first degree robbery conviction to run consecutively to defendant's death sentence for capital murder. On the burglary conviction, defendant was sentenced to a concurrent term of five years in prison with a two-and-one-half year parole bar. Those sentences were made consecutive to prison terms previously imposed on defendant for unrelated crimes. Thus, defendant's aggregate sentence, irrespective of the death penalty, is life plus sixty-five years with a fifty-seven-and-one-half year parole disqualifier.

### - II -

We first consider defendant's contention that the trial court committed reversible error when it failed to instruct the jury in accordance with this Court's later decision in *State v. Mejia*, 141 *N.J.* 475, 662 *A.*2d 308 (1995).

- A -

■ Evaluation of defendant's *Mejia* argument begins with *Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792. In *Gerald,* this Court held as a matter of state constitutional law that only those murderers who intended to kill were eligible for the death penalty. Those who intended to inflict only serious bodily injury were not death-eligible under *N.J.S.A.* 2C:11–3(a)(1) or (2), even if their actions resulted in their victim's death. *Id.* at 69–70, 549 *A.*2d 792. Subsequent constitutional and statutory amendments have abrogated the *Gerald* rule by subjecting to the death penalty murderers who intended to cause only serious bodily injury. *N.J. Const.* art. I, ¶ 12 (1992); *L.* 1993, *c.* 111 (signed May 5, 1993). At the time of Schnaps's murder, however, only those who murdered with the intent to kill were death-eligible. Thus, the *Gerald* rule applies to the present case.

■ Under *Gerald,* the jury's determination whether defendant killed with the intent to kill or merely with the intent to inflict serious bodily injury, became the linchpin of capital-punishment eligibility. If the evidence produced at trial provided even a rational basis for a jury to convict a defendant of SBI murder rather than intentional murder, the trial court was compelled to "instruct the jury to specify which, if [either], of those findings forms the basis for conviction." *State v. Coyle,* 119 *N.J.* 194, 209, 574 *A.*2d 951 (1990). Under *Gerald,* the jury's key role became to determine whether defendant's intent was to kill or to inflict SBI. *State v. Moore,* 122 *N.J.* 420, 484, 585 *A.*2d 864 (1991).

■ In *Mejia, supra,* 141 *N.J.* at 481, 662 *A.*2d 308, this Court clarified *Gerald* by stating that a jury need not be unanimous on whether the defendant intended to kill or to injure seriously. The intent-to-kill requirement is not an element of murder, but a "triggering device" for the death-penalty phase of the trial. *Id.* at 486, 662 *A.*2d 308. Thus, unanimity is not required in making the *Gerald* determination. *Id.* at 487, 662 *A.*2d 308 (noting "unanimity requirement extends only to verdicts adverse to the defendant").

A jury can return a valid guilty verdict for purposeful-or-knowing murder even if it cannot agree that defendant killed intentionally. Such a verdict, however, will not support the imposition of the death penalty. *Id.* at 486, 662 *A.*2d 308. In *Mejia,* the record provided "a rational basis for a jury to find that defendant intended only to cause serious bodily injury." *Id.* at 481, 662 *A.*2d 308. The trial court's failure to instruct the jury about the possibility of returning a non-unanimous verdict on the defendant's intent thus constituted plain error.

In *State v. Harris,* 141 *N.J.* 525, 549, 662 *A.*2d 333 (1995), however, we held that a failure to give a non-unanimous *Mejia* charge could be considered harmless when the evidence of intent to kill was overwhelming and no rational basis existed for concluding that defendant had intended to inflict only serious bodily injury.

Although defendant's case was tried seven months before the issuance of *Mejia* and *Harris,* defense counsel requested a charge on a non-unanimous verdict. Before us, defendant argues that the absence of a non-unanimous verdict charge coerced the jury into returning a verdict of capital murder. The initial inquiry, then, is whether the evidence provided a rational basis to find that defendant intended to inflict only serious bodily, and not to kill.

- B -

Failure to charge in accordance with *Gerald/Mejia* requires the reversal of a death sentence if the record below contains evidence that is "minimally adequate to provide a rational basis for the jury to hold a reasonable doubt that the defendant intended to cause death." *Mejia, supra,* 141 *N.J.* at 489, 662 *A.*2d 308; *see also State v. Pennington,* 119 *N.J.* 547, 561, 575 *A.*2d 816 (1990) (characterizing rational-basis standard as a "low threshold"); *State v. Pitts,* 116 *N.J.* 580, 615, 562 *A.*2d 1320 (1989) (same). Accordingly, a rational basis may exist even though a jury likely would reject the defendant's serious-bodily-injury theo-

ry. *Mejia, supra,* 141 *N.J.* at 489, 662 *A.*2d 308; *see State v. Dixon,* 125 *N.J.* 223, 254, 593 *A.*2d 266 (1991) ("The error was not harmless because there was evidence in this case that could have sustained an SBI ... verdict. We do not suggest that such a verdict was likely, but merely that if the jury returned that verdict, the court could not reject it."). Satisfaction of the "minimally adequate/rational basis" standard, however, requires more than a mere "scintilla of the evidence." *Mejia, supra,* 141 *N.J.* at 489, 662 *A.*2d 308; *State v. Crisantos,* 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986).

We have found harmless error in cases where defendants' actions have been "so wantonly brutal that the jury could have concluded only that the defendant intended to cause death." *Mejia, supra,* 141 *N.J.* at 488, 662 *A.*2d 308; *see, e.g., Harris, supra,* 141 *N.J.* at 550, 662 *A.*2d 333 (victim was handcuffed and lying on ground when defendant shot him in back of head); *State v. Bey,* 129 *N.J.* 557, 579, 610 *A.*2d 814 (1992) (*Bey III*) (defendant stomped on victim with sufficient force to crush her chest), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *State v. Biegenwald,* 126 *N.J.* 1, 18, 594 *A.*2d 172 (1991) (*Biegenwald IV*) (defendant fired four gunshots into victim's head); *State v. McDougald,* 120 *N.J.* 523, 558–60, 577 *A.*2d 419 (1990) (defendant slashed victims' throats, bludgeoned one with baseball bat, and expressed intent to kill both before and after killings); *State v. Hightower,* 120 *N.J.* 378, 412–14, 577 *A.*2d 99 (1990) (*Hightower I*) (defendant shot victim at close range in chest, neck, and head, and then dragged victim into freezer); *State v. Rose,* 120 *N.J.* 61, 63–64, 576 *A.*2d 235 (1990) (*Rose II*) (defendant fired twelve-gauge shotgun point-blank into victim's stomach); *State v. DiFrisco,* 118 *N.J.* 253, 571 *A.*2d 914 (1990) (*DiFrisco I*) (defendant shot victim four times in head and admitted intention to kill), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *Pitts, supra,* 116 *N.J.* at 614–20, 562 *A.*2d 1320 (defendant threatened to kill victims two days before murders, inflicted twenty-five to thirty stab wounds with combat knife, cut one victim's throat twice, and paused to take victim's pulse to verify death); *State v.*

*Hunt,* 115 *N.J.* 330, 374–77, 558 *A.*2d 1259 (1989) (defendant stated intent to kill immediately prior to stabbing victim twenty-four times).

- C -

Schnaps was brutally murdered. Her killer struck her fifteen times in the head with a blunt instrument. He struck her with sufficient force and frequency to fracture her skull in several places, knock out her teeth, and break her jaw. He further applied sufficient pressure to her neck to cause severe bruising. Reviewing that medical evidence in *Harvey I, supra,* we wrote that "such repeated blows can support a jury finding of intentional murder." 121 *N.J.* at 413, 581 *A.*2d 483.

Relying substantially on the assertions in defendant's confession, however, we concluded that the evidence as a whole required reversal. We reached that conclusion because "the record provided a rational basis for the jury to find that [defendant] intended to cause only serious bodily injury." *Id.* at 414, 581 *A.*2d 483 (internal quotations omitted). Contrary to the dissent's assertions, all of the "pertinent facts" contained in Harvey's confession were not before the jury in the retrial. *Post* at 299, 699 *A.*2d at 686. Not before the jury was defendant's confession that he had struck the victim only once in response to being punched in the nose. *Harvey I, supra,* 121 *N.J.* at 412, 581 *A.*2d 483. That confession provided a rational basis for a juror in the first trial to have concluded that Harvey intended only to injure his victim and not kill her. The absence of Harvey's confession is a critical distinction between the record in *Harvey I* and that in the present case.

- D -

In determining whether a rational basis existed for a *Gerald* charge, we are confined to the evidence in the record. *See Bey III, supra,* 129 *N.J.* at 581, 610 *A.*2d 814 ("[W]e examine scrupulously the evidence that was adduced at trial to see whether

the jury had a rational basis for finding that the defendant could have intended only serious bodily injury."); *Dixon, supra,* 125 *N.J.* at 253, 593 *A.*2d 266 (noting appellate role is to ask if jury answered question on death-eligibility). We may not consider the evidence in the first trial. In brief, defendant's confession, which was admitted in the first trial but excluded from the second, is not part of the record.

Absent the confession, the evidence does not provide a rational basis for the supposition that defendant struck his victim to ward off her attack. The dissent attempts to distinguish Schnaps's murder from related cases where we have found harmless trial courts' failure to provide a non-unanimity instruction. According to the dissent, repeated bludgeoning to the head by a hammer-like instrument, such as the one used by defendant, "is not like a gun fired at close range into a person; the victim's death is not so assured." *Post* at 302, 699 *A.*2d at 687 (citing *Hightower I, supra,* 120 *N.J.* at 412–14, 577 *A.*2d 99 (finding that defendant shot victim with a .32–caliber handgun from close range in the chest, neck, and head)). Incomprehensibly, the dissent also concludes that, unlike other cases, "there is no evidence that defendant took further steps to assure Ms. Schnaps's death." *Post* at 302, 699 *A.*2d at 687 (citing *Hightower I, supra,* 120 *N.J.* at 413, 577 *A.*2d 99 (finding that defendant dragged victim into freezer); *Pitts, supra,* 116 *N.J.* at 618, 562 *A.*2d 1320 (noting that defendant took victim's pulse)). We disagree. The inescapable inference created by the objective facts, especially the severity and number of Schnaps's wounds, is that defendant intended to kill her.

- E -

Nor is defendant's argument strengthened by the trial court's delivery of a *Gerald* charge. Given this Court's reversal of the conviction in the first trial, the inclusion of a *Gerald* charge in the second trial is understandable, if unnecessary. In reversing the conviction in the first trial, which included defendant's confession, we did not predetermine the need for such a charge in a retrial in

which the confession was excluded. Likewise, the inclusion of charges on the lesser-included offenses of aggravated and reckless manslaughter do not compel the need for a *Gerald/Mejia* charge. Those charges reflect the trial court's caution when instructing the jury.

- F -

We are unpersuaded also by defendant's contention that he was entitled to a *Mejia* charge. Defendant bases that contention on the State's acknowledgment that when defendant entered the victim's apartment, he intended to commit only burglary, not murder. Similarly unpersuasive is defendant's attempt to derive support from the State's argument, made pursuant to *N.J.S.A.* 2C:11-3c(4)(c), that defendant, when committing aggravated assault on the victim, inflicted some blows not to kill, but to cause pain. Even if defendant did not intend to kill Schnaps when he first entered her apartment, the evidence reveals that he changed his mind once he began to assault her. Whether this occurred in a "brief moment," as the dissent argues, or not is irrelevant. *Post* at 301, 699 *A.*2d at 686.

Furthermore, a *Gerald/Mejia* charge is not required simply because the prosecution relies on *N.J.S.A.* 2C:11-3c(4)(c). Overwhelming evidence establishes that even if defendant struck the first few blows merely to cause pain, he struck the others to kill. The trial court did not err in failing to tell the jury that it could return a non-unanimous verdict on whether defendant intended to kill. Defendant's attack was "so wantonly brutal that the jury could have concluded only that the defendant intended to cause death." *Mejia, supra,* 141 *N.J.* at 488, 662 *A.*2d 308.

- III -

Defendant contends that the trial court's instruction on murder improperly precluded the jury from considering the non-capital offense of felony murder. Specifically, defendant alleges that the instruction and the verdict sheet prevented the jury from

considering felony murder until after it first had found him guilty of purposeful-or-knowing murder. Defense counsel did not object to the charge or the verdict sheet. Hence, the issue arises as a matter of plain error under *Rule* 2:10–2. The issue is whether the error "is clearly capable of producing an unjust result." We recognize that the charge was flawed, but conclude that the error was not capable of producing such a result.

- A -

Defendant was indicted "for purposely or knowingly causing Schnappes [sic] death or serious bodily injury resulting in death." The indictment also included counts for second-degree robbery and second-degree burglary. In addition, the State relied on aggravating factor *N.J.S.A.* 2C:11–3c(4)(g) (the murder was committed during the course of a robbery and a burglary). Although defendant was neither indicted for, nor charged with felony murder, *N.J.S.A.* 2C:11–3a(3), the court, in accordance with *Purnell, supra,* 126 *N.J.* at 530–34, 601 *A.*2d 175, instructed the jury on felony murder. A conviction for felony murder, however, does not render a defendant eligible for the death penalty. *N.J.S.A.* 2C:11–3c; *Dixon, supra,* 125 *N.J.* at 255, 593 *A.*2d 266. In *Purnell,* this Court held that the death penalty could not be imposed for a murder that was committed in the course of a felony if the jury was not permitted to consider the non-capital verdict of felony murder. Although the trial court here gave a felony-murder charge, the verdict sheet makes clear that the jury could not have considered a verdict on felony murder without first finding defendant guilty of purposeful-or-knowing murder.

- B -

The court instructed the jurors that page one of the verdict sheet provided them with four choices when considering the murder charge. They could find defendant not guilty, guilty of murder, guilty of aggravated manslaughter, or guilty of reckless

manslaughter. Page one did not present felony murder as an option.

The court instructed the jurors that if they found defendant not guilty of murder, they were to ignore pages two and three of the verdict sheet, and proceed directly to page four, where they were to consider the robbery count. Only if the jury found defendant guilty of murder were they to proceed to pages two and three. Page two directed the jury to determine whether defendant had committed the killing by his own conduct and purposely or knowingly. If the jury answered affirmatively, the verdict sheet directed them to page three. That page directed the jury to the *Gerald* issue, whether defendant had acted with the intent to kill or to inflict serious bodily injury. It also directed the jury to consider whether defendant was guilty of felony murder. Thus, unless the jurors first found defendant guilty of purposeful-or-knowing murder, they would not have reached the felony-murder alternative. In effect, the verdict sheet distracted the jury from convicting the defendant of felony murder, but not purposeful-or-knowing murder.

In a capital case, "the jury must be given every opportunity to convict of the charge not carrying the death penalty." *Mejia, supra,* 141 *N.J.* at 484, 662 *A.*2d 308 (quoting John M. Cannel, *New Jersey Criminal Code, Annotated,* Comment 13 to *N.J.S.A.* 2C:1–8(e)). Here, the combination of the jury charge and the verdict sheet led the jury away from rendering a non-capital verdict of felony murder. That was error.

On the facts of this case, however, the flaws in the charge and verdict sheet do not constitute plain error. Defendant has not advanced any plausible version in which the jury could have convicted him of felony murder without also convicting him of purposeful-or-knowing murder. Nor can we ascertain any such version from the record. In sum, the error was not clearly capable of producing an unjust result.

## - IV -

Following a *Rule* 104 hearing, the trial court permitted the prosecution to admit into evidence the results of a DNA test kit known as the "PM" or "polymarker" test. The kit, which is manufactured by Roche Laboratories and marketed by the Perkin-Elmer Corporation, is sold under the trade name "AmpliType PM." This polymarker evidence was an important link in tying defendant to the crime. We accept the admission into evidence of results of polymarker testing, which is used primarily on small samples of genetic material, such as blood stains.

On this record, we conclude that the scientific community generally accepts polymarker testing, including dot-intensity analysis. Generally speaking, dot-intensity analysis is a means of identifying a single sample from two sources, such as a blood stain that contains the blood of two people. Such samples may be present at the scene of a violent crime.

The State's experts identified the genetic markers for the victim and the perpetrator. Through polymarker testing they determined that the box-spring sample, which contained the victim's blood, also contained blood with the same genetic markers as defendant's blood. The experts concluded that defendant's genotype for the genetic markers was shared by only one-in-1,400 African Americans. We hold that the trial court did not err in admitting the testimony of the State's experts about the results of the DNA tests. The weight of that evidence was for the jury.

DNA testing is an evolving science. The general acceptance or rejection of a test may change over time. Even a test that is accepted generally, moreover, may attract critics. One generally accepted DNA test involves restriction fragment length polymorphism (RFLP) analysis. Because the blood sample in this case was so small, the State's experts could not use RFLP analysis. Instead, they used tests based on a Polymerase Chain Reaction (PCR): the HLA DQ ALPHA (DQ Alpha) and polymarker (PM) tests.

We begin with a basic explanation of DNA. The explanation necessarily uses technical terms and describes scientific methods. Our purpose is to discuss the basic concepts to the extent necessary for comprehension of the trial court's decision to admit the DNA evidence.

In the course of our discussion, we shall review objections raised by defendant and the dissent to the admission of the DNA evidence. Generally, the defense repeats arguments rejected by the trial court. The dissent, however, raises several objections not raised by the defense either at trial or on this appeal. Both the defense and the dissent share the objective of precluding the admission of DNA evidence proving that defendant murdered Irene Schnaps. Our scrutiny of the record leads to the conclusion that the trial court did not err in admitting the DNA evidence. The weight of the evidence was a matter for the jury.

- A -

1. *Deoxyribonucleic Acid (DNA)*

Deoxyribonucleic acid (DNA) is a molecule of genetic materials shaped like a double-helix or spiral ladder. In every person, each cell with a nucleus contains a copy of that person's DNA. Thus, DNA serves as a blueprint for the human body.

The sides of the DNA helix or ladder are composed of two chains comprised of sugars and phosphates. Rungs or steps connect the two sides of the ladder. The rungs consist of pairs of molecules called "bases" or "nucleotides," which consist of four types: adenine (A), cytosine (C), guanine (G), and thymine (T). Nucleotides from separate DNA strands bond in a specific order to form the rungs that connect the sides of the DNA ladder. C bonds only with G, and A bonds only with T. Thus, for example, if the nucleotides on one strand are CGAT, the corresponding nucleotides on the attached strand will be GCTA.

The order of the base pairs along the DNA molecule comprises an individual's genetic code. Human DNA contains approximately

three to four billion base pairs, known as the "genome." These base pairs govern the production of bodily proteins.

A gene is a sequence of nucleotides on a DNA strand responsible for producing a particular protein. The sequence of the nucleotides can vary. The possible sequences or variations are called "alleles." Thus, an allele is simply a version of a gene.

A gene's position on a chromosome is its locus. In different individuals, genes may be "polymorphic," meaning that they may take different forms or contain different sequences of base pairs. The polymorphic genes, which vary from one person to another, provide the basis for DNA identification. Most DNA has no known function, but even non-functional DNA remains important in forensic analysis.

During mitosis, or cell division, each chromosome is copied. The paired nucleotides separate, dividing the chromosome's DNA molecule into two separate strands. Free-floating nucleotides attach to the exposed nucleotides of the separated strands in accordance with the G–C, A–T rule. Thus, each strand reconstitutes identical DNA molecules. When the cell divides, these two identical chromosomes enter newly-created "daughter" cells. Each new cell has the identical genetic composition as the original cell.

All cells contain the same chromosomal composition. No two individuals, except identical twins, have the same nucleotide sequences throughout their DNA. DNA testing conducted on cells from various parts of the same body, whether blood, skin, semen, saliva, or hair will yield the same results. As in this case, DNA analysis can help identify donors of genetic material, such as blood.

### 2. *Restriction Fragment Length Polymorphism (RFLP)*

At present, the most widely accepted DNA test is the RFLP analysis. *See, e.g., Fishback v. People,* 851 *P.*2d 884, 892 (Colo. 1993) (holding that "no serious dispute exists as to whether the

techniques involved in RFLP analysis are generally accepted"); *State v. Moore*, 268 *Mont.* 20, 885 *P.*2d 457, 468 (1994) (concluding that "the theory underlying DNA and RFLP technology is generally not open to serious attack and [ ] such evidence is widely admitted in various state and federal courts and jurisdictions"); *State v. Streich*, 163 *Vt.* 331, 658 *A.*2d 38, 48 (1995) (noting that "we cannot find any recent decision under any standard of admissibility which refuses to admit the DNA match result based on" the RFLP technology). Recently, in *State v. Marcus*, the Appellate Division recognized that the scientific community generally accepts RFLP analysis. 294 *N.J.Super.* 267, 683 *A.*2d 221 (1996). As Judge Skillman stated, "DNA testing by the RFLP method is generally accepted and is sufficiently reliable to warrant its admission in criminal cases." *Id.* at 285, 683 *A.*2d 221. RFLP was not the DNA analysis employed in this case. A brief description of RFLP, however, may be useful as background information.

RFLP focuses on non-functional regions of DNA known as variable-number tandem repeats (VNTRs). In these regions, which typically range from 500 to 10,000 pairs of nucleotides, a core sequence of approximately fifteen to thirty-five base pairs is repeated many times consecutively along the chromosome. The number of repeats varies among individuals. At a given locus or site on a chromosome, sequences with different numbers of repeated units are known as VNTR alleles. Because different VNTR alleles contain different numbers of repeats, these alleles can be identified by their lengths. National Research Council, *The Evaluation of Forensic DNA Evidence* 14–15 (1996) (*NRC Report* ).

In RFLP analysis, the recovered DNA sample and the sample from the suspect are treated with a restriction enzyme, which seeks out a specific nucleotide pattern on the DNA helixes. It then fragments the molecules at those sites. Because of VNTRs, the locations of these sites, and the lengths of the resulting fragments, differ among individuals. Through a process called "gel electrophoresis" the DNA fragments are sorted by size and

split into single strands. These strands bond to a nylon membrane, where a specially treated and radioactively-tagged single strand of DNA, called a "genetic probe," is applied. The genetic probe bonds with a targeted VNTR sequence.

The nylon membrane is then placed in contact with a piece of X-ray film. The radioactivity of the probes exposes the film, producing a pattern of bands, like the bar-code on a box in a supermarket, where the probes have attached to VNTRs. This bar-code image is called an "autoradiograph" or "autorad."

Fragments from different donors contain different numbers of repeat units, with a corresponding variation in the lengths of the fragments. Typically, radioactive probes need days or even weeks to expose the film. *Id.* at 18. Generally speaking, RFLP testing is time-consuming and may require months for a complete analysis. *Ibid.*

Comparison of the location of the bands reveals whether the targeted VNTR in the subject's DNA matches the DNA from the recovered genetic material. That analysis can lead with a high degree of certainty to a correlation between the DNA samples.

The next step involves analysis of population statistics, which reveals the likelihood of a random match between the samples. Using single-locus probes, the probability of finding a random match between unrelated individuals on all bands of a DNA fingerprint is less than one in ten million. Using one multi-locus probe, the probability is about one in thirty-three billion. Thomas M. Fleming, Annotation, "Admissibility of DNA Identification Evidence," 84 *A.L.R.*4th 313, 324 (1991).

One problem with RFLP testing is that it requires a large quantity of high-quality genetic material. For example, it requires at least a quarter-sized blood stain or a dime-sized semen stain. Unless those samples are recovered when relatively fresh, they will degrade into fragments too small for RFLP analysis. *Id.* at 320. Cellmark attempted RFLP testing in this case. The samples, however, were too degraded to permit RFLP analysis.

Thus, Cellmark turned to a newer technology, which involved Polymerase Chain Reaction (PCR).

### 3. *PCR*

When, as here, the quantity or quality of genetic material recovered from a crime scene is insufficient to allow RFLP analysis, forensic scientists have used the PCR process to amplify the DNA to produce an amount suitable for testing. The PCR process can copy a segment of DNA millions of times. *NRC Report, supra,* at 22–23. With the resulting genetic product, scientists can conduct "allele-specific probe" analysis. Fleming, *supra,* 84 *A.L.R.*4th at 322–23.

The PCR process copies DNA fragments similar to the way DNA replicates itself during mitosis. Through heating the DNA sample in a thermal cycler, the process separates the helix into separate strands. Primers composed of short DNA segments are added to define the target sequence of DNA. Then, a basic solution containing the enzyme DNA polymerase and the four basic nucleotides are added to the primed DNA sample. The added nucleotides pair with the exposed nucleotides on the separated target-strands in accordance with the G–C, A–T pairing rule. From the original DNA segment, two identical segments result. The thermal cycler runs through its cycle approximately thirty-two times, amplifying the original sample by a factor of two billion. Currently, PCR technology effectively amplifies only small regions of DNA. Accordingly, PCR cannot be used to amplify longer VNTRs for RFLP testing. *NRC Report, supra,* at 69–70.

PCR-based testing methods have several advantages over RFLP analysis. They are relatively simple processes and can yield results within a short period of time, often within twenty-four hours. Of particular importance to the present case, the PCR process also makes possible DNA tests on small amounts of genetic material.

A disadvantage of PCR-based tests, however, is that the identified genes have fewer alleles than VNTRs. Hence, scientists must

examine more loci to produce the same amount of information about the likelihood that two individuals share a profile. *Id.* at 71. Also, some of the loci examined by PCR-based tests are functional genes. Unlike non-functional VNTR markers, functional genes are more susceptible to natural selection, a susceptibility that might undermine their usefulness in matching DNA samples. *Ibid.* Contamination also is of concern in PCR testing. The technology is so efficient that even small contaminants can be replicated along with the targeted DNA. *Ibid.* Cellmark used two types of PCR-based tests in defendant's case: the HLA DQ Alpha (DQ Alpha) and polymarker (PM) tests.

### a. *HLA DQ Alpha Test*

The DQ Alpha test reveals an individual's form of alleles for the human-leukocyte-antigen DQ Alpha gene. The purpose of the DQ Alpha test is to identify the genotype or the two alleles that comprise the DQ Alpha gene present in the DNA sample. That result is then compared with the DQ Alpha genotype of the suspect. If the genotypes match, then the suspect cannot be excluded as a possible donor. Genetics population databases then produce the frequency with which the suspect's genotype appears in the population. Although eight alleles have been identified at the DQ Alpha locus, only six are commonly used in forensic work. *Ibid.* Each of those six alleles can be distinguished by specific enzyme probes. *Ibid.* The six alleles for DQ Alpha are denominated as 1.1, 1.2, 1.3, 2, 3, and 4. For the DQ Alpha gene, there are twenty-one possible pair combinations or genotypes.

To interpret the results, the test uses a test strip with six chemical dots. Each dot consists of a specific enzyme probe that selectively binds to one of the six DQ Alpha alleles. Because the probes, rather than the DNA, are fixed on the membrane, this is called a "reverse" blot. *Ibid.* This test strip is then immersed in a solution containing the PCR product. The alleles for DQ Alpha present in the PCR product then attach to their corresponding enzyme probe on the test strip. Where the alleles bond, the dots

turn blue. Two of the six dots will turn blue to indicate which two alleles constitute an individual's genotype. If an individual is homozygous, meaning that the two DQ Alpha alleles are identical, only one dot will turn blue.

The DQ Alpha test performed on defendant's blood revealed that his genotype for DQ Alpha is 4,4 or homozygous. Approximately 17% of the entire population (about one-in-six people) and 11.9% of the African American population (about one-in-eight) share that genotype.

DQ Alpha tests performed on a blood stain from the box-spring fabric indicated the presence of the DQ Alpha alleles 2 and 4. Schnaps's genotype for DQ Alpha was 2,4.

If the blood stain on the box spring were from a single donor, defendant could have been excluded because he does not possess the 2 allele. Schnaps, whose genotype matched the alleles, however, could not be excluded. If, however, the blood on the box spring is from a mixed sample, i.e., from more than one donor, then defendant cannot be excluded. The reason is that the 4 allele, which defendant possessed, was present in the blood stain. Based on other evidence, the prosecution established that the box-spring stain was a mixed sample.

Courts in New Jersey and in other jurisdictions have admitted results of PCR technology and the DQ Alpha test as scientifically reliable. *See State v. Dishon,* 297 *N.J.Super.* 254, 277, 687 *A.*2d 1074 (App.Div.), *certif. denied,* 149 *N.J.* 144, 693 *A.*2d 112 (1997) (finding that testimonial hearing was unnecessary to establish the general acceptance of DQ Alpha DNA testing); *State v. Williams,* 252 *N.J.Super.* 369, 381, 599 *A.*2d 960 (Law Div.1991) (holding that "overwhelming and persuasive evidence" pointed to general acceptance of PCR process and DQ Alpha test); *State v. Haddock,* 257 *Kan.* 964, 897 *P.*2d 152 (1995) (admitting results of DQ Alpha test as scientifically reliable); *People v. Palumbo,* 162 *Misc.*2d 650, 618 *N.Y.S.*2d 197 (Sup.Ct.1994) (same); *State v. Gentry,* 125 *Wash.*2d 570, 888 *P.*2d 1105, *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 131, 133 *L.Ed.*2d 79 (1995) (same).

Defendant does not contest the admissibility of the PCR/DQ Alpha test results. He objects, however, to the admissibility of the results of the polymarker test, the validity of which the dissent concedes. *Post* at 236, 699 *A*.2d at 654. Because of defendant's objection, we briefly discuss the polymarker test.

b. *The Polymarker (PM) Test*

The PM test works like the DQ Alpha test, but instead of testing for the composition of one gene, it tests for six genes. The six genes tested in the PM test are: LDLR (low density lipoprotein receptor), GYPA (glycophorin A), HBGG (hemoglobin gammaglobulin), D7S8, and GC (Group Component). Each of those genes consists of combinations of either two or three different alleles. A blue-dot test, similar to that used in the DQ Alpha test, determines the genotype for each gene. As explained by Ms. Cooper, one of the State's experts, the PCR test begins by amplifying the amount of DNA. Then, the DNA is passed over a polymere test strip. When the DNA finds its type on that locus, the dot changes color. Each combination of alleles is associated with a population frequency that is expressed as a percentage.

After ascertaining a sample's genotypes and population frequencies for each of the five individual genes, a mathematical formula known as the "product rule" reveals the likelihood that another individual in the relevant population would share the test subject's genotype for all five targeted genes. The product rule, which gives the profile frequency in a population as a product of coefficients and allele frequencies, rests on the assumption that a population can be treated as a single, randomly mating unit. *NRC Report, supra,* at 5. Under the product rule, the population frequencies for each of the six genotypes are multiplied by one another.

Defendant's genotype for LDLR is present in 56% of the African–American population, his GYPA in 50%, his HBGG in 27%, his D7S8 in 45%, his GC in 17%, and his DQ Alpha in 11.9%. Applying the product rule, the prosecution's expert testified that

one–in–170 African Americans would share defendant's genotype for the LDLR, GYPA, HBGG, D7S8, and GC loci. The product rule equation would be: $.56 \times .5 \times .27 \times .45 \times .17 = .0058$, or, expressed as a ratio, about one–in–170 African Americans. By including defendant's DQ Alpha genotype frequency in the product rule equation along with the polymarker loci, only one–in–1400 African Americans would share defendant's composite genotype for all six genes. The product rule equation would be: $.56 \times .5 \times .27 \times .45 \times .17 \times .119 = .00069$. Expressed as a ratio, the result is about one–in–1400 African Americans.

### 4. *The Dot–Intensity or Association–of–Alleles Technique*

In addition to his general objection to the polymarker test, defendant contends that the polymarker test cannot accurately analyze a mixed-blood sample. At trial, the experts described this method of analysis of interpreting the polymarker test on a mixed-blood sample as involving "the association of alleles." Scientific articles describe it as "dot-intensity" analysis, a description that we adopt generally in this opinion.

At the pretrial hearing, Dr. Word, one of the State's experts, testified that the polymarker test is designed so that if a single blood source contributes a pair of heterozygous alleles (i.e., A, B or B, C but not A, A), the two alleles will turn blue in equal intensities. If, however, two or more blood donors contribute the same allele, that dot would be more intense or a darker blue than if an individual donor contributed only one such allele. The same result would follow if one blood donor contributed two of the same allele so as to result in a pair of homozygous alleles (i.e., A, A or B, B but not A, B). In sum, the determination whether a sample is from more than one source of blood depends on the intensity of the color of the dots.

Cellmark performed PM tests on three samples: (1) on a bloody towel, assumed to contain blood from the victim only; (2) on a sample of defendant's blood; and (3) from a portion of the box-spring cover that contained a mixture of blood. The polymarker

test on the blood removed from the box spring revealed the presence of both possible alleles (A and B) for LDLR, GYPA, and D7S8, and all three possible alleles (A, B, and C) for HBGG and GC. An individual can possess, at most, two different alleles. Consequently, the presence of three different alleles at the HBGG and GC loci demonstrated that the DNA sample from the box spring was a mixture of blood from more than one individual.

Dr. Word testified that the PM test conducted on the mixed-blood sample from the box spring revealed two distinct sources. Two sets of alleles caused the color imbalances in the dots from the box-spring sample. On the test strip, some of the blue dots appeared darker, but others were lighter. None of the dots, however, was lighter than the control dot. Those dot-intensity imbalances resulted from the presence of some alleles in pairs and other singly.

Using dot-intensity analysis, Dr. Word explained that a theoretical subtraction of the victim's blood from the PM results of the box-spring sample revealed the genotype of the second subject. She explained that if all three alleles for GC were present (A, B, and C) and the A allele-dot was darker on the test strip, the sample contained two A alleles, one B allele, and one C allele. The genotypes of the contributing donors, then, had to be either AB and AC, or AA and BC. No other combinations consisted of two A alleles, and only one each of B and C.

Based on dot-intensity analysis of the blood stain from the box spring, the State's experts concluded that the blood could have been a mixture of defendant's blood with that of Schnaps's. Cellmark made only two assumptions in its analysis: (1) that Schnaps was a donor to the blood on the box-spring sample; and (2) that the blood was a mixture of two people.

The PM test for GC on the box spring revealed the presence of the A, B, and C alleles. The A dot was darker than the other two. That difference indicated that the composition of the GC in the sample consisted of two A alleles, plus the B and C alleles. If the sample had two donors, the possible combinations were AA and

BC, or AB and AC. Schnaps was AC type for GC. The remaining donor therefore had to be AB. Defendant's genotype was AB.

The D7S8 test on the box-spring sample revealed the A and B alleles, with the A dot being darker. The only possible combination, then, was AA and AB. Schnaps was AA type for D7S8. The remaining donor had to be AB. Defendant's genotype was AB.

The HBGG test revealed the A, B, and C alleles at equal intensities. Because no dot was darker, Dr. Word testified that the possible combinations could be only AA and BC, AB and CC, or AC and BB. Schnaps was BB type for HBGG. Cellmark concluded that the remaining donor, then, had to be AC. Defendant's genotype was AC.

The GYPA test revealed A and B alleles with the A dot being darker. Schnaps was AA type for GYPA. The other donor had to be AB. Defendant was AB.

The LDLR test revealed A and B alleles with the B dot being darker. Schnaps was AB type for LDLR. The other donor had to be BB. Defendant's genotype for LDLR was BB.

Based on those test results, the State's experts concluded that neither Harvey nor Schnaps could be excluded as donors to the box-spring blood sample. As with the RFLP test, *infra* part IV.A.2., the second step involves analysis of population statistics. Our discussion of the statistics in the present case is at *infra* part VI.

- B -

1. *Standard of Review*

The first question concerns the standard of appellate review of a trial court's decision on the admissibility of DNA evidence. Generally, appellate courts review a trial court's determination of the admissibility of evidence for an abuse of discretion. *State v. Conklin,* 54 *N.J.* 540, 545, 258 *A.2d* 1 (1969). The question remains, however, whether the abuse-of-discretion stan-

dard should apply to decisions concerning the admission of novel scientific evidence. We begin by recognizing that the best time to make the record on admission of such evidence is in a *Rule* 104 hearing.

 The party offering the evidence bears the burden of proof. *Windmere, Inc. v. International Ins. Co.*, 105 *N.J.* 373, 378, 522 *A.2d* 405 (1987). Trial lawyers must make myriad choices in deciding how best to present or refute novel scientific evidence. Those choices construct the universe of discourse within which the trial court decides whether the scientific community considers the evidence acceptable generally. The choices also influence the presentation of the evidence to the jury and the record on appeal.

Unlike many other evidentiary issues, whether the scientific community generally accepts a methodology or test can transcend a particular dispute. *People v. Miller*, 173 *Ill.*2d 167, 219 *Ill.Dec.* 43, 61, 670 *N.E.*2d 721, 739 (1996) (McMorrow, J., concurring), *cert. denied*, —— *U.S.* ——, 117 *S.Ct.* 1338, 137 *L.Ed.*2d 497 (1997). In determining the general acceptance of novel scientific evidence in one case, the court generally will establish the acceptance of that evidence in other cases. *Jones v. United States*, 548 *A.*2d 35, 40 (D.C.1988). Notwithstanding the trial court's better position to shape the record and make factual determinations, appellate courts retain an important residual role for questions concerning the admission of scientific evidence. Like trial courts, appellate courts can digest expert testimony as well as review scientific literature, judicial decisions, and other authorities. To the extent that general acceptance focuses on issues other than a witness's credibility or qualifications, deference to the trial court is less appropriate. *Miller, supra*, 219 *Ill.Dec.* at 60–62, 670 *N.E.*2d at 738–40 (McMorrow, J., concurring).

 When reviewing a decision on the admission of scientific evidence, an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature. In the rapidly changing world of modern science, continuing research may affect the scientific

community's acceptance of a novel technology. By reviewing post-trial publications, an appellate court can account for the rapid pace of new technology. The continuing review also recognizes that general acceptance may change between the time of trial and the time of appellate review. *State v. Bible*, 175 *Ariz.* 549, 858 *P.*2d 1152, 1189 n. 33 (1993), *cert. denied*, 511 *U.S.* 1046, 114 *S.Ct.* 1578, 128 *L.Ed.*2d 221 (1994); *see also Hadden v. State*, 690 *So.*2d 573, 579 (Fla.1997) (finding that an appellate court "should consider the issue of general acceptance at the time of appeal rather than at the time of trial"). *But see Lindsey v. People*, 892 *P.*2d 281, 290–91 n. 25 (Colo.1995) (reasoning that *Frye v. United States*, 293 *F.* 1013 (D.C.Cir.1923), "requires nothing more than general acceptance at the time the evidence is admitted"). Moreover, by examining such additional information, an appellate court can prevent any injustice rendered by the admission or exclusion of the evidence at the trial level. *Bible, supra*, 858 *P.*2d at 1189 n. 33 (stating that if "the result obtained is the product of invalid scientific theory, there is no good reason to accept it simply because we were fooled at the inception of the inquiry").

On this appeal, we do not decide whether a different standard of appellate review should apply to a trial court's decision to admit or exclude expert testimony in civil cases, where the focus is not on whether the scientific evidence is generally accepted, but rather whether it derives from a reliable methodology supported by some expert consensus. *Landrigan v. Celotex Corp.*, 127 *N.J.* 404, 417, 605 *A.*2d 1079 (1992); *Rubanick v. Witco Chem. Corp.*, 125 *N.J.* 421, 449, 593 *A.*2d 733 (1991). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 *U.S.* 579, 113 *S.Ct.* 2786, 125 *L.Ed.*2d 469 (1993), the United States Supreme Court adopted essentially the same standard for federal courts in both civil and criminal cases. The question of the appropriate standard of appellate review for federal courts is currently before the United States Supreme Court. *Joiner v. General Elec. Co.*, 78 *F.*3d 524 (11th Cir.1996), *cert. granted*, —— *U.S.* ——, 117 *S.Ct.* 1243, 137 *L.Ed.*2d 325 (1997). We restrict our analysis to the standard of review of evidence that the trial court has found to be generally accepted.

## 2. *Standard for Admission of Expert Testimony*

 *New Jersey Rule of Evidence* 702, which is virtually identical to former *Evid. R.* 56(2), governs the admission of expert testimony. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In effect, this rule imposes three basic requirements on the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
>
> (2) the subject of the testimony must be at a state of the art such that an expert's testimony could be sufficiently reliable; and
>
> (3) the witness must have sufficient expertise to explain the intended testimony. [*State v. Kelly,* 97 *N.J.* 178, 208, 478 *A.2d* 364 (1984); *N.J.R.E.* 702, 1991 Supreme Court Committee Comment.]

Defendant does not contest that DNA testing is beyond the ken of the average juror. Likewise, the defense does not dispute the qualifications of Ms. Cooper or Dr. Word as experts in the field of DNA testing. The sole issue is whether the scientific community sufficiently accepted the DNA tests to justify admission of the testimony of the State's experts.

In criminal cases we continue to apply the general acceptance or *Frye* test for determining the scientific reliability of expert testimony. In *Frye, supra,* the court wrote:

> [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained *general acceptance in the particular field in which it belongs.*
>
> [293 *F.* at 1013–14 (emphasis added).]

 In 1993, the United States Supreme Court abandoned *Frye*'s general-acceptance standard as the exclusive test for admitting scientific testimony in favor of the more relaxed standards of *Federal Rule of Evidence* 702. *Daubert, supra,* 509 *U.S.* 579, 113 *S.Ct.* 2786, 125 *L.Ed.2d* 469. Even before the United States Supreme Court decided *Daubert,* this Court had relaxed the test

for admissibility of scientific evidence in toxic-tort cases. *Landrigan, supra,* 127 *N.J.* at 404, 605 *A.*2d 1079; *Rubanick, supra,* 125 *N.J.* at 421, 593 *A.*2d 733. We have been cautious in expanding the more relaxed standard to other contexts. *State v. Fertig,* 143 *N.J.* 115, 126, 668 *A.*2d 1076 (1996); *State v. Spann,* 130 *N.J.* 484, 509–10, 617 *A.*2d 247 (1993); *State v. J.Q.,* 130 *N.J.* 554, 572–73, 617 *A.*2d 1196 (1993). Thus, the test in criminal cases remains whether the scientific community generally accepts the evidence. *Spann, supra,* 130 *N.J.* at 509, 617 *A.*2d 247; *Windmere, supra,* 105 *N.J.* at 386, 522 *A.*2d 405.

A proponent of a newly-devised scientific technology can prove its general acceptance in three ways:

(1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis;

(2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and

(3) by judicial opinions that indicate the expert's premises have gained general acceptance.

[*Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364 (citing *State v. Cavallo,* 88 *N.J.* 508, 521, 443 *A.*2d 1020 (1982)).]

The burden to "clearly establish" each of these methods is on the proponent. *Williams, supra,* 252 *N.J.Super.* at 376, 599 *A.*2d 960.

Courts have applied this test in various contexts to evaluate the reliability of scientific evidence. *See, e.g., Kelly, supra,* 97 *N.J.* at 209, 478 *A.*2d 364 (admitting expert testimony relating to battered woman's syndrome); *State v. Zola,* 112 *N.J.* 384, 412–13, 548 *A.*2d 1022 (1988) (admitting expert testimony that modified-chemical test detected presence of saliva on victim), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989); *Windmere, supra,* 105 *N.J.* at 373, 522 *A.*2d 405 (concluding that voice-print evidence does not derive from reasonably reliable scientific method); *Romano v. Kimmelman,* 96 *N.J.* 66, 82, 474 *A.*2d 1 (1984) (holding breathalyzer scientifically reliable); *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981) (admitting hypnotically refreshed testimony when subjected to strict safeguards ensuring reliability of hypnotic

procedure); *State v. King*, 215 *N.J.Super.* 504, 518–20, 522 *A.*2d 455 (App.Div.1987) (finding isoenzyme test, which detects presence in blood of six distinct enzyme systems, held scientifically reliable); *Williams, supra,* 252 *N.J.Super.* at 378–83, 599 *A.*2d 960 (holding PCR/DQ Alpha test and Gm/Km blood tests sufficiently reliable to be admitted at trial).

### 3. *General Acceptance*

Proof of general acceptance within a scientific community can be elusive. *Windmere, supra,* 105 *N.J.* at 379, 522 *A.*2d 405. Satisfying the test involves more than simply counting how many scientists accept the reliability of the proffered technology. *Williams, supra,* 252 *N.J.Super.* at 375, 599 *A.*2d 960. Proving general acceptance "entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience." *Rubanick, supra,* 125 *N.J.* at 436, 593 *A.*2d 733. Essentially, a novel scientific technique achieves general acceptance only when it passes from the experimental to the demonstrable stage. *Windmere, supra,* 105 *N.J.* at 378 n. 2, 522 *A.*2d 405.

General acceptance, however, does not require complete agreement over the accuracy of the test or the exclusion of the possibility of error. *See* Richard J. Biunno, *Current N.J. Rules of Evidence,* Comment 4 to *N.J.R.E.* 702; *State v. Johnson,* 42 *N.J.* 146, 171, 199 *A.*2d 809 (1964). Neither is it necessary to demonstrate that the techniques, methodology, and procedures are infallible. Nor is it necessary that acceptance within the scientific community be unanimous. *State v. Tate,* 102 *N.J.* 64, 83, 505 *A.*2d 941 (1986). Every scientific theory has its detractors. *Windmere, supra,* 105 *N.J.* at 379, 522 *A.*2d 405. Here, the State's burden is to prove that the polymarker test and the interpretation of its results are non-experimental, demonstrable techniques that the relevant scientific community widely, but perhaps not unanimously, accepts as reliable.

## 4. *Polymarker Test*

██ A proponent of scientific evidence can prove general acceptance through expert testimony, publications, or judicial opinions.

### a. *Expert Testimony*

At the pretrial hearing, Dr. Word testified that the scientific community generally accepts the polymarker test as scientifically reliable. The dissent agrees. *Post* at 236, 699 *A.*2d at 654. Dr. Word explained that the polymarker test is technologically and procedurally similar to the well-established PCR/DQ Alpha test. Cellmark, moreover, conducted validation studies on the PM test. The studies, which were conducted in accordance with protocols established by the Technical Working Group on DNA Analysis Methods (TWGDAM), revealed that the PM test reliably produced accurate results. Approximately thirty to forty laboratories in the United States use the PM test either for casework or validation studies. Six of the better-known laboratories independently had tested the polymarker and likewise concluded that it was reliable. Those laboratories included: the Federal Bureau of Investigations (FBI), the Department of Justice, the Georgia Bureau of Investigations, the California Laboratory in Berkeley, the Center for Blood Research in Boston, the Regional Crime Laboratory at Indian River Community College, and Roche Biomedical Laboratories. Of all the laboratories using the PM kit, none had ever reported receiving an incorrect result from a properly performed test.

Defendant challenged the general acceptance of the polymarker test, asserting that some laboratories still subject it to validation studies. Defendant's expert at the *Rule* 104 hearing, Dr. Robert Shaler, testified that polymarker testing was not yet appropriate for use in casework and that Cellmark's validation procedures were flawed.

The trial court concluded:

Based upon the expert testimony of Dr. Charlotte Word, and the scientific literature admitted into evidence, PCR/PM has been sufficiently validated to be

used in casework; has been accepted by the relevant scientific community; and produces uniform and reasonably reliable results.

Our review of the record leads us to conclude that the scientific community has generally accepted the polymarker test. Dr. Word established that independent tests have validated the polymarker's reliability and that highly-regarded laboratories have employed the test in casework. Only defendant doubts the reliability of the PM test.

### b. *Publications*

Scholarly and scientific publications, moreover, approve the polymarker test. In support of the polymarker test, the State submitted one published article, George Herrin, Nicola Fildes & Rebecca Reynolds, "Evaluation of the AmpliType PM DNA Test System on Forensic Case Samples," 39 *J. Forensic Sci.* 1247 (1994) (Herrin article), and two articles that since have been published: Nicola Fildes & Rebecca Reynolds, "Consistency and Reproducibility of AmpliType PM Results Between Seven Laboratories: Field Trial Results," 40 *J. Forensic Sci.* 279 (1995) (Roche field study); Bruce Budowle, et al., "Validation and Population Studies of the Loci LDLR, GYPA, HBGG, and D7S8, and Gc (PM Loci), and HLA–DQx Using A Multiplex Amplification And Typing Procedure," 40 *J. Forensic Sci.* 45 (1995) (*FBI Report*). All three of those documents concluded that the PM test was reliable for casework. Further, the State submitted a list of forty-four presentations, posters, lectures, seminars, and workshops in which forensic scientists discussed issues regarding polymarker-related research, testing, and results. Dr. Word had attended fifteen to twenty such lectures and had lectured on the reliability of the polymarker test at many of the meetings.

Defendant argues that the scholarly works were too few to support a conclusion of general acceptance. Further, defendant maintains that lectures do not provide effective forums for peer review. In addition, defendant alleges that Cellmark violated the national standards for DNA testing by failing to publish both the

results of its validation studies and the types of primers and probes that it uses.

The articles and lectures, however, support general acceptance of the polymarker test. Admittedly, prior cases have involved greater bodies of accumulated scholarship. *See, e.g., Kelly, supra,* 97 *N.J.* at 211, 478 *A.*2d 364 (noting that there were "at least five books and almost seventy scientific articles and papers about the battered-woman's syndrome"); *Williams, supra,* 252 *N.J.Super.* at 382, 599 *A.*2d 960 (noting that six testifying experts had authored, cumulatively, close to 600 articles, many on PCR technology). We recognize, additionally, the correlation between the number of published articles and the general acceptance of a subject. Yet, we never have required a specific number of articles to satisfy the test of general acceptance. Rather, our focus always has been whether existing literature reveals a consensus of acceptance regarding a technology. In *Windmere, supra,* 105 *N.J.* at 383–84, 522 *A.*2d 405, for example, although ample literature existed on the subject of voiceprint analysis, the existing "journals [were] in disarray." By contrast, all of the written works on the polymarker test agree that the test is reliable. Defendant produced no documents, published or pre-publication, suggesting anything to the contrary.

Further, "[u]nder appropriate circumstances, speeches, addresses, and other similar sources may be used to demonstrate the acceptance of a premise by the scientific community." *Kelly, supra,* 97 *N.J.* at 211 n. 17, 478 *A.*2d 364; *see also State v. Anderson,* 118 *N.M.* 284, 881 *P.*2d 29, 42–43 (1994) (rejecting claim that presentations, as opposed to formal publications, were inadequate as peer review). From the forty-four lectures and presentations, it appears clear that the forensic-science community has kept abreast of developments and has had adequate opportunity for peer review of PM testing.

Since the conclusion of defendant's trial, moreover, the National Research Council, the members of which are drawn from the councils of the National Academy of Sciences, the National Acade-

my of Engineering, and the Institute of Medicine, published *The Evaluation of Forensic DNA Evidence* (referred to *supra* as *NRC Report*), an update to their 1992 report, *DNA Technology in Forensic Science.* The report concludes that PCR-systems, including the polymarker, are "ready to be used." *NRC Report, supra,* at 119. The report further confirms that the polymarker has been "validated with tests for robustness with respect to environmental insults," and that "substantial information on population frequencies" exists for the polymarker loci. *Id.* at 72. We conclude that existing literature, combined with research shared at lectures and symposia, supports a finding that the polymarker test is generally accepted as reliable by the forensic science community.

c. *Judicial Opinions*

At the time of the *Rule* 104 hearing, both the State and the defense were unaware of any judicial opinion discussing polymarker evidence. *See Wilkerson v. Pearson,* 210 *N.J.Super.* 333, 336, 509 *A.*2d 818 (Ch.Div.1985) (holding that absence of judicial opinions demonstrating acceptance by other courts of particular type of scientific technique should not, by itself, foreclose finding of general scientific acceptance and reliability). Before the *Rule* 104 hearing, however, a New York court had admitted polymarker evidence. *People v. Morales, N.Y.L.J.,* Oct. 26, 1994, at 34 (N.Y.Cty.Ct.1994), *aff'd,* 227 *A.D.*2d 648, 643 *N.Y.S.*2d 217, *appeal denied,* 677 N.E.2d 301 (1996). In *Morales,* experts from the Center for Blood Research Laboratories, Yale University School of Medicine's Department of Genetics, and the Office of the Chief Medical Examiner for New York testified in support of admission of the evidence. Curiously, the witness from the New York Medical Examiner supporting the admission of the polymarker evidence was Dr. Shaler, the same expert who testified against admission of polymarker evidence in the present case. The New York court concluded that "the People have met their burden in establishing that the PCR tests at issue here are sufficiently established to gain general acceptance in the scientific community and satisfy the standard of reliability." *Ibid.*

Since defendant's trial in the present case, at least six other courts have held that polymarker testing is scientifically reliable. *United States v. Beasley*, 102 *F.*3d 1440, 1448 (8th Cir.1996), *cert. denied,* — *U.S.* —, 117 *S.Ct.* 1856, 137 *L.Ed.*2d 1058 (1997) (holding that DQ Alpha and polymarker testing are sufficiently reliable under *Daubert* and have achieved general acceptance within relevant scientific community); *United States v. Shea,* 957 *F.Supp.* 331, 338 (D.N.H.1997) (finding PCR testing, including polymarker testing, reliable under *F.R.E.* 702); *United States v. Lowe,* 954 *F.Supp.* 401, 418 (D.Mass.1996) (finding that polymarker and another PCR-based test, D1S80, are sufficiently reliable under *Daubert* ); *Brodine v. State,* 936 *P.*2d 545, 550–51 (Alaska.Ct.App.1997) (finding polymarker testing generally accepted in scientific community); *People v. Pope,* 284 *Ill.App.*3d 695, 220 *Ill.Dec.* 309, 314, 672 *N.E.*2d 1321, 1326 (1996) (finding that DQ Alpha and polymarker typing are generally accepted in scientific community under *Frye* ); *Keen v. Commonwealth,* 24 *Va.Ct.App.* 795, 485 *S.E.*2d 659, 664 (1997) (rejecting defendant's challenges to the polymarker test). In *Pope, supra,* the Illinois Court of Appeals found polymarker testing generally accepted in the scientific community even when the *Frye* hearing in that case involved the testimony of only one witness, the State's expert. *Pope, supra,* 220 *Ill.Dec.* at 314, 672 *N.E.*2d at 1326. Admission of the polymarker test in other jurisdictions supports our conclusion that the trial court correctly admitted the evidence in the present case.

We thus conclude that the trial court did not err in admitting expert testimony on the results of the polymarker test. We are satisfied that the polymarker technology is scientifically reliable and that Cellmark conducted the tests in accordance with established procedures.

5. *Dot–Intensity Analysis*

Defendant asserts that even if the results of the polymarker test are admissible, dot-intensity analysis, the State's method of interpreting the mixed-blood sample, is scientifically unreliable. The

dissent likewise rejects dot-intensity analysis. Indeed, the dissent goes so far as to assert that if dot-intensity analysis is reliable, "the results obtained would be inconsistent with defendant being the murderer." *Post* at 261, 699 *A*.2d at 667.

At the *Rule* 104 hearing, dot-intensity analysis was presented as an integral part of polymarker testing. The *Rule* 104 hearing involved consideration of oral testimony and written evidence on the polymarker test and dot-intensity analysis. Both the defense and the State considered dot-intensity analysis as an application of the polymarker test, not as an issue apart from polymarker testing. In holding that the results of polymarker testing were admissible, the trial court implicitly approved dot-intensity analysis, which was the only use of the polymarker test on which the State relied.

Based on the record, as well as on posttrial publications and judicial opinions, we conclude that the trial court correctly allowed the State's experts to testify about dot-intensity analysis. In so concluding, we recognize that a court must examine each step of a scientific process or technique. *Kelly, supra,* 97 *N.J.* at 210, 478 *A*.2d 364. Thus, we independently examine dot-intensity analysis to determine whether it has obtained sufficient acceptance to justify admission of its results into evidence.

### a. *Expert Testimony*

At the pretrial hearing, the defense offered the testimony of Dr. Shaler and a written report by Dr. Blake, of Forensic Science Associates, both of whom disagreed with Dr. Word on the propriety of dot-intensity analysis. Dr. Shaler disputed Cellmark's theory that the dot-intensity imbalances on the polymarker test strip represented the presence of allele pairs. He testified that such color imbalances occurred even on the DNA test strips of the single-donor control samples of defendant's and Schnaps's blood. For example, Dr. Shaler claimed to have detected intensity imbalances on defendant's GYPA and HBGG loci and on the victim's GC locus. According to the defense, those variances in the dot

intensities in Harvey's and Schnaps's control strips destroyed the integrity of the dot-intensity analysis of the mixed-blood sample taken from the box spring. The dissent agrees, asserting that "[t]o the degree that there are naturally occurring variances in dot intensities that cannot be predicted prior to the analysis, dot-intensity analysis disintegrates as a reliable and useful test." *Post* at 169, 699 *A.*2d at 620–21. According to Dr. Shaler, the PM test of the box spring supported a calculation only of "all the second donor types which would be possible" to fill out the necessary alleles.

Defendant also asserts that color imbalances in the polymarker test strips may have been caused not by allele pairs, but by human errors such as contamination or manufacturing defects. Dr. Shaler, at the pretrial hearing and at trial, faulted Cellmark for not repeating the polymarker test procedure despite the possibility of error or contamination. He further stated that contamination, a manufacturing defect, or improper laboratory procedures caused the dot imbalances.

Our previous holding that the polymarker test is scientifically reliable, *supra* part IV.B.4.d., leads us to the conclusion that the foregoing challenges to dot-intensity analysis regarding Cellmark's performance of the polymarker test, concern not the admissibility, but the weight of the evidence. *See Marcus, supra,* 294 *N.J.Super.* at 291, 683 *A.*2d 221 (holding that interpretation of extra bands on autorads developed from bloodstains, "like an expert's ability to perceive an abnormality on an x-ray, is a matter within the province of the jury"); *Fishback, supra,* 851 *P.*2d at 893 (reasoning that defendant's challenge to techniques of RFLP analysis, including interpretation of autorads, concerns weight and not admissibility of DNA typing evidence under *Frye*); *State v. Schweitzer,* 533 *N.W.*2d 156, 160 (S.D.1995) (reasoning that DNA-expert's conclusions regarding results of DNA test were issue of weight for jury to consider); *State v. Kalakosky,* 121 *Wash.*2d 525, 852 *P.*2d 1064, 1072 (1993) (holding that defendant's assertions that specific laboratory procedures utilized to analyze DNA sam-

ple were flawed, goes to weight of evidence, not admissibility). As such, the ultimate determination of these issues was properly left to the jury.

The State's experts, Dr. Word and Ms. Cooper, differed from the defense expert, Dr. Shaler, in the interpretation of the dot intensities on the control strips. Defense counsel vigorously questioned the State's experts whether the differences in the dots of the victim's and defendant's blood samples undermined the dot-intensity analysis of the sample from the box spring. On cross-examination, Ms. Cooper disputed Dr. Shaler's claim that dot-intensity imbalances existed at the HBGG and GC loci on the defendant's and Schnaps's test strips. Ms. Cooper stated that "[t]he only place where I really see any type of a slight difference would be at the GYPA locus for Mr. Harvey." Moreover, neither Ms. Cooper nor Dr. Word found any evidence that Cellmark had made a mistake in the conduct of the polymarker test. According to Ms. Cooper, the intensity imbalance on defendant's GYPA locus was probably due to a variant allele present in some African Americans. Ms. Cooper explained that the difference in dot intensities at the GYPA locus was not due to errors in testing or to a manufacturing defect. Indeed, nothing in the record supports the defense's conjecture that contamination or manufacturing defects caused any differences in dot intensities.

The dissent goes beyond the defendant's arguments. For example, the dissent repeatedly concludes that the polymarker test kit used by the State was "designed solely to determine the presence or absence of certain alleles," so that it at most can "potentially show that a mixture exists in certain circumstances." *Post* at 244, 259, 699 *A.*2d at 658, 666.

The State, however, presented expert testimony at the *Rule* 104 hearing demonstrating that differences in intensities of the test-strip dots could reveal the blood donors to a mixed-blood sample. Dr. Word testified that the Perkins–Elmer Amplitype PM test strip was designed so that a sample from a single individual would produce similar dot intensities within each locus for which the

individual is heterozygous. If two or more blood donors contributed the same allele, or one blood donor contributed two of the same allele so as to result in a pair of homozygous alleles, that dot would be more intense than if one of that allele was contributed by an individual donor. Dr. Word further testified that Cellmark's validation studies included a mixture-dilution study. That study provided Cellmark with information on the dilutions that were capable of detection and showed that the mixtures could be interpreted in many cases.

Contrary to the dissent's characterization, *see post* at 255, 699 *A*.2d at 664, the testimony of the State's expert supports the general acceptance of dot-intensity analysis. We conclude that the trial court reached the right decision in not preventing the jury from hearing the State's DNA testimony.

The dissent nonetheless argues that certain omissions in the expert testimony of both parties reveal that dot-intensity analysis is unreliable. It maintains that the State's inability to use dot-intensity analysis for the DQ Alpha test proves that the analysis does not work. It further states that the "DQ Alpha marker was retested using the PM testing strips." *Post* at 265 n. 14, 699 *A*.2d at 668 n. 14. The record, however, contains no evidence of two sets of DQ Alpha test results. Likewise, the record contains no discussion of the application of dot-intensity analysis to the results of the DQ Alpha test. At trial, the defense did not challenge the absence of any such analysis. Hence, the record does not reveal whether dot-intensity analysis can be performed on a DQ Alpha test or whether the test for the DQ Alpha allele differs from the polymarker test. The Roche field study states that "[O]n DQA1 DNA probe strips, the probes are not as well balanced and the signal intensities cannot be used as easily to associate alleles from different sources" and that "it was easier to determine the major genotype on the PM DNA probe strips than the DQA1 DNA probe strips because the relative intensities of the dots could be compared." *Fields, supra,* 40 *J. Forensic Sci.* at 284; *see also* Edward Blake, et al., "Polymerase Chain Reaction (PCR) Amplifi-

cation and Human Leukocyte Antigen (HLA)-DQa Oligonucleotide Typing on Biological Evidence Samples: Casework Experience," 37 *J. Forensic Sci.* 700, 706 (May 1992) (reasoning that for DQ Alpha test results, a "mixture cannot necessarily be detected, however, if two contributors to a mixture contribute no more than two alleles in total and contribute approximately equivalent amounts of DNA"); *NRC Report, supra,* at 130 ("Mixed samples can also lead to more complicated calculations with DQA, where some alleles are inferred by subtraction.").

Finally, the dissent claims that the polymarker results from the HBGG marker of the box-spring sample prove that dot-intensity analysis does not work. *Post* at 263–265, 699 *A.*2d at 667–668. The HBGG marker results for the box spring were "A,B,C," with all three alleles balanced in intensity. Schnaps's type at the HBGG marker was "B,B." According to dot-intensity analysis, the B allele should be more intense. Neither at trial nor on appeal, however, has defendant challenged the polymarker results or the dot-intensity analysis of the box-spring sample at the HBGG marker. Consequently, the State never has had an opportunity to meet the challenge. Perhaps defense counsel elected not to challenge the findings that the HBGG locus for strategic reasons. On the record before us, the unchallenged results of the dot-intensity analysis at the HBGG marker do not justify a reversal of defendant's conviction. In an application for post-conviction relief, defense counsel may make such use of the polymarker results at the HBGG marker as is appropriate.

b. *Publications*

At the *Rule* 104 hearing, the State introduced three articles: the Roche field study, the FBI Report, and the Herrin article. *See supra* Part IV.B.4.b. All three articles discuss dot-intensity analysis. Not one states that dot-intensity analysis is unreliable. The articles go no further than to express caution when interpreting the results through dot-intensity analysis.

The Roche field study was designed to determine the genotypes of either the major contributor or minor contributor, or both, to a mixed-blood sample. For example, in a mixed sample, where the intensity of the dots corresponding to the minor component was greater than or equal to the control dots, the study could not identify the major or minor component. Consequently, the study placed such a result in the uninterpretable category.

Apparently, the Roche field study was not a study of dot-intensity analysis for mixtures where the relative amounts of DNA for each donor were equal. The study, however, concluded that analyzing the balance of dots on a PM strip could be a "valuable asset of the system for the analysis of mixtures" and directed individual laboratories to develop policies for the interpretation of mixed-blood samples "based on experience and case history information." *Id.* at 284–85. Here, Cellmark developed such interpretive methods.

The dissent contends that the FBI Report "flatly contradicts the assumptions of dot-intensity analysis." *Post* at 280, 699 *A*.2d at 676. We read the FBI Report differently. The FBI Report stated that "[a]s a general rule, samples with two contributors of known PM types displayed PM types *as predicted.*" *FBI Report,* *supra,* at 49 (emphasis added). Each contributed to the profile and when the samples with two contributors of known PM types shared alleles in common the dot intensities were increased compared to alleles that were not shared. *Ibid.* Because the FBI, in its study, already knew the PM types of each donor, dot-intensity analysis was not necessary. Thus, contrary to the dissent's assertion, the FBI Report did not refuse to draw any conclusions from dot-intensity imbalances. *Post* at 257, 699 *A*.2d at 665. Rather, the FBI Report acknowledged that mixtures of donors sharing the same alleles resulted in an increased dot intensity.

The dissent argues further that the Herrin article "did not conclude that dot-intensity analysis was sufficiently reliable to warrant its use in an actual criminal case." *Post* at 258, 699 A.2d at 665. In fact, the Herrin article supports dot-intensity analysis,

especially where the victim's known allele profile at the relevant locus is homozygous:

> Comparison of the dot intensity within loci allowed deduction of types at some loci even when separation of DNA from sperm and non-sperm cells was not complete. *This feature may prove to be very useful in routine casework....* In this case the non-sperm fraction HBGG locus produced 3 dots with the A allele being approximately twice as intense as the B and C alleles (indicating that at least 2 A alleles were present). By comparison with the known sample from the victim in this case (HBGG AA), *it is possible to assign the A alleles to the victim and know that the B and C alleles originated with another individual(s).*
>
> [Herrin *et al, supra,* 39 *J. Forensic Sci.* at 1249–50 (emphasis added).]

Recent publications enhance the acceptance of dot-intensity analysis. The *NRC Report* states:

> Mixed samples are sometimes found in crime situations—for instance, blood from two or more persons at the scene of a crime.... In many cases, one of the contributors—for example, the victim—is known, and the genetic profile of the unknown is readily inferred. *In some cases, it might be possible to distinguish the genetic profiles of the contributors to a mixture from differences in intensities of bands in an RFLP pattern or dots in a dot-blot typing;* in either case, the analysis is similar to the unmixed case.
>
> [*NRC Report, supra,* at 129 (emphasis added).]

Moreover, Dr. Word recently has published an article validating the use of the PM kit for use on mixed-blood samples. Charlotte J. Word et al., "Summary of Validation Studies from Twenty–Six Forensic Laboratories in the United States and Canada on the Use of the AmpliType PM PCR Amplification and Typing Kit," 42 *J. Forensic Sci.* 39 (1997).

Our review of the relevant literature leaves the impression that dot-intensity analysis is an esoteric topic of interest to a limited scientific community. Within that limited community, however, the analysis has been sufficiently accepted to permit the jury to hear about it. We recognize that, as occurred in the trial below, dot-intensity analysis provides an opening for cross-examination and contradictory expert testimony. That opening, however, should not deprive the jury from hearing testimony about the analysis. We also recognize that other cases considering the general acceptance of scientific innovations have involved a greater number of scientific articles. *See supra* Part IV.B.4.b. No

published article, however, rejects dot-intensity analysis. As previously discussed, the trend supports acceptance of the test.

### c. *Judicial Opinions*

Although no court has discussed dot-intensity analysis at length, the United States District Court for the District of New Hampshire recently accepted as reliable under *Daubert* the premise underlying this interpretive method. In *Shea, supra,* the defendant argued that the polymarker test should be excluded because PCR cannot reliably detect mixtures of more than one person's DNA. 957 *F.Supp.* at 339. The district court rejected that argument, finding persuasive the government expert's testimony that "an examiner will be able to identify a mixture from observable differences in the relative strengths of the signals indicated on the PCR test strips, except in extremely unusual circumstances." *Id.* at 340.

### d. *New Jersey Rule of Evidence 403*

 Finally, the dissent argues that even if the DNA evidence derives from a generally accepted methodology, the evidence's prejudicial effect outweighs its probative value. *Post* at 270, 699 *A.*2d at 671. In particular, the dissent challenges the assumption that only two people provided blood to the box-spring sample and that the victim's and suspect's blood were present in equal amounts. The argument is more theoretical than real. Nothing in the record suggests the presence of more than two persons at the crime scene.

 In general, whether evidence should be excluded under *New Jersey Rule of Evidence* 403 because its prejudicial effect outweighs its probative value is an issue remitted to the discretion of the trial court. *State v. Wilson,* 135 *N.J.* 4, 20, 637 *A.*2d 1237 (1994). Only when the trial court commits a clear error of judgment does an appellate court disturb the trial court's decision. *State v. DiFrisco,* 137 *N.J.* 434, 496, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873

(1996); *State v. Koedatich,* 112 *N.J.* 225, 313, 548 *A.*2d 939 (1988) (*Koedatich I*), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989).

We find no error in the admission of the DNA evidence. The probative effect of the evidence is that the DNA test results showed that defendant could not be excluded as a contributor to the box-spring blood sample. Without specifying how the prejudicial effect of the evidence outweighs its probative value, the dissent suggests possible avenues of inquiry that defense counsel might have pursued. Suffice it to say that defense counsel made a different choice, one that involved the cross-examination of the State's experts concerning the dot-intensity analysis of the blood. We perceive no reason to disturb the trial court's ruling admitting the DNA evidence.

- V -

We next evaluate defendant's argument that the trial court violated his constitutional right to present a defense by restricting examination of expert witnesses to potential flaws in the administration of the polymarker test.

- A -

After holding that the polymarker kit was admissible, the trial court precluded further challenges to admissibility at trial. The court's ruling, however, did not prevent defendant from introducing evidence relevant to the weight or credibility of the expert testimony.

In accordance with that ruling, the trial court prohibited defendant from attempting before the jury (1) to cross-examine the State's experts on Cellmark's validation studies and (2) to elicit testimony from Dr. Shaler that the FBI did not use the polymarker test on mixed-blood samples. Defendant claims that the trial court committed reversible error when it barred him from cross-

examining on these issues. To evaluate the defense's argument, it is necessary to review the scope of the expert-witness testimony.

- B -

The State's first DNA expert, Ms. Cooper, explained the results of the DQ Alpha and Polymarker tests conducted on crime scene samples and blood samples taken from defendant. Ms. Cooper also explained that before employing the PM test in its lab, Cellmark conducted a validation study.

The defense cross-examined Ms. Cooper on the dot-intensity imbalances in defendant's PM test. Defense counsel sought to elicit that Cellmark had not conducted the PM test under the proper conditions and had failed to follow prescribed procedures. Ms. Cooper conceded that dot imbalances could result from improper hybridization or wash temperatures, improper salt-solution concentrations, or improperly-timed stringent washes. She disputed that discernible dot imbalances appeared on defendant's HBGG and GC loci and explained that variations could occur at the GYPA locus. Because the positive control conducted with the test appeared normal, she did not investigate possible causes for the imbalances. Defense counsel also questioned Ms. Cooper on the possibility that by lifting the lid of the thermal cycler during the amplification process, she could have affected the accuracy of the tests.

Dr. Word testified that she reviewed all of Ms. Cooper's work, and that she agreed with all of Ms. Cooper's results. At one point during direct examination, the prosecutor inquired about a list of presentations on the PM test. Concerned that the prosecutor was trying to bolster the reliability of the PM test, the trial court precluded the inquiry.

On cross-examination, defendant pressed Dr. Word on the dot imbalances and on the possibility that Cellmark had not followed correct testing procedures. Dr. Word acknowledged that Cellmark did not know how many people contributed to the mixed-blood sample recovered from the box spring.

On redirect, Dr. Word testified that Cellmark had performed validation studies with the PM test. When the prosecutor tried to inquire into the nature and conclusions of Cellmark's validation study, defense counsel objected successfully.

According to the defense expert, Dr. Shaler, Cellmark's PM test results were flawed and Cellmark's method of interpreting the test was "scientifically indefensible." Dr. Shaler emphasized the presence of dot imbalances to the jury and faulted Cellmark's technicians for not doing the tests twice. He also raised the possibility that Cellmark's test strips were defective.

Dr. Shaler further testified that he did not believe in dot-intensity interpretation, stating that he had a "philosophical difference" with the State's experts. Accordingly, he disputed Cellmark's thesis that the defendant could be linked to the box-spring stain. Defense counsel requested a side-bar conference because he wanted to ask Dr. Shaler about Cellmark's validation work. The court responded that it deemed inappropriate the inquiry about validation because the inquiry was directed at the admissibility, not the weight, of the evidence.

Later, on redirect, Dr. Shaler restated his view that associating alleles was an unscientific method of analyzing a mixed-blood sample. Defense counsel then presented Dr. Shaler with an article asserting that the FBI did not use the dot-intensity analysis technique. The State objected. At side-bar, defense counsel explained that he did not believe that the article went to admissibility, but rather to the weight of Dr. Shaler's testimony that associating alleles was not a valid interpretive technique. The prosecutor responded that the article went to admissibility and that Dr. Shaler already had testified to his belief that other scientists did not believe in dot-intensity analysis. The trial court sustained the State's objection.

- C -

The Sixth Amendment to the United States Constitution and Article 1, paragraph 10 of the New Jersey Constitution

guarantee a criminal defendant's right to confront witnesses. The right to cross-examine is an essential element of that right. *State v. Budis,* 125 *N.J.* 519, 530–31, 593 *A.2d* 784 (1991). A criminal defendant, therefore, may cross-examine an expert witness for the State on the facts, methodology, and rationale underlying the expert's opinion. *State v. Martini,* 131 *N.J.* 176, 264, 619 *A.2d* 1208 (1993) (*Martini I* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.2d* 137 (1995); *see also N.J.R.E.* 705 ("The expert may ... be required to disclose the underlying facts or data on cross-examination."). The scope of cross-examination, however, rests within the sound discretion of the trial court. *Martini I, supra,* 131 *N.J.* at 263, 619 *A.2d* 1208. Thus, a defendant's constitutional right to confrontation does not guarantee unlimited cross-examination of a witness. *Delaware v. Fensterer,* 474 *U.S.* 15, 20, 106 *S.Ct.* 292, 294, 88 *L.Ed.2d* 15, 19 (1985).

Here, the trial court properly ruled that defendant could not relitigate admissibility issues that the court had determined. The court limited the parties to presenting evidence that went to the weight of the polymarker test results.

### 1. *Validation Studies*

Without merit is defendant's argument that the trial court violated his confrontation rights by refusing to allow him to cross-examine Cellmark's validation studies. Defense counsel never attempted to cross-examine the State's experts on that matter. To the contrary, defense counsel objected when the prosecutor attempted to elicit testimony from Dr. Word on Cellmark's validation trials. The dissent therefore misleads when it states that the trial court did not permit defendant to examine the scientific experts on Cellmark's validation studies. *Post* at 276, 699 *A.2d* at 674.

■ The trial court properly precluded defendant from eliciting testimony through his own expert about Cellmark's validation studies. The issue of Cellmark's validation studies on the polymarker more properly concerns the reliability of the polymarker.

As such, the issue goes to the admissibility of the test and not its weight.

We are convinced the trial court did not compromise the defendant's confrontation rights. As the record reveals, defense counsel cross-examined the State's experts on their methodologies and on the results from the PM tests.

## 2. *FBI Report*

██ The trial court should have allowed defendant to elicit testimony from Dr. Shaler about an article indicating that the FBI did not use the association-of-alleles or dot-intensity technique. The error, however, was harmless. *R.* 2:10–2.

As previously explained, *supra* part IV.B.5., some of defendant's criticisms regarding the dot-intensity technique bore on the weight, not the admissibility of the DNA evidence. Thus, the court should have permitted defendant to elicit testimony about the article, which went only to the weight of the State's evidence that it could determine defendant's identity from the mixed-blood sample taken from Schnaps's box spring.

██ The error, however, was not clearly capable of producing an unjust result. *R.* 2:10–2. Dr. Shaler tried to prove that dot-intensity analysis was unscientific. He also testified that other forensic scientists agreed. Through his testimony, the jury knew that some scientists questioned the validity of dot-intensity analysis.

Knowledge of the FBI's position would have added only limited weight to defendant's argument. As previously discussed, *supra* part IV.B.5., the FBI article did not, as the dissent states, contradict dot-intensity analysis. *Post* at 256–258, 280, 699 *A.2d* 664–665, 676. Rather, the FBI Report urged caution when interpreting evidentiary samples that potentially may be from more than one donor. *FBI Report, supra,* at 52. The article also states, however, that mixtures of donors sharing the same alleles resulted in an increased dot intensity. *Id.* at 49.

- VI -

Defendant next argues that Cellmark improperly computed the one–in–1,400 number associated with the prosecution's DNA evidence. Specifically, defendant alleges that Cellmark improperly calculated its product-rule computation; failed to inform the jury of the margin of error associated with such statistical calculations; and improperly assumed that the contributor to the mixed-blood sample was an African American. In addition to echoing the defendant's criticisms, the dissent urges the necessity of an independent hearing for the admission of the statistical evidence. We find, however, that the trial court did not err in admitting statistic evidence tending to show that defendant could not be excluded as a contributor to the blood found at the crime scene.

- A -

Cellmark concluded that Harvey's genotype for all of the six genes studied in both the PM and the DQ Alpha tests was common to only one–in–1,400 African Americans. In reaching that conclusion, Cellmark consulted databases of genetic frequencies for each genotype and multiplied those figures together in accordance with the product rule.

Cellmark used two population-frequency databases. One derived from Cellmark's own study of fifty African Americans, some of whom were Cellmark employees, and from "paternity work" blood samples done at the lab. Cellmark also referred to a database compiled by Roche derived from a sample of 100 African Americans. Defendant does not challenge the adequacy of Cellmark's databases. Indeed, Dr. Shaler used the same databases in his calculations.

As mentioned above, defendant's DNA tests revealed the following results:

| LDLR: | Genotype BB | = 56% of African Americans |
| GYPA: | Genotype AB | = 50% of African Americans |
| HBGG: | Genotype AC | = 27% of African Americans |
| D7S8: | Genotype AB | = 45% of African Americans |

GC: Genotype AB = 17% of African Americans
DQ Alpha: Genotype 4,4 = 11.9% of African Americans

According to the prosecution's experts, someone with the foregoing genetic make-up could not be excluded as a donor to the mixed-blood sample recovered from the victim's box spring.

To determine the percentage of African–American individuals who would share defendant's genotype for all six genes, Cellmark multiplied genotype frequencies by one another in accordance with the product rule. *See supra* part IV.A.3.b. Application of the product rule indicated that defendant's genotype for all six genes was common to approximately one–in–1,400 African Americans.

On appeal, defendant alleges that Cellmark's one–in–1,400 figure was incorrect because it did not include the percentage of African Americans who could have matched the mixed-blood sample. Defendant argues that this alleged error arose because the DQ Alpha percentage used in Cellmark's product-rule calculation was wrong. The dissent agrees. *Post* at 283–285, 699 *A.*2d at 678–679.

The DQ Alpha test conducted on the box-spring sample revealed the presence of the 2 and 4 alleles. It was not possible to associate alleles with the DQ Alpha test. The parties agree that the DQ Alpha test revealed all the possible genotypes that could have combined to reveal the presence of the 2 and 4 alleles: 2,2; 2,4; 4,4. Because defendant's DQ Alpha genotype was 4,4, he could not be excluded as a potential donor if two people had contributed to the box-spring stain.

Defendant argues that the population frequencies for each of these three genotypes (2,2; 2,4; and 4,4) should have been added together before inserting a DQ Alpha statistic into the product-rule calculation. According to defendant, individuals who share defendant's five polymarker genotypes and who have a DQ Alpha genotype of either 2,2; 2,4; or 4,4—not just 4,4—could not be excluded from the mixed-blood, box-spring sample.

Evidence for the entire population revealed the population frequencies for only two of these three possible genotypes: 9% of the population had the 2 and 4 alleles, and 17% had the 4 and 4 alleles. On that basis, defendant argues that at least 26% of the population (17% + 9%) had a DQ Alpha genotype that would correspond to the box-spring sample. Therefore, defendant alleges that Cellmark should have used a DQ Alpha value of 26% rather than 17% (adjusted to 11.9%, taking race into account) when it conducted the product-rule calculation. Defendant contends that substituting the 26% DQ Alpha value yields a result of .0015 or one–in–666. Thus, defendant posits that one–in–666 individuals could have contributed genetic material consistent with that detected in the box-spring sample. In sum, defendant concludes that the State unfairly prejudiced him by stating that one–in–1400, instead of one–in–666 African Americans, could have provided the sample.

The prosecution did not present the one–in–1400 figure to prove the percentage of African Americans whose genetic compositions could be comparable with the PM/DQ Alpha profile of the box-spring sample. Nor did the prosecution, as the dissent states, "assert[ ] that the blood recovered from the scene revealed the '4,4' DQ–Alpha genotype." *Post* at 283, 699 *A.*2d at 678. Rather, ·the prosecution used the DNA evidence to demonstrate that defendant could not be excluded as a donor to the mixed-blood sample and that one–in–1400 African Americans shared his composite genotype.

On the State's case, Ms. Cooper testified:

Prosecutor: Now, using the product rule, if you use the four, four, based upon your calculation and did as you indicated with a polymarker, what percentage do you come up with?

Cooper: For African–Americans having the polymarker types we have indicated and an individual having a four, four DQ Alpha type, the number is approximately 1 in 1400 in African–Americans.

Prosecutor: Let's mark this down the bottom. You can excuse one thousand three hundred and ninety-nine African–Americans from having these characteristics, is that correct?

Cooper: Again, these numbers are just giving you an idea how rare or common, how these different types occur in a given population. And if you have a random population of approximately 1400 people, the chances are at least 1 of those people would have those particular polymarker and DQ Alpha type.

So described, the one–in–1400 evidence was relevant to show that defendant's relatively rare composite genotype could not be excluded by the PM/DQ Alpha tests as a contributor to the boxspring sample. On cross-examination, moreover, Ms. Cooper testified that defendant's specific DQ Alpha marker of 4,4, which occurred in seventeen percent of the population, constituted millions of people.

In addition, Ms. Cooper testified about statistics that did not include Harvey's DQ Alpha results. She stated that multiplying the frequency calculations of each of Harvey's PM loci showed that approximately one–in–170 African Americans shared Harvey's genotype at the LDLR, GYPA, HBGG, D7S8, and GC loci.

Defendant now argues that the prosecution should have presented a ratio of the individuals whose polymarker genotypes would match defendant's and whose DQ Alpha genotype was either 2,2; 2,4; or 4,4. That ratio, according to defendant, is approximately one–in–666. Defense counsel adduced no testimony in support of that ratio at trial. It is too late in the proceeding for defendant to insist that the State should have presented statistical evidence that defendant now believes would have been helpful at trial.

In addition, we note that the trial court, pursuant to defense counsel's request, instructed the jury that statistical evidence does not relieve the jury of its obligation to determine the ultimate question of guilt. Specifically, the trial court stated:

Now, you heard testimony from DNA experts, from both the State and the Defense. Some of the testimony was expressed to you in terms of percentages. You must determine whether the State, again, has proven each and every element of the these [sic] charges beyond a reasonable doubt, and no testimony couched in terms of percentages or probabilities can relieve you of your obligation to make that determination.

At trial, the State derived its statistical evidence from genetics-population databases submitted to the trial court at the *Rule* 104

hearing. Dr. Word testified that the databases were compiled from Cellmark's own study of fifty African Americans and a database created by Roche Molecular Systems, which was derived from a Roche study of 100 African Americans. She further explained that Cellmark's polymarker databases were "essentially the same" as those used by other prominent forensic laboratories around the country. Dr. Word also testified to the use of the product rule to derive a composite frequency for defendant's six-loci genotype.

At the *Rule* 104 hearing, the defense's expert, Dr. Shaler, did not contest the accuracy of Cellmark's databases. Instead, he relied on them in his own statistical calculations. Although the defense still does not criticize the databases, it contends that the State's population databases were not large enough to be an accurate sampling of the population. *Post* at 291, 699 *A*.2d at 682.

In addition, the defense never sought to introduce evidence disputing the general acceptance or the mathematical soundness of the product rule. Even on this appeal, the defense does not challenge the use of the product rule. Indeed, the defense states that "everyone agrees that the product rule is absolutely valid." The dissent, however, maintains that the trial court erred in failing to hold an admissibility hearing on the reliability of the product rule. *Post* at 293, 699 *A*.2d at 682. In particular, the dissent argues that the State never established the independence of the loci tested, *post* at 290, 699 *A*.2d at 681, and that the use of the "unmodified" product rule was erroneous, *post* at 286, 290, 699 *A*.2d at 679, 681.

On this record, the dissent's arguments are particularly unpersuasive. First, publications reveal that statistical databases used by other laboratories for DQ Alpha and PM loci are often constructed with small groups of blood donors. *See, e.g.,* Kwang Man Woo & Bruce Budowle, "Korean Population Data on the PCR–Based Loci LDLR, GYPA, HBGG, D758, Gc, HLA–DQA1 and D1S80," 40 *J. Forensic Sci.* 645 (1995) (obtaining blood from 116

unrelated Korean individuals); Jeanne M. Hayes et al. & Maya Freund, "Arab Population Data on the PCR–Based loci: HLA–DQA1, LDLR, GYPA, HBGG, D758, Gc and D1S80," 40 *J. Forensic Sci.* 888 (1995) (collecting ninety-four blood samples from unrelated Arabs); *see also Pope, supra,* 220 *Ill.Dec.* at 312, 672 *N.E.*2d at 1324 (finding that "[b]ecause the PCR polymarker systems are two allele or three allele, the FBI may rely on a smaller database. Thus, the PCR Caucasian database contains only 145 individuals").

■ Second, the trial court found that the underlying databases were reliable. In light of that finding, questions regarding the size of a database go to the weight of the evidence, not its admissibility. *See People v. Adams,* 195 *Mich.App.* 267, 489 *N.W.*2d 192, 198 (1992) (holding that, in face of expert testimony that database was valid, questions concerning size of database and statistical conclusions drawn from it went to weight, not admissibility, of evidence), *modified in part on other grounds,* 441 *Mich.* 916, 497 *N.W.*2d 182 (1993); *State v. Copeland,* 130 *Wash.*2d 244, 922 *P.*2d 1304, 1320–21 (1996) (holding that questions regarding size of FBI's population databases was matter of weight once principle that frequency calculations could be made from an adequate database was determined to be generally accepted). Even on appeal, the defense does not challenge the size of Cellmark's databases. *See Fishback, supra,* 851 *P.*2d at 893 (admissibility established because evidence uncontradicted).

The dissent's contention that the trial court on its own motion should have conducted an independent *Rule* 104 hearing on the product rule also is without merit. The product rule assumes that each of the multiplied events (*i.e.,* the matches at each allele) has occurred independently of one another. The State's witnesses testified at the pretrial hearing and at trial that the population frequencies of the genes examined in the polymarker and DQ Alpha tests satisfied that requirement. Each derives from a gene located on a different part of the chromosome. Defendant never challenged the independence of the loci. At the pretrial hearing,

Dr. Shaler used the same version of the product rule as the State to compute his statistical figures. Furthermore, he testified that those loci were "independently inherited." *See also FBI Report, supra,* at 53 ("The distribution of the genotype frequencies for the various PM loci (as well as HLA–DQa) meet HWE [Hardy–Weinberg expectations], and there is little evidence for association of alleles across loci (for the PM loci, HLA–DQa, and D1S80) for our African American, Caucasian, southeastern Hispanic, and southwestern Hispanic population databases. The data demonstrate that valid estimates of a multiple locus profile frequency can be derived for identity testing purposes using the product rule under the assumption of independence.").

Although we have not previously considered whether the product rule has sufficient general acceptance so as to be admissible, two recent decisions by the Appellate Division accepted DNA statistical evidence calculated using the product rule. *See Marcus, supra,* 294 *N.J.Super.* at 287, 683 *A.*2d 221 (finding that "it is even clearer now than at the time of the *Frye* hearing that the use of the product rule in DNA analysis is generally accepted in the scientific community"); *Dishon, supra,* 297 *N.J.Super.* at 284–85, 687 *A.*2d 1074 (holding that use of product rule to calculate frequency of occurrence in Caucasian and Black populations is scientifically valid and that debate concerning ethnic substructures went to weight, rather than admissibility, of evidence). In addition, many other jurisdictions accept the product rule as scientifically reliable. *See, e.g., Fishback, supra,* 851 *P.*2d at 893–94 (holding that calculations done by applying product rule were generally accepted in relevant scientific community); *Clark v. State,* 679 *So.*2d 321, 321 (Fla.App.1996) (reasoning that "product rule calculations are appropriate as a matter of scientific fact and law"); *Pope, supra,* 220 *Ill.Dec.* at 315–16, 672 *N.E.*2d at 1327–28 (holding that use of product rule was generally accepted in scientific community); *People v. Chandler,* 211 *Mich.App.* 604, 536 *N.W.*2d 799, 803 (1995) (holding that "product rule method of DNA statistical evidence is now generally accepted in the relevant scientific community"); *State v. Kinder,* 942 *S.W.*2d 313, 317

(Mo.1996) (finding that product rule was generally accepted in scientific community); *Copeland, supra,* 922 *P.*2d at 1319 (concluding that "use of the product rule in establishing statistical probabilities of a genetic profile frequency in the human population is generally accepted within the relevant scientific community and that a significant dispute no longer exists in this matter").

All of the foregoing decisions rely on the 1996 *NRC Report* and the FBI Report, both of which concluded that the product rule was appropriate for calculating frequency probabilities. *See FBI Report, supra,* at 50–51 ("These examples demonstrate that the use of the product rule would provide a valid estimate of a multiple loci frequency for forensic purposes."); *NRC Report, supra,* at 5 ("In general, the calculation of a profile frequency should be made with the product rule.").

The dissent, however, asserts that a remand is necessary because the product rule used by the State and the defendant was "unmodified." *Post* at 287–291, 294, 699 *A.*2d at 680–681, 683. Specifically, the dissent notes that the NRC has recommended a "factor-of-ten" adjustment to the product rule, a modification of the product rule not employed here by either party. *Post* at 287, 699 *A.*2d at 680. That adjustment to the product rule can account for uncertainties in estimated frequencies. *NRC Report, supra,* at 33–34. Thus, for example, "[i]f the calculated probability of a random match between the suspect and evidence DNA is 1/(100 million), we can say with confidence that the correct value is very likely between 1/(10 million) and 1/(1 billion)." *Id.* at 34.

The dissent cites out-of-state decisions raising questions about population substructuring and the failure of the parties to use the "ceiling principle." *Post* at 287–291, 699 *A.*2d at 680–681 (citing, *e.g.,* *State v. Johnson,* 186 *Ariz.* 329, 922 *P.*2d 294 (1996) (finding product rule admissible only with use of ceiling principle); *United States v. Porter,* 618 *A.*2d 629, 643 (D.C.App.1992) (same); *Commonwealth v. Lanigan,* 413 *Mass.* 154, 596 *N.E.*2d 311, 314–16

(1992) (same)). In its 1996 report, however, the NRC dispelled many of those concerns.

In 1992, the NRC in its report, *DNA Technology in Forensic Science* 10–12 (1992), questioned the reliability of population substructuring:

The validity of the multiplication rule depends on the assumption of absence of population substructure. Population substructure violates the assumption of statistical independence of alleles. In a population that contains groups each with different allele frequencies, the presence of one allele in a person's genotype can alter the statistical expectation of the other alleles in the genotype. For example, a person who has one allele that is common among Italians is more likely to be of Italian descent and is thus more likely to carry additional alleles that are common among Italians. The true genotype frequency is thus higher than would be predicted by applying the multiplication [product] rule using the average frequency in the entire population.... The key question underlying the use of the multiplication rule—i.e., whether actual populations have significant substructure for the loci used for forensic typing—has provoked considerable debate among population geneticists. Some have expressed serious concern about the possibility of significant substructure.

To account for substructuring, the 1992 report recommended the use of the ceiling principle to calculate frequency statistics. The ceiling principle assumes the existence of some degree of population substructure and generates more conservative population frequency statistics than the product rule. *Marcus, supra,* 294 *N.J.Super.* at 282, 683 *A.2d* 221. In its 1996 report, however, the NRC "concluded that use of the ceiling principle overstates the effect of population substructure in calculating the population frequencies of a combination of matching DNA print patterns and consequently its use for forensic purposes is unnecessary." *Ibid.; NRC Report, supra,* at 35.

We conclude that the scientific community generally accepts the product rule. Whether a party uses a "factor-of-ten" adjustment as the NRC recommends, or the "ceiling principle," or no adjustment may be a legitimate subject of scientific debate. Indeed, the FBI, unlike the NRC, does not recommend a specific adjustment to the product rule. *FBI Report, supra,* at 50–52. General acceptance, however, does not require scientific consensus. We agree with the Appellate Division's reasoning in *Marcus:*

> The State [ ] may present evidence [to the jury] of population frequencies calculated by use of the product rule, the ceiling principle, or any other method that has a legitimate scientific basis. The defendant remains free to present conflicting expert opinion testimony regarding population frequency calculations. A point ultimately may be reached where there is such widespread agreement among experts in the field regarding the proper method of calculating population frequencies that only statistics generated by that methodology should be presented to the jury. However, until such a scientific consensus is established, this remains a legitimate subject for expert testimony at trial.

> [*Marcus, supra*, 294 *N.J.Super.* at 288, 683 *A.*2d 221.]

Thus, the dissent's concerns regarding the use of the "unmodified" product rule concern its weight, not its admissibility. *See Shea, supra*, 957 *F.Supp.* at 343 (finding that whether adjustments to product rule suggested in 1996 *NRC Report* were sufficiently conservative was issue of weight, not admissibility). Notably, the defense did not challenge the unmodified product rule, but rather used it in its own statistical analysis.

Moreover, application of the "factor-of-ten" to the polymarker results does not necessarily help defendant's case. The dissent claims that, based on the State's one–in–170 number "as many as one in seventeen people may share the DNA characteristics of the blood found at the scene." *Post* at 289, 699 *A.*2d at 680. The "factor-of-ten," however, is a confidence limit in both directions. Thus, using the one–in–170 number, as many as one–in–1700 hundred people may also share the DNA characteristics of the blood found at the scene.

As one court has stated:

> There are doubtless many formulas and principles which experts use ... to arrive at their ultimate opinions. The determination of which factors, formulas, or calculations are necessary, either singly or in conjunction with each other, to form an expert opinion is within the knowledge and judgment of the expert, and, again is a subject which can be approached and examined in the cross-examination or by bringing forward other expert witnesses.

> [*Jenkins v. State*, 627 *N.E.*2d 789, 794 (Ind.1993), *cert. denied*, 513 *U.S.* 812, 115 *S.Ct.* 64, 130 *L.Ed.*2d 21 (1994).]

Defendant had ample opportunity at trial to present the jury with a statistical interpretation of the DNA test results. In fact, Dr. Shaler explained his belief that, without associating alleles and taking into account all possible second donors to the box-spring

sample, approximately one–in–100 people could have contributed a non-excludable composite genotype, a more favorable figure than the one–in–666 figure that defendant now propounds. Defendant had the opportunity to challenge the State's statistical evidence, to present his own evidence, and to argue to the jury. We conclude that the trial judge did not err in permitting the jury to evaluate the State's statistical evidence.

Our reading of the record reveals that the dissent attributes greater significance to the statistical evidence than the evidence received at trial. The summations did not belabor the statistical evidence. On summation, defense counsel argued:

> The percentage that eventually came out as a result of this test, I believe is one out of 400 and there was another number, one out of 170.

For its part, the State invited the jury to deliberate based on Dr. Shaler's one–in–100 calculation, if it found that calculation to be more credible:

> Prosecutor: Remember the figures that we have, one in a hundred and seventy, one in fourteen hundred.
>
> Evaluate them. If you want to use them, I suggest you should use the one in fourteen hundred, or if you choose, use the figure given by Dr. Shaler, one in a hundred. Exclude ninety-nine percent.

Further, the trial court instructed the jury that it was not bound by any expert opinion, that it could assign whatever weight it deemed appropriate to the expert evidence, and that testimony couched in terms of percentages or probabilities could not relieve the State of its burden of proof. The court left the weight of the statistical evidence to the jury. That defendant belatedly has thought of an alternative manner in which to present statistical evidence concerning the DQ Alpha results does not constitute reversible error.

## - B -

 Likewise without merit is defendant's objection to the admission of the State's statistical evidence through experts who were not statisticians. As previously indicated, defendant's own

expert, Dr. Shaler, did not take issue with Cellmark's databases or its mathematical formula.

 Moreover, the competency of a witness to testify as an expert is an issue remitted to the sound discretion of the trial court. *See supra* Part IV.B.1. Absent a clear abuse of that discretion, an appellate court will not interfere with the exercise of that discretion. *Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 411, 161 *A.*2d 69 (1960). We cannot say that the trial court's decision to allow Dr. Word's testimony at the pretrial hearing and Ms. Cooper's testimony at trial regarding the frequency of genetic markers in the population was an abuse of discretion.

- C -

 Also without merit is defendant's objection to the admission of the State's statistical evidence on the basis that it was introduced without telling the jury of the "confidence intervals" or "margins of error" associated with statistical analysis. In support of that argument, the defense attaches to its brief a letter from Dr. Eleanor Feingold, a biostatistical professor at Emory University. Dr. Feingold's letter asserts that the Cellmark data used to calculate defendant's number for inclusion on the polymarker test has a range of between one–in–122 and one–in–297, at a 95% confidence level.

Pursuant to *Rule* 2:5–4(a), the State argues that the letter from Professor Feingold in defendant's appendix concerning confidence intervals should be stricken from the record along with the portions of defendant's brief relying on the letter. The State contends that such material is outside the record on appeal. The defense counters that Dr. Shaler alluded at trial to confidence intervals and that Dr. Feingold's letter is simply an "illustration of the importance of confidence intervals to a fair understanding of statistical evidence."

 We grant the State's motion to strike. An appellate court, when reviewing trial errors, generally confines itself to the

record. *See County of Bergen v. Borough of Paramus,* 79 *N.J.* 302, 309–10 n. 2, 399 *A*.2d 616 (1979) (holding that appellant's appendix, which contained numerous documents not offered into evidence, clearly violated *R.* 2:5–4); *Ambassador Ins. Co. v. Montes,* 76 *N.J.* 477, 481–82, 388 *A*.2d 603 (1978) (reasoning that Court was limited to review of insurance policy introduced into evidence and that insurance company could not supplement record on appeal). As previously explained, an appellate court may review scientific literature and judicial opinions, including those published after trial, to determine whether a technique is generally accepted. That practice, however, does not constitute an invitation for the parties to supplement the record with additional expert testimony. The place to introduce expert testimony is at trial, where the expert is subject to cross-examination, the opposing party can introduce contradictory expert testimony, and the trial court can assess the experts' credibility.

Moreover, even if we were to accept Dr. Feingold's letter, it would not alter our conclusions concerning the statistical evidence. As stated previously, the issue of the proper confidence level, if any, is one of weight, not admissibility. *See supra* Part VI.A. Defendant had ample opportunity to present such evidence at trial.

### - D -

 Defendant challenges the results of Cellmark's DNA tests because the tests assume the source of the mixed-blood sample was an African American. Defendant states that Cellmark's assumption was unwarranted and contrary to the presumption of innocence. He argues that his genotype for the D7S8 gene is less common in African Americans (45%) than in Caucasians (50%). From that premise, he concludes that analyzing the blood samples on the assumption that the suspect was black made the inclusion ratio appear more incriminating.

The allegation is without merit. The statistics were expressed in terms of the African–American population because defendant

was African–American. Significantly, considerable other evidence indicated that the perpetrator of the Schnaps murder was African–American. An African–American hair was recovered at the scene. Non–DNA blood typing revealed the presence of the CA II enzyme, which is present only in African Americans. We conclude that that evidence justifies the premise that the perpetrator was an African American. Legitimate reasons existed for expressing the percentage figures in terms of the African–American population. In sum, the DNA tests were not tainted by racism.

## - VII -

We next consider defendant's argument that the trial court erred in failing to grant a mistrial when a prosecution witness testified that another suspect had passed a polygraph examination.

## - A -

Early in the investigation, police considered Peter Stohwasser, a neighbor of Schnaps, as a possible suspect. Defendant contended at trial that the police failed to investigate thoroughly Stohwasser and prematurely dismissed him as a suspect.

To that end, defense counsel cross-examined Philip Beesley, a forensic scientist for the New Jersey State Police. Beesley acknowledged that during the time when Stohwasser was a suspect, Beesley did not conduct any of the comparison studies on Stohwasser's blood that he later ran on defendant's blood. Nor did Beesley receive any blood samples from Stohwasser.

Following Beesley's testimony, Investigator O'Brien explained why the police had dismissed Stohwasser as a suspect. Pursuant to a search warrant, police searched Stohwasser's apartment and seized various items for bloodstain analysis. Investigating police eventually eliminated Stohwasser as a suspect, however, for numerous reasons. First, the blood stains on the seized items did

not match the blood type of the victim. Second, Stohwasser did not possess any footwear that matched the sneaker print left at the crime scene. Finally, Stohwasser is Caucasian and could not have been the source of the "Negroid hair" found at the crime scene.

On redirect, the State elicited from O'Brien that Stohwasser had taken and passed a polygraph test. At that point, defense counsel objected. The trial court sustained the objection and informed the jury to "disregard the last question and the last answer."

The following day, the defense moved for a mistrial on the basis of the polygraph reference. The defense unsuccessfully argued that mention of the polygraph raised an inference that the police had not eliminated defendant as a suspect because either he refused to take a lie detector test or he took the test and failed.

At the charge conference the polygraph issue re-emerged. The trial court reprimanded the State and proposed a corrective jury instruction:

Now, I prepared a proposed instruction on my own, thinking about this issue, which I will eventually tell the jury that a polygraph examination is not admissible in evidence. While it may be a legitimate investigatory tool, and I would have told the jury or [sic] my proposed instruction that I thought of was simply to suggest that the question was not designed to bring out the truth of the result, but simply to show why the police eliminated him as a suspect.

I would also—my proposed instruction will tell the jury that they are to draw no adverse inference against Mr. Harvey, because when the Stonehauser [sic] request was made, Mr. Harvey was not in custody. That was my proposal.

You want me not to raise it because of your concern of possible impact, I certainly won't do it.

All I am saying is that in my view of my notes on this issue and my feeling of the case, so to speak, I am satisfied tht [sic] the question and answer are simply something not capable of producing any prejudice to the defendant whatsoever.

Defendant declined the instruction.

- B -

Defendant now argues that the reference to the polygraph results of an earlier suspect should have resulted in a mistrial

because it violated his Fifth Amendment right to silence and prejudiced him in the eyes of the jury.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, *State v. DiRienzo,* 53 *N.J.* 360, 383, 251 *A.*2d 99 (1969), which should grant a mistrial only to prevent an obvious failure of justice. *State v. Rechtschaffer,* 70 *N.J.* 395, 406, 360 *A.*2d 362 (1976). An appellate court should defer to the decision of the trial court, which is in the best position to gauge the effect of the allegedly prejudicial evidence. *State v. Winter,* 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984). Thus, an appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice. *DiRienzo, supra,* 53 *N.J.* at 383, 251 *A.*2d 99. Here, the reference to the polygraph test did not refer directly either to defendant or a testifying witness, but to the polygraph results of an unindicted suspect.

In a similar context, the Ninth Circuit has found the reference to the polygraph test of another suspect to constitute harmless error. *See United States v. Candoli,* 870 *F.*2d 496, 505 (9th Cir.1989) (finding that district court's refusal to strike references to polygraph examination was not prejudicial because it did not materially affect verdict); *United States v. Hall,* 805 *F.*2d 1410, 1417 (10th Cir.1986) (testimony that defendant had failed two polygraphs submitted to explain police's failure to conduct more complete investigation). *But see State v. Moss,* 180 *W.Va.* 363, 376 *S.E.*2d 569 (1988) (holding that admission of testimony that State had dismissed indictment against earlier suspect because he successfully passed polygraph was reversible error when prosecutor repeatedly referred to polygraph on direct and in summation).

On this record, the reference to an unindicted suspect's polygraph results does not constitute reversible error. The reference came in response to defendant's attack on the conduct of the police's murder investigation. Further, the trial court immediately sustained the defendant's objection and instructed the jury to disregard the reference to the polygraph results. The State,

moreover, presented substantial evidence explaining why it eliminated Stohwasser as a suspect. Any prejudice to defendant was minimal.

### - VIII -

Defendant argues that the trial court committed reversible error by inadequately protecting the jury from prejudicial pre- and midtrial publicity. Specifically, defendant alleges that the trial court erred in refusing: (1) to dismiss the entire pool of qualified jurors as being tainted by pretrial publicity; (2) to question individually jurors regarding their exposure to press coverage of the trial; (3) to question jurors on whether they had been exposed to publicity of the contemporaneous murder trial of *State v. Johnson;* and (4) to sequester the jury during the penalty-phase deliberations.

### - A -

The first phase of jury selection lasted from February 2 to March 31, 1994. Each potential juror filled out an eleven-page questionnaire. On the specific issue of pretrial publicity, the questionnaire contained five relevant questions:

> 37. Have you seen anything on television or heard anything on the radio about this case? __Yes __No.
>
> 38. Have you read anything about this case in the newspaper? __Yes __No.
>
> 39. Other than what the judge said to you today, has anyone else talked to you about this case? __Yes __No.
>
> 40. Have you heard anybody discussing this case or the people involved in it, either here today or at anytime previously? __Yes __No.
>
> 41. Do you know anything about this case other than what you have heard in court today? __Yes __No.

The trial court questioned each juror individually concerning their answers. The court also afforded both the defense and the prosecution opportunities to question the jurors. Not one juror was excused because of exposure to prejudicial press coverage. Defendant did not object to the court's handling of the publicity issue. At the close of the February–March 1994 selection phase, and without objection from defendant, the trial court qualified forty-seven jurors.

An adjournment to enable defendant to examine the prosecution's DNA evidence delayed resumption of the jury-selection process until October 18, 1994. Using the same process, the court qualified six more jurors. Again, no juror was excused on the basis of exposure to publicity.

On October 24, 1994, the jurors who had been selected during the February–March phase returned to court. The trial court asked whether, during the interim, they had heard anything about either the parties or the proposed evidence that would impair their ability to serve impartially. Only one prospective juror indicated that he had read about the case. He told the court that he had learned that this case was a retrial and that defendant previously had been sentenced to death. The trial court excused that juror and told the other jurors to return October 28, at which time the court resumed *voir dire* with the remaining jury pool.

On October 25, 1994, defense counsel notified the court of the existence of three recently published newspaper articles that discussed defendant's case. The articles mentioned defendant's suppressed confession and the previously-imposed death sentence. At defendant's request, the court inquired of potential jurors about their knowledge of the articles. From October 25 through October 27, in response to specific questions from the court, no juror revealed that he or she had read the subject articles. Concerned about the jurors selected in February–March and on October 18 and 20, who had not been present in the courtroom since October 24, defense counsel requested on October 28 that

the court similarly question those jurors individually. The court denied the request. Instead, the court questioned the previously-selected jurors as a group and individually questioned only those jurors who indicated that they were familiar with the newspaper articles. In addition, the court gave defense counsel the option of requesting additional peremptory challenges.

When the forty-seven previously qualified jurors were brought into the courtroom, the court asked whether any of them had "read, heard, overheard, or been told anything about this matter whatsoever?" Twelve jurors raised their hands. Of these twelve jurors, two had overheard discussions of the case, two had heard radio broadcasts, and seven admitted having read about the case in the newspaper. One of the jurors who raised her hand had not heard about the case but wanted to inform the court that she knew a sheriff's officer. Ultimately, all twelve of those jurors were excused.

In light of the number of jurors who had indicated that they had been exposed to pretrial publicity, defendant moved either to dismiss the entire pool of the remaining, previously-qualified jurors or for individual questioning of the jurors. Defendant argued that, despite the jurors' denials, a substantial likelihood existed that the remaining jurors had been exposed to the circulating articles and broadcasts.

The trial court denied both motions, explaining that the questioning had effectively identified tainted potential jurors. The court reminded the remaining jurors of the importance of avoiding news coverage and of their ongoing obligation to report exposure to any such coverage. It then instructed the qualified jurors to return on November 29, 1994, for the commencement of the trial.

To replace the jurors excused on October 28, the court continued jury selection on November 2, 3, 4, 7, 9, 10, and 15, 1994. During those sessions, the court individually questioned each potential juror about his or her familiarity with defendant's case. None of the potential jurors revealed any exposure to pretrial

publicity. By the close of jury selection on November 15, 1994, fifty jurors had been qualified.

On the morning of the first day of the trial, November 29, 1994, defendant moved to sequester the jury or to strike the entire panel and to start the selection process anew. Defendant informed the court that the morning editions of the Star Ledger, News Tribune, and Home News carried articles on the court's DNA rulings. Two of the articles mentioned defendant's suppressed confession. The court denied the defendant's motions for sequestration and to strike the jury, but agreed to ask all of the qualified jurors whether any of them had read anything about the case.

The court's inquiry to the panel of qualified jurors revealed that two had been exposed to press coverage. The court excused both jurors. Defendant renewed his motion to strike the panel and sequester the new jury. Again, the court denied the motions.

The jury was then selected from the pool of qualified venire persons. Defendant used only eighteen of his twenty peremptory challenges, thus mooting the court's earlier offer to consider defense requests for additional challenges. At the end of the day on November 29, the court instructed the jury to avoid exposure to any press coverage.

On December 1, 1994, the third day of trial, defendant brought to the attention of the court that three newspapers had published new articles about the case. Five days later, a juror informed the court that he had heard a coworker discussing the case and that he had discovered that two of his coworkers were related to defendant. The court excused the juror. Thereafter, the court denied defendant's motion for sequestration.

Following defendant's conviction on December 13, 1994, the court began the penalty phase on December 15, 1994. On December 14, defendant again moved for sequestration because of continuing publicity. The court denied that motion and defendant's

request that the court again question individually the jurors on their exposure to the press coverage.

At the beginning of the second day of the penalty phase, defendant complained about three more damaging articles in the morning newspapers. The court declined a defense request to interview jurors individually about the articles. In response to questions posed to the entire panel, no juror indicated that he or she had been exposed to press coverage.

- B -

The Sixth and Fourteenth Amendments to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee the right to a fair trial by an impartial jury. *Irvin v. Dowd,* 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L.Ed.*2d 751, 755 (1961); *Koedatich I, supra,* 112 *N.J.* at 267, 548 *A.*2d 939; *State v. Williams,* 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983) (*Williams I* ). The guarantee protects the defendant from substantial pre- and midtrial publicity. *Sheppard v. Maxwell,* 384 *U.S.* 333, 362–63, 86 *S.Ct.* 1507, 1522–23, 16 *L.Ed.*2d 600, 620 (1966); *Williams I, supra,* 93 *N.J.* at 60, 459 *A.*2d 641. In death-penalty cases, the trial court has a heightened duty "to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudication process." *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641.

The means for ensuring jury impartiality in the face of pretrial publicity is interrogation of the jury. *Patton v. Yount,* 467 *U.S.* 1025, 1038–39, 104 *S.Ct.* 2885, 2892–93, 81 *L.Ed.*2d 847, 858 (1984); *State v. Jackson,* 43 *N.J.* 148, 203 *A.*2d 1 (1964), *cert. denied sub nom. Ravenell v. New Jersey,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *State v. Gary,* 229 *N.J.Super.* 102, 111, 550 *A.*2d 1259 (App.Div.1988). In performing that function, trial courts possess considerable discretion. To protect juries from the taint of pretrial publicity, particularly in capital cases, courts should "exercise extraordinary care in the *voir dire* of potential jurors and [can] excuse for cause any juror who has been exposed

to sensational prejudicial publicity, especially where such exposure is repeated and involves patently inadmissible evidence." *Williams I, supra,* 93 *N.J.* at 68–69, 459 *A.*2d 641. Even capital defendants, however, are not entitled to jurors who are totally ignorant of the facts and issues of their cases. *Koedatich I, supra,* 112 *N.J.* at 268, 548 *A.*2d 939; *State v. Sugar,* 84 *N.J.* 1, 23, 417 *A.*2d 474 (1980); *Gary, supra,* 229 *N.J.Super.* at 110, 550 *A.*2d 1259.

The appellate standard for reviewing a *voir dire* procedure is whether, despite the trial court's efforts, there still existed a "realistic likelihood of prejudice resulting from pretrial publicity." *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641.

Preliminarily, an appellate court must distinguish "between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel." *State v. Biegenwald,* 106 *N.J.* 13, 33, 524 *A.*2d 130 (1987) (*Biegenwald II* ). Our examination of the record does not support a presumption of prejudice to defendant.

When a court cannot assume prejudice, the inquiry to determine the existence of a realistic likelihood of prejudice is whether under the totality of the circumstances the *voir dire* resulted in a fair and impartial jury. *Biegenwald IV, supra,* 126 *N.J.* at 22–23, 594 *A.*2d 172. In making that determination, an appellate court should show appropriate deference to the trial court's assessment of "matters of credibility, judgment and discretion which should not ordinarily be disturbed on appeal." *Gary, supra,* 229 *N.J.Super.* at 111, 550 *A.*2d 1259; *see also State v. Singletary,* 80 *N.J.* 55, 63–64, 402 *A.*2d 203 (1979); *Jackson, supra,* 43 *N.J.* at 160, 203 *A.*2d 1.

We conclude that the trial court did not err by failing to strike the qualified jury pool. The court examined all potential jurors through questionnaires and individual questioning. It spe-

cifically questioned jurors on learning of the October 25 newspaper articles and questioned collectively the previously-qualified jurors. The court excused jurors who revealed prejudicial exposure to press reports. Furthermore, the court informed the jurors of their ongoing duty to avoid contact with newspaper articles and broadcasts. We conclude that a substantial likelihood did not exist that media coverage had prejudiced the remaining jurors.

- C -

We also reject defendant's argument that the trial court committed reversible error by not interrogating the previously-qualified jurors after publication of each new series of newspaper articles. After considering the totality of the circumstances, the trial court effectively informed the jurors of their duty to remain impartial and removed tainted jurors from the panel. The collective questioning elicited admissions of taint from twelve jurors. On balance, we conclude that the trial court adequately responded to problems posed by press coverage of the trial.

- D -

Defendant also alleges that the trial court erred by failing specifically to inquire of jurors about another Middlesex County murder prosecution, *State v. Johnson*, which was also the subject of press coverage during defendant's trial. The *Johnson* case bore superficial similarities to defendant's case in that it also involved an African–American male accused of murdering a white woman. Local newspapers widely reported Johnson's statement that "blacks should kill white women so they can't reproduce."

In response to defendant's concerns about the *Johnson* case, the trial court asked the penalty-phase jury collectively whether it had read reports about defendant's case or "anything else" that would affect their impartiality. Defendant complains that the trial court should have asked the jurors specifically about the *Johnson* case. We disagree.

Defendant did not express concern over the *Johnson* case until December 15, 1994, the eve of the commencement of the penalty phase. Furthermore, defendant did not request questioning of the jurors about the *Johnson* case before the guilt phase. Before starting the penalty-phase deliberations, the court asked the jurors whether they had learned about defendant or heard anything else that could affect their impartiality in deciding defendant's sentence. Although the court did not specifically mention *Johnson*, the court broadened the inquiry to ascertain whether the jurors had read any prejudicial reports from any source outside the record.

The present case differs from *State v. Jasuilewicz*, 205 *N.J.Super.* 558, 501 *A.*2d 583 (App.Div.1985), *certif. denied*, 103 *N.J.* 467, 511 *A.*2d 649 (1986), where the defendant killed his mother by stabbing her twenty-one times. At trial, Jasuilewicz had relied on the defense of insanity. Jury selection began in the wake of news accounts of the acquittal by reason of insanity of John Hinckley, who had shot President Ronald Reagan. Concerned about taint from the Hinckley verdict, Jasuilewicz repeatedly requested a *voir dire* concerning the effect on each juror of the Hinckley publicity. *Id.* at 567, 501 *A.*2d 583. The trial court, however, refused defendant's request. The Appellate Division found that the trial court's refusal to interrogate about the Hinckley publicity constituted reversible error. *Id.* at 569, 501 *A.*2d 583.

In *Jasuilewicz*, the trial court failed not only to ask searching questions, but failed generally to ask any questions about the jurors' potential exposure to the *Hinckley* case. *Ibid.* In contrast, the trial court here, although it did not specifically mention the *Johnson* case, adequately interrogated the jury about its exposure to another murder prosecution.

Unlike Jasuilewicz, who was concerned about the reaction of the jury to the insanity defense in *Hinckley*, defendant here did not voice a concern over the *Johnson* case until the day before the beginning of the penalty phase. Thus, the court did not question jurors about the *Johnson* case before the guilt phase. Further-

more, the trial court in the present case, unlike the court in *Jasuilewicz,* responded to defendant's concerns.

- E -

█ Defendant alleges error in the trial court's failure to sequester the jury, especially during the penalty phase. Defendant also asks this Court to rule that jury sequestration should be mandatory in all capital cases.

█ Jury sequestration is a decision generally left to the discretion of the trial court. *State v. Moriarty,* 133 *N.J.Super.* 563, 569, 338 *A.*2d 14 (App.Div.1975), *certif. denied,* 68 *N.J.* 172, 343 *A.*2d 459 (1975). The practice places a great burden on the judicial system and on individual jurors. Accordingly, courts use it only in extraordinary circumstances. *R.* 1:8–6(a). We are unconvinced that the publicity surrounding defendant's trial was so pervasive and prejudicial that the trial court abused its discretion by denying defendant's motion.

- IX -

Defendant next alleges various incidents of prosecutorial misconduct. Specifically, defendant argues that the prosecutor: exceeded the bounds of proper summation; improperly questioned the State's expert on hair analysis by asking questions the answers to which were inadmissible and beyond the scope of examination as limited by the trial court; and indirectly introduced inflammatory evidence.

- A -

█ Defendant contends that the prosecutor committed misconduct in summation by urging the jury to apply the product rule to the entirety of the State's case.

In her summation, defense counsel stressed that reasonable doubt still existed about the identity of Irene Schnaps's murderer. Counsel claimed that the initial investigation was marred by

shoddy police work and that all of the State's evidence, including the DNA test results, could not narrow the pool of potential suspects below the thousands.

The prosecution countered in its summation that the evidence established beyond a reasonable doubt that defendant was guilty of the murder of Irene Schnaps. The prosecutor argued to the jury:

> Use the product rule ... and figure out in your own mind the likelihood that one person out of one hundred—it could be thousands—would have size six and a half shoe [sic], would have sneakers with the thread [sic] that size and wear [sic] match, blood stained pillow at the scene, multiply it by the fact that the Negroid hair matched the Negroid hair found at the scene, match the exemplar from Mr. Harvey, and multiply that by the watch.

> You have taken a circumstantial—you started with everybody in the world and you narrowed that circumstantial by what is available. These are the items that were available at the scene. This is what the State used. I suggest to you, they are more than sufficient to show you beyond a reasonable doubt Mr. Harvey committed this offense.

> \* \* \* \* \* \* \* \*

> This is not speculation, this is not guesswork, this is fact. The probabilities of a person having those things, all these things, are minuscule, well beyond a reasonable doubt, and the person that had these characteristics, whether it be hair, blood, shoe size, shoes and watch is minuscule. That person is Mr. Harvey....

Following the State's summation, defense counsel objected to the prosecutor's comment that the probabilities were "minuscule" that all the pieces of evidence, when taken together, allowed room for a reasonable doubt. Counsel argued that the prosecution was "trying to assess a mathematical standard" in determining the existence of reasonable doubt. Further, counsel requested the court to instruct the jury that "reasonable doubt cannot come down to [a] mathematical formula or standard." The court denied the request.

Defendant now challenges the prosecutor's invitation for the jury to apply the product rule to the totality of the State's evidence. Furthermore, defendant alleges that inviting the jury to use the product rule was akin to the performance of an improper demonstration by the prosecutor before the jury.

■ We evaluate the allegations of prosecutorial misconduct in light of the unique responsibilities of a prosecutor. Prosecutors must pursue their duties "with earnestness and vigor," *United States v. Young*, 470 *U.S.* 1, 7, 105 *S.Ct.* 1038, 1042, 84 *L.Ed.*2d 1, 7 (1985) (quoting *Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)), and make a "forceful presentation of the State's case." *State v. Ramseur*, 106 *N.J.* 123, 320, 524 *A.*2d 188 (1987). As advocates, prosecuting attorneys enjoy considerable leeway when making a summation. *State v. Perry*, 65 *N.J.* 45, 48, 319 *A.*2d 474 (1974); *Dixon, supra,* 125 *N.J.* at 259, 593 *A.*2d 266; *State v. Michaels*, 264 *N.J.Super.* 579, 641, 625 *A.*2d 489 (App.Div.1993), *aff'd,* 136 *N.J.* 299, 642 *A.*2d 1372 (1994).

■ Generally, prosecutorial misconduct does not constitute a ground for reversal unless the conduct is deemed "so egregious that it deprived defendant of a fair trial." *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188. A reviewing court must consider "the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." *State v. Marshall*, 123 *N.J.* 1, 153, 586 *A.*2d 85 (1991) *(Marshall I)*. The United States Supreme Court has articulated a similar test: "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 *U.S.* 168, 181, 106 *S.Ct.* 2464, 2471, 91 *L. Ed.*2d 144, 157 (1986) (internal quotations omitted).

Here, the prosecutor's reference to the product rule did not constitute reversible error. The comment was more a rhetorical device than an invitation for the jury to apply a mathematical formula. The prosecutor was responding to defendant's allegations that the evidence acted to enlarge, rather than limit, the pool of possible suspects. By commenting on the product rule, the State tried to argue that all of the evidence, when considered collectively, pointed to defendant's guilt.

■ Furthermore, the trial court's instructions cured any perceived prejudice. On three separate occasions, the court instructed the jury that the comments of counsel were not evidence. Further, the court gave a specific instruction that no testimony couched in mathematical terms, such as percentages or probabilities, could relieve the State of its burden of proof. These instructions ensured that no confusion or prejudice resulted from the prosecutor's product-rule comment. *See Spann, supra,* 130 *N.J.* at 518, 617 *A.2d* 247 (1993) (stating that appropriate jury instructions can enable juries to cope with complexities of probabilistic evidence).

- B -

Defendant next attacks the prosecutor's examination of the State's hair-analysis expert, Theodore Mozer. Specifically, defendant contends that portions of Mozer's testimony were both inadmissible and beyond the permissible scope of the examination.

Defense counsel objected when Mozer testified that if the characteristics of microscopically-compared hairs match, "we can determine that this hair ... probably came from the person to which we're comparing the sample to." Defense counsel contended that the testimony was not made with a reasonable degree of scientific certainty. The State then elicited testimony from Mozer that to a reasonable degree of scientific certainty defendant's hair compared "microscopically and physically" to the "Negroid" hair recovered from the crime scene.

■ Defendant argues that certain questions to which his counsel successfully objected invited answers that exceeded the scope of the extent of the witness's testimony, as represented by the prosecutor. Consequently, defendant maintains that the prosecution improperly created the impression that the expert had never made a mistake and that the hair came from defendant. We disagree. The trial court promptly sustained defense objections to the questions. Our reading of the record leads us to

conclude that the prosecutor's questions do not warrant reversal of defendant's conviction.

- C -

Defendant's third allegation of prosecutorial misconduct is that the State improperly injected into the case the specter of sexual assault. Specifically, defendant complains about the introduction of a schematic diagram and testimony regarding items sent to the State Police Laboratory.

Before trial, the State prepared a schematic diagram of Schnaps's apartment to explain where it found certain items of evidence. Of the approximately sixty individual items of evidence retrieved from the apartment, eight were featured in the diagram. At the bottom of the diagram was a legend describing the eight items, indicating their location in the apartment.

Defendant challenges the inclusion in the diagram of the location of the victim's "panties" and a pair of her shorts. Defense counsel objected to those items being highlighted in the diagram, arguing that they had no evidential value and that reference to them was potentially prejudicial.

The trial court overruled the objection, noting that the shorts, which were made of terry cloth, were designed for outerwear. Consequently, reference to them was devoid of potential prejudice. The court decided that the panties were relevant to the State's allegation that Schnaps's body had been washed to remove traces of blood. Defense counsel accepted the court's offer of a limiting instruction. Subsequently, a State investigator testified to the long list of evidence removed from Schnaps's apartment, including the panties. The trial court then instructed the jury:

> Ladies and gentlemen, before [the prosecutor] goes further, you heard the investigator indicate to you what he retained from the apartment and I know he referred to panties and perhaps other undergarments. I have allowed that testimony but please understand that there is no charge against Mr. Harvey of any type of sexual assault. Please understand that.

Thereafter, the investigator described the items sent to the State Police Laboratory on June 20, 1985. Two of the items were "a pubic hair control taken from the victim," and "oral, vaginal, and anal swabs taken from the victim at the time of autopsy." Defense counsel did not object to the description. Hence, we treat the reference to them as a matter of plain error.

The investigator then began to read from the list of items that were later sent to the police laboratory including "pubic hair sample from the sus..." At a sidebar conference, defense counsel objected to mention of defendant's pubic hairs. The court agreed and instructed the prosecutor that the investigator could not refer to the submission of defendant's pubic hair.

Defendant now maintains that introduction of the schematic diagram featuring the location of the victim's panties, the mention that vaginal and anal swabs were sent to the police laboratory, and the reference to pubic hair, combined to infect the proceedings with prejudicial inferences of sexual assault. The contention is without merit.

Through special instructions, the trial court ensured that the jury understood that the case did not include any allegations of sexual assault. The court did not abuse its discretion in admitting the schematic diagram. That evidence was relevant to the prosecution's theory that defendant had wiped blood from the victim's body with a damp towel. Nor do we find that the State's investigator raised the specter of sexual assault. The court properly prevented the investigator from testifying that a sample of defendant's pubic hair was sent to the police laboratory. Likewise, we do not find plain error in the reference to the vaginal and anal swabs sent for analysis to the police laboratory. *See State v. Harper,* 128 *N.J.Super.* 270, 277, 319 *A.*2d 771 (App.Div.) ("Trial errors which were induced, encouraged, or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal"), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974). The trial court's instruction that defendant was not accused of sexual assault was sufficient to have dispelled any possible taint which

could have resulted from that reference. Moreover, unlike the dissent, we do not view these independent trial events to be violative of our directive in *Harvey I, supra,* 121 *N.J.* at 407, 581 *A.*2d 483, that references at retrial should not include the information that the hair found at the crime scene was a pubic hair. *Post* at 313, 699 *A.*2d at 693. The State never characterized the hair found in Schnaps's apartment as a pubic hair.

- X -

Defendant argues that the police illegally seized the Seiko LaSalle watch found in the trunk of his car. He asserts further that the police violated his right to silence four times on October 28, 1985, by "unrelenting[ly] coercive police methodology." Those violations of his right to silence, he alleges, coerced him into admitting that he committed various burglaries and a sexual assault in West Windsor Township. He argues that the "coerced" admissions "forced" him to consent to a police search of his car and Jamesburg apartment on October 29. Defendant accordingly argues that the trial court should have suppressed the watch.

- A -

At the pretrial suppression hearing, the trial court concluded that defendant had consented to the search and that the watch could be admitted into evidence at trial. The court acknowledged that October 28, the date of defendant's arrest, was an "exhausting" day for defendant. Nevertheless, the court concluded that the police did not employ any coercive tactics and that defendant voluntarily sought out Detective Swanhart to confess to the West Windsor crimes. Likewise, the court held that defendant voluntarily signed the consent-to-search form. The voluntariness of defendant's consent, the court noted, was confirmed by the fact that he did not believe that any incriminating evidence was in his car.

- B -

In *Harvey I, supra,* 121 *N.J.* at 417, 581 *A.*2d 483, defendant sought to suppress only his October 30 confession to the Schnaps murder. Accordingly, we declined to address defendant's allegations that his right to silence was violated on October 28. *Ibid.* We now conclude that defendant's concerns are without merit.

In general, the police must "scrupulously honor" a suspect's right to silence. *Michigan v. Mosley,* 423 *U.S.* 96, 104, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321 (1975); *Miranda v. Arizona,* 384 *U.S.* 436, 473–74, 86 *S.Ct.* 1602, 1627–28, 16 *L.Ed.*2d 694, 723 (1966); *State v. Johnson,* 120 *N.J.* 263, 282, 576 *A.*2d 834 (1990); *Hartley, supra,* 103 *N.J.* at 260–61, 511 *A.*2d 80. "Scrupulously honoring" a defendant's right to silence requires a cessation of questioning once the defendant asserts his Fifth Amendment right. *Johnson, supra,* 120 *N.J.* at 282, 576 *A.*2d 834 ("Where the invocation of the right to remain silent is followed by no interruption in questioning, and where the interrogation continues as if nothing had happened, the right is not scrupulously honored."); *State v. Bey,* 112 *N.J.* 45, 68–70, 548 *A.*2d 846 (1988) (*Bey I*) (holding defendant's rights not scrupulously honored when police officers ignored his attempt to remain silent and continued questioning); *Hartley, supra,* 103 *N.J.* at 287, 511 *A.*2d 80 ("[a]uthorities must cease interrogation of suspect on his request"....). If police are unsure whether a defendant is asserting his right to silence, they must either stop the interrogation completely or "ask only questions narrowly directed to determining whether defendant was willing to continue." *Johnson, supra,* 120 *N.J.* at 284, 576 *A.*2d 834; *see also State v. Wright,* 97 *N.J.* 113, 120 n. 4, 477 *A.*2d 1265 (1984).

Once a defendant invokes his or her right to silence, interrogation can resume only if the police administer a fresh set of *Miranda* warnings. *Hartley, supra,* 103 *N.J.* at 267, 511 *A.*2d 80; *accord State v. Adams,* 127 *N.J.* 438, 445, 605 *A.*2d 1097 (1992); *State v. Fuller,* 118 *N.J.* 75, 83, 570 *A.*2d 429 (1990); *State*

*v. Mujahid,* 252 *N.J.Super.* 100, 109, 599 *A.*2d 536 (App.Div.1991), *certif. denied,* 127 *N.J.* 561, 606 *A.*2d 372 (1992). That rule, however, does not apply if the defendant initiates a dialogue about the crime. *Fuller, supra,* 118 *N.J.* at 85, 570 *A.*2d 429.

- C -

Police interrogated defendant three different times on October 28 before he confessed to the West Windsor crimes. When the police brought defendant to the station at 8:30 a.m., they informed him of his *Miranda* rights, and he signed a waiver. Defendant ate lunch at around 3:00 p.m. The first interrogation began at 3:37 p.m.

At this first interrogation session, the police again read defendant his rights, and he signed another rights form. The interrogation lasted a little over an hour, at which point defendant started to cry and asked for a half-hour "to think." The interrogation ceased, and the police returned defendant to his cell.

By requesting "time to think," defendant was not invoking his right to silence. *See State v. Bey,* 112 *N.J.* 123, 138–40, 548 *A.*2d 887 (1988) (*Bey II* ) (holding defendant's request to "lay down and think about what happened" did not constitute invocation of right to silence as "[n]ot every break in questioning compels renewed administration of the *Miranda* warnings"). Although the police granted defendant the requested respite, they were not required to formally re-Mirandize him before resuming their interrogation.

Questioning resumed at 4:50 p.m. with the police "reminding" defendant of his rights. That session lasted until defendant began to cry and requested to speak with his mother-in-law. That request was tantamount to an invocation of defendant's right to silence. In *Harvey I, supra,* 121 *N.J.* at 418–22, 581 *A.*2d 483, we held that defendant invoked his right to silence when, on October 30, he requested to speak with his father. *Id.* at 419, 581 *A.*2d 483.

Defendant was emotionally upset by the end of the 4:50 p.m. session and wanted the advice of a trusted family member. The police properly ended the interrogation and allowed Harvey to meet with Pearl Thomas.

When the next interrogation began at 7:30 p.m., the police did not readminister *Miranda* rights. That omission violated the bright-line rule of *Hartley*. As defendant had invoked his right to silence at the end of the 4:50 p.m. session, the police failed to honor scrupulously his right to silence. Hence, we concluded that "[a]ny statements made prior to the new warnings must be suppressed." *Harvey I, supra,* 121 *N.J.* at 420, 581 *A.*2d 483.

Defendant, however, made no incriminating statements during the 7:30 p.m. session. When defendant again became upset, the police stopped the questioning and returned him to his cell at around 8:00 p.m. The investigators' failure to honor scrupulously defendant's rights, therefore, did not prejudice defendant.

At 8:15 p.m., Harvey initiated efforts to speak with Detective Swanhart alone. As we concluded in *Harvey I, supra,* 121 *N.J.* at 418, 581 *A.*2d 483, there was "no evidence of police coercion or misconduct" on October 28. Furthermore, defendant was not subjected to "extended interrogations designed to wear down [his] will." *Ibid.* Investigators provided defendant with lunch, dinner, cigarettes, and chewing tobacco. The police also accommodated defendant's wish to have his mother-in-law brought to the jail to speak with him.

Defendant's voluntary reinitiation of dialogue with Detective Swanhart relieved the police of the duty to readminister *Miranda* warnings. *Fuller, supra,* 118 *N.J.* at 84–85, 570 *A.*2d 429. Nonetheless, Swanhart administered those warnings before recording defendant's confession.

Neither was defendant subjected to any police coercion on October 29. The record is devoid of evidence of coercion during the car tour of West Windsor or afterward.

The consent-to-search form was based on information provided by defendant in his voluntary confession. Defendant knew what the police wanted to search, what they were searching for, and that he had the right to refuse consent. Nonetheless, defendant voluntarily and knowingly signed the consent-to-search form. Because of defendant's consent, the police did not need a warrant. *Schneckloth v. Bustamonte*, 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043–44, 36 *L.Ed.*2d 854, 858 (1973).

The detectives thus lawfully discovered the Seiko–LaSalle watch. After searching defendant's car, they tied the bag containing the watch, put the bag in the trunk, and notified the Plainsboro police department. Later, the Middlesex County Prosecutor's Office obtained a valid search warrant and seized the watch.

- XI -

Defendant contends that the prosecution failed to produce sufficient supporting evidence of aggravating factor c(4)(f) to justify submission of that factor to the penalty-phase jury. Aggravating factor c(4)(f) applies to murders "committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another." *N.J.S.A.* 2C:11–3c(4)(f). Defendant avers that the killing itself cannot support a submission of the c(4)(f) factor. Rather, defendant argues that the State must produce proof that the defendant killed with the specific intent of escaping apprehension. Defendant also argues that the c(4)(f) factor impermissibly duplicates aggravating factor *N.J.S.A.* 2C:11–3c(4)(g) which pertains to the commission of a murder in the course of a felony (the c(4)(g) factor). His point is that all felons want to avoid capture. After careful consideration, we believe that the trial court properly submitted the c(4)(f) factor to the penalty-phase jury.

- A -

"The key to finding factor c(4)(f) is that the defendant intended to eliminate a potential witness to his crimes." *Martini*

*I, supra*, 131 *N.J.* at 281, 619 *A.*2d 1208. The c(4)(f) aggravating factor can apply in the context of a contemporaneous felony murder. Merely because a killing occurred during the course of a felony, however, does not, in itself, support submission of the c(4)(f) factor. *Hightower I, supra*, 120 *N.J.* at 422, 577 *A.*2d 99. Rather, the State has the burden of producing sufficient evidence from which a reasonable jury could conclude that at least one of the purposes motivating the killing was defendant's intent to avoid apprehension for the commission of the underlying felony. *Ibid.; State v. Loftin*, 146 *N.J.* 295, 377, 680 *A.*2d 677 (1996). Because direct evidence of a defendant's intent to avoid apprehension is rarely available, the State may establish a defendant's motive through circumstantial evidence. *Martini I, supra*, 131 *N.J.* at 282, 619 *A.*2d 1208. Avoiding apprehension, however, need not be the killer's sole motive. *Ibid.* The requirement that the State adduce evidence in support of the intent to avoid apprehension ensures that the c(4)(f) factor does not merely duplicate the c(4)(g) factor pertaining to the commission of murder in the course of a felony.

- B -

In the instant case, the prosecution presented sufficient circumstantial evidence to support the jury's conclusion that one of defendant's motives in killing Irene Schnaps was to eliminate her as a witness to his burglary of her apartment and to avoid apprehension and punishment for his crime. Defendant entered Schnaps's apartment by forcing open a glass patio door. Apparently Schnaps awoke and discovered defendant in her bedroom, which was the only room showing signs of disturbance. The jury reasonably could have inferred that defendant decided to kill Schnaps to prevent her from alerting her neighbors, calling the police, and later identifying defendant as the person who intended to rob her. *See Loftin, supra*, 146 *N.J.* at 377–78, 680 *A.*2d 677 (finding that State presented sufficient circumstantial evidence to support c(4)(f) factor even when defendant wore mask because

victim "might have been able to identify his assailant's voice, height, weight, and overall build"). Indeed, when questioned by police, neighbors in the apartment complex denied hearing any noises from Schnaps's apartment. The State adduced sufficient evidence to enable a jury to conclude that at least one of defendant's motives was to silence Schnaps as a potential witness to avoid apprehension for his crime.

- C -

In arguing to the penalty-phase jury that the State had met its burden in proving the existence of each of the aggravating factors beyond a reasonable doubt, the assistant prosecutor made the following statement concerning the c(4)(f) factor:

> Aggravating factor number three is was this murder additionally committed in an attempt to avoid prosecution, apprehension? Yes, it was. Items were removed not only to be stolen and kept by Mr. Harvey, but items were removed from this apartment to detect or to prevent detection. I suggest to you bedding. The body of Irene Schnappes [sic] was washed clean in an attempt to prevent the police from locating the individual that committed this offense, Mr. Harvey.

Although defense counsel did not object, the argument was improper. Actions taken by a killer subsequent to the murder are irrelevant to the c(4)(f) determination. They do not inform the inquiry concerning the defendant's motives for killing. *See Hightower I, supra,* 120 *N.J.* at 422, 577 *A.*2d 99; *State v. Monturi,* 195 *N.J.Super.* 317, 326–27, 478 *A.*2d 1266 (1984).

The trial court remedied the prosecutor's error by properly instructing the jury that "[a]ny evidence of actions taken by the defendant to conceal the murder itself cannot be used to prove this aggravating factor." Accordingly, the prosecutor's remarks in summation did not constitute plain error.

- XII -

Defendant's argument that the c(4)(f) factor violates the Eighth Amendment is without merit. As discussed above, c(4)(f) is not duplicative of the c(4)(g) factor.

## - XIII -

Defendant argues that the trial court committed reversible error by instructing the jury that it could consider all of the guilt-phase evidence during its penalty-phase deliberations. He avers that the trial court should have instructed the jury on which evidence was relevant to the aggravating-factor inquiry and limited the evidence accordingly. Defendant contends that unguided jury consideration of the guilt-phase evidence impermissibly increased the likelihood that the jury would return a capital sentence. We disagree.

## - A -

Instead of relating the guilt-phase evidence to the aggravating factors, the court told the jury that it was to consider all of the evidence at both the guilt and penalty phases. Defense counsel neither objected to the instruction nor requested that the court specify how the jury should relate the guilt-phase evidence to the penalty phase.

We acknowledge that the trial court should have instructed the jury "concerning the evidence that it may use in its penalty deliberations and the purposes for which that evidence may be used." *State v. Erazo*, 126 *N.J.* 112, 133, 594 *A.*2d 232 (1991). To the same effect is the *Bench Manual For Capital Cases*, at 231–32 (November 1, 1996) '*Manual*' which states:

> [W]here there is evidence introduced during the guilt phase which may have the capacity to prejudice penalty phase proceedings, (e.g., photographs, other-crimes evidence, movies), the court should provide instructions to the jury which delineate to what extent they may consider this evidence, and for what purposes, during the penalty phase.

The Model Charge advises, moreover, that when the "State is relying on facts established during a guilt phase verdict to prove an aggravating factor," *Manual* at J–6 n. 8, the trial judge should give the following instruction:

> However, the guilt and sentencing phases are considered as separate proceedings. The State contends that certain facts established by your verdict in the guilt phase

* * *

also prove the following aggravating factors

* * *

I am instructing you that it is your duty to deliberate again on these facts to determine whether they prove the aggravating factor(s) the State alleges. You have the right to reach a different conclusion about whether these facts prove an aggravating factor than the conclusion you reached as to whether they proved guilt.

[*Manual* at J–6.]

Here, however, the court's failure to designate specifically the evidence that the jury should consider did not constitute plain error. The court instructed the jury not to consider aggravating factors other than those alleged by the State and that it should consider evidence adduced at both phases of the trial. Defendant did not object or seek a more specific charge. Our review of the record reveals that the error was not of such a nature as to have been clearly capable of producing an unjust result. *R.* 2:10–2.

- B -

In summation, the prosecutor directed the jury to the evidence that supported the State's allegation of aggravating factors. In support of the c(4)(c) factor—that the killing involved aggravated assault to the victim—the prosecutor invited the jury to:

Recall the testimony of Dr. Shuster to the nature and the extent of the wounds. Recall the testimony of Captain Rizzo as to where and how that blood was found in that bedroom, blood found underneath a hospital chair, . . . on a towel where there was a fan, her body found on the other side of that bedroom laying back down, face up with blood splashed on the end table.

Dr. Shuster . . . testified that these wounds to the head bleeds [sic] very profusely, that she would have become unconscious simply because there was such a loss of blood in the head area. Look at those wounds again, those photographs that I'm sure you looked at before. Look at those wounds.

This is not an attempt to kill with one blow. This is an attempt to commit, a successful attempt to commit severe bodily pain by Mr. Harvey, and he was successful.

That's aggravating factor number one.

With regard to the c(4)(g) factor—that the murder was committed during the course of a felony—the prosecutor told the jury to

consider the evidence indicating that defendant was in the midst of committing burglary and robbery when he killed Irene Schnaps.

Although the prosecutor's comments regarding which facts were relevant to prove the c(4)(f) (avoiding apprehension) factor were improper, the trial court properly informed the jury that "[a]ny evidence of actions taken by the defendant to conceal the murder itself cannot be used to prove this aggravating factor." *See supra* Part XI.C.

Furthermore, the trial court correctly defined the elements of each of the charged aggravating factors and informed the jury it was not bound by any conclusions that it reached in the guilt phase.

The court's instructions, when viewed against the background of the prosecutor's summation, sufficiently informed the jury of the evidence concerning the aggravating factors.

 The photographs of the crime scene and of the victim's body were properly submitted to the penalty-phase jury as relevant to the c(4)(c) inquiry. *See Moore, supra,* 122 *N.J.* at 469, 585 *A.*2d 864 (holding that trial court had discretion to admit relevant photographs in penalty phase); *Bey II, supra,* 112 *N.J.* at 182, 548 *A.*2d 887 (same). Both the prosecutor and defense counsel referred to the photographs in summation only in the context of the c(4)(c) aggravating factor. Although the trial court properly should have instructed the jury to use these photographs only when considering the c(4)(c) factor, the omission was not prejudicial. The jury, moreover, did not unanimously return a finding of factor c(4)(c). We conclude that the photographs did not adversely impact the jury's consideration of the c(4)(f) and c(4)(g) aggravating factors.

- C -

 Defendant also challenges the admission into evidence of two photographs of the victim's apartment that showed family photographs. He contends that the photographs constituted im-

permissible victim-impact evidence. We disagree. The State introduced the photographs to familiarize the jury with the crime scene and to demonstrate that no struggle had occurred in the victim's living room. The prosecution never commented upon the photographs in any "manner that serve[d] only to highlight the victim's virtues in order to inflame the jury." *State v. Williams*, 113 *N.J.* 393, 452, 550 *A.*2d 1172 (1988) (*Williams II* ).

## - XIV -

Defendant contends that the prosecutor committed reversible error in his penalty-phase summation by inviting the jury to consider whether a non-capital sentence constituted "sufficient punishment." We find that argument unpersuasive.

## - A -

As part of his penalty-phase case, defendant presented Dr. Richard Moran, a professor of sociology at Mount Holyoke College, as an expert on the correlation between age and criminal behavior. Dr. Moran testified that as people get older, they generally are less likely to commit a violent crime. Based on that theory, Dr. Moran testified:

> I believe that from Mr. Harvey's birth date [1950] and the date that he would be first eligible for parole, and I stress here could be eligible for parole after thirty years, that would bring us up to the year 2014, and he would be 64 years old.

> \* \* \*

> If he does get paroled when he's first eligible at the age of 64, he will be in the lowest possible category [of individuals likely to commit crime]. And if you look at the fact that he committed the crime in his thirties ... people under 40 commit eighty-nine percent of the crime. He'll move to the 60–plus category where he'll be in the lowest possible risk category.

Accordingly, Dr. Moran concluded that "there would be a very tiny minute chance that [Harvey] would ever offend again."

On cross-examination, the prosecutor questioned Dr. Moran about his assumption that defendant would first be eligible for parole in 2014. The prosecutor asked: "And that is twenty years

from today or twenty years from 1994. Is that correct?" When Dr. Moran agreed, the prosecutor ceased cross-examination.

In anticipation of Dr. Moran's testimony, the State asked that the court instruct the jury that defendant's thirty years without parole would start from the date of his original incarceration, October 31, 1985, not from the end of the trial in December 1994. Defense counsel did not object.

In summation, defense counsel referred to Dr. Moran's testimony regarding the age of the defendant at the time of the offense as a mitigating factor, *N.J.S.A.* 2C:11–3c(5)(c). Defense counsel argued to the jury:

> What this says is that his age when he committed this offense was such that the earliest he could ever possibly get out would be sixty-four. And you heard testimony that would indicate that people in their sixties are very unlikely, only one percent of all violent crimes are committed by people of that age. You heard that testimony.

The prosecutor responded:

> Is Mr. Harvey's age a mitigating factor for you to consider? Sure you can consider it. You heard the testimony, the penalty, if it is not death, it is thirty years to life, minimum thirty years. What does that mean? Very simple, thirty years. What does that mean in this case? *The year 2014, twenty years from now Mr. Harvey will be eligible for parole, twenty years from today. Is that sufficient punishment do you feel?* You may consider that.

Defense counsel did not object.

- B -

Defendant now argues for the first time that the assistant prosecutor's comment justifies reversal. According to defendant, this argument was tantamount to asking the jury to consider a non-statutory aggravating factor during their death-penalty deliberation. Furthermore, defendant argues that the prosecutor made this comment knowing that a non-capital sentence, combined with the periods of incarceration that defendant was already serving for unrelated crimes, would not enable defendant to be eligible for parole in 2014. We reject the argument.

- C -

Defendant's penalty-phase case consisted of an attempt to convince the jury that a sentence of life with a thirty-year parole bar was a more appropriate sentence than death. The prosecutor asked the jury to consider whether such a sentence was justified. Rather than arguing a non-statutory aggravating factor to the jury, the prosecutor simply posed a rhetorical question designed to prompt the jury to consider the weight of the "age" factor, *N.J.S.A.* 2C:11-3c(5)(c).

The allegation that the prosecutor misled the jury by referring to the year 2014 as a potential parole date, is likewise meritless. Although defendant could not be eligible for parole in 2014, Dr. Moran included that date in his analysis. That conclusion was designed to keep from the jury defendant's prior convictions for unrelated violent crimes. Because the prosecutor could not discuss defendant's true prospects of parole, he confined himself to commenting on the evidence as presented by the defense. Defendant cannot have it both ways. He may not knowingly present an inaccurate date for parole eligibility to the jury, bar the prosecution from rebutting it with proof of prior sentences, and then claim error.

- XV -

Defendant argues that his entire trial was so infected with error that even if the alleged individual errors do not constitute reversible error, in the aggregate, the errors denied him a fair trial. *State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954). We disagree. Defendant's allegations of trial error, both singly and in aggregation, are without merit. We are satisfied that defendant's trial was fair and that he suffered no undue prejudice.

- XVI -

Defendant argues that the death-penalty statute violates the prohibition against cruel and unusual punishment contained in

the Eighth Amendment of the Federal Constitution. As this Court originally held in *Ramseur, supra,* 106 *N.J.* at 166–97, 524 *A.*2d 188, and recently restated in *Harris, supra,* 141 *N.J.* at 574, 662 *A.*2d 333, *DiFrisco II, supra,* 137 *N.J.* at 508, 645 *A.*2d 734, and *Martini I, supra,* 131 *N.J.* at 221–22, 619 *A.*2d 1208, we reject that argument. The New Jersey death-penalty statute is not violative of the protections offered by the Eighth Amendment.

## - XVII -

Pursuant to *N.J.S.A.* 2C:11–3e, defendant requests that we determine whether his "sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." We will review the proportionality of defendant's sentence pursuant to a briefing and argument schedule to be established by the Clerk of the Court after consultation with counsel.

In conclusion, defendant's conviction for the murder of Irene Schnaps and his sentence of death are affirmed.

HANDLER, J., dissenting.

In this case, the Court sanctions a death sentence that was dependent on an analysis of blood samples that served to identify defendant as the killer of Irene Schnaps. That evidence, endorsed by the Court today in affirming defendant's conviction of murder and his sentence of death, was not based on accepted scientific knowledge. Further, the Court deems the evidence to have been reliable even though the hearing conducted by the trial court to determine its admissibility did not focus on its scientific acceptability and reliability. The specific evidence that was admitted to establish defendant's identity was derived from a novel procedure or methodology of blood analysis known as dot-intensity analysis. Dot-intensity analysis cannot, by any measure, be considered reliable or generally accepted. It is not supported by any authority sufficient to establish its scientific reliability or acceptance within any reputable body or community of scientists.

We thus are presented with a capital prosecution that is based primarily on disputed, esoteric, and problematic evidence. It is clear that because that evidence is not reliable, defendant's convictions and sentence cannot be sustained. The Court's approval of that evidence as scientifically reliable is a mistake of enormous significance based on profound misunderstandings of the law and facts.

The majority compounds its error by failing to recognize that unfair and improper limitations were placed on defendant's challenges to the DNA evidence and then by sustaining the use of a problematic "statistical" analysis in conjunction with the evidence to enhance its probative significance. The statistical evidence employs a mathematical calculation that is inexact when used with DNA analysis and, in this case, is based on factually erroneously data. Further, that statistic-based evidence was admitted without a hearing to determine its reliability and through a witness lacking in adjective expertise. Part One of this opinion addresses those issues.

In the course of the trial of this case, other significant errors contributed to defendant's conviction and death sentence. Among those errors were the trial court's erroneous jury charge on the *Mejia* issue, which the Court finds harmless even though it resulted in defendant's eligibility for the death penalty; the application of the escape-detection aggravating factor, which the Court finds harmless in part and error-free in part even though it clearly contributed to defendant's death sentence; and the misleading verdict sheet, which the Court also finds harmless although it was clearly capable of dissuading the jury from returning anything but a death-eligible murder verdict. Those issues and others are considered in Part Two.

### Part One

The evidence adduced at trial connecting defendant to the murder of Irene Schnaps was purely circumstantial. It consisted of a shoe print found at the crime scene consistent with sneakers recovered from defendant; a single hair with negroid characteris-

tics found underneath the victim consistent with defendant's hair; an empty watch box found at the scene and a watch of the same type found in defendant's car; an empty camera box found at the scene and a camera strap found in defendant's car; and blood evidence. The most damning of the evidence for the defense was clearly the blood evidence.

The blood evidence consisted of both traditional and established enzyme analysis as well as novel and rarely used DNA testing. The traditional blood analysis was hardly determinative because the vast majority of the results were inconclusive or incomprehensible. Only two results were readable. One result showed that defendant could not be excluded as the person who contributed to the blood found at the scene. The other result indicated that the contributor to the blood was African–American, although the enzyme found in the blood could have come from anyone whose lineage derived from racially mixed ancestors.

Because the traditional enzyme analysis was weak and inconclusive, the State extended its blood evidence much further. Like the traditional blood-enzyme analysis, the evidence derived from the extended novel DNA testing showed that defendant could not be excluded as a possible source of the blood found at the scene. Unlike the traditional analysis, however, the State's extended analysis purported to quantify the results and to produce a statistical figure representing the likelihood that defendant was the actual donor. That statistical construct suggested that only one in 1,400 African Americans could have left such blood at the scene. It was that DNA evidence, as well as embellishing statistics, on which the State relied to secure defendant's conviction and death sentence.

I

The State's basic DNA evidence consisted of DQ–Alpha testing and polymarker testing. Those testing procedures are relatively new, untested, and do not enjoy full acceptance. DQ–Alpha testing, however, although not universally accepted, has gained

approval in numerous jurisdictions, *see* National Research Council, *The Evaluation of Forensic DNA Evidence,* 177 & n. 30 (1996) (*"NRC Report"*), including ours, *State v. Dishon,* 297 *N.J.Super.* 254, 687 *A.*2d 1074 (App.Div.1997); *State v. Williams,* 252 *N.J.Super.* 369, 599 *A.*2d 960 (Law Div.1991). On the other hand, only a few courts have permitted polymarker testing since the testing kit was first marketed in October 1993. *See United States v. Beasley,* 102 *F.*3d 1440, 1447 (8th Cir.1996), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 1856, 137 *L.Ed.*2d 1058 (1997); *United States v. Lowe,* 954 *F.Supp.* 401, 417–18 (D.Mass.1996); *People v. Pope,* 284 *Ill.App.*3d 695, 220 *Ill.Dec.* 309, 314, 672 *N.E.*2d 1321, 1326 (1996), *appeal denied,* 171 *Ill.*2d 579, 222 *Ill.Dec.* 436, 677 *N.E.*2d 970 (1997); *People v. Morales,* 227 *A.D.*2d 648, 643 *N.Y.S.*2d 217 (N.Y.App. Div.), *appeal denied,* 89 *N.Y.*2d 926, 654 *N.Y.S.*2d 729, 677 *N.E.*2d 301 (1996). Despite the relatively limited trial record relating to these procedures, the majority endorses both the DQ–Alpha and the polymarker testing as generally accepted and admissible scientific evidence.

The technologies of the DQ–Alpha and polymarker testing have been accepted as a basis for admissible scientific evidence, but only when they have been used as designed. The Court's description of the first two parts of the DQ–Alpha and polymarker testing—the separation and amplification of the DNA strands—is adequate. *See ante* at 157–163, 699 *A.*2d at 615–617. Its description of the third and crucial part of the testing, the analysis of results, however, requires elaboration to understand why the evidence used in this case—dot-intensity analysis—is wholly unsettled, highly controversial, and of problematic scientific reliability; it is not, as indicated by the majority, simply an obvious and routine extension of the basic DNA testing methodologies.

### A.

The process of isolating DNA fragments, amplifying the DNA segments, and analyzing the results using the reverse dot-blot system, is identical for both the DQ–Alpha and polymarker testing

kits. For both kits, the cell's nucleus is broken open to release the DNA, and the relevant portions of the DNA are separated out by filtration, chemical cleansing, and the utilization of a centrifuge. The DNA materials are then amplified. During the amplification stage, the DNA strands are broken apart through heating and then allowed to reform with loose DNA matter and primers that are added to the mixture. The materials are then subject to the examination or analysis stage, during which the newly isolated and amplified DNA is flooded over testing strips. The only difference between DQ–Alpha testing and polymarker testing is that the primers used in stage two (the amplification process) and the strips used in stage three (the examination process) are different. Both the DQ–Alpha kit and the polymarker kit were developed and manufactured by the same company.

The DQ–Alpha and polymarker tests were designed so that results are analyzed using "little strips" with "reverse dot/blot technology." The nylon membrane strips contain dots with allele-specific probes. During the third stage, the amplified DNA product is flooded over the strips. The dots represent the sections of the DNA ("loci") being examined. The number of loci tested and the number of possible alleles are different in the two tests. DQ–Alpha testing examines one locus, while polymarker testing looks at six loci (five polymarker markers as well as the DQ–Alpha marker). The DQ–Alpha marker has six commonly recognized alleles, while each of the five polymarker markers has two or three possible alleles. On the testing strips, there are dots representing each of the different types of alleles for that particular marker.

The dots represent alleles, not genotypes. A person's genotype for a particular marker is composed of a pair of alleles, one allele coming from each of the person's parents. In some instances, DQ–Alpha and polymarker testing can determine which of the different genotypes an individual possesses. DQ–Alpha locus has twenty-one different genotypes, made up of every possible combi-

nation of six possible alleles.[1] The polymarker loci, which have only two or three possible alleles each, thus have only three or six possible genotypes.[2] If a DNA sample contains only one person's blood and if the testing kit identifies the presence of two different alleles, then the individual's genotype can be determined by simply combining the two alleles (everyone has two and only two alleles for each genetic marker; the two alleles, however, can be the same). For example, if the victim's DNA sample is found to have both the 2 and the 4 DQ–Alpha alleles, then we know the victim's genotype is a "2,4." To illustrate further, if the sample reveals only the B HBGG allele, then the suspect's HBGG genotype is "B,B."

The State's experts testified about how the strips used during the analysis stage of polymarker and DQ–Alpha testing work. The strips contain dots representing the different alleles for a particular marker. The dots become more intense (brighter blue) as the enhanced DNA that is flooded over the strips binds or "hooks" to the dots. Dr. Charlotte Word, a scientist at Cellmark Diagnostics, testified for the State that this was an "instamatic process whereby you get a colored development and you will get a blue dot in a place DNA attached." The methodology for reaching a result is hardly complicated. To reach the result, "you simply read the blue dots off of the strip." If the dot remains blank or faint, then the allele that the dot represents is considered not present in the DNA sample. Every color development brighter than the control dot indicates the presence of the allele that the dot represents. Perkin Elmer Co., *AmpliType PM: PCR Ampli-*

---

[1] The six types of DQ-alpha alleles recognized at the time of this trial are known as: 1.1, 1.2, 1.3, 2, 3, and 4. Thus, the 21 genotypes include: (a) 1.1 paired with 1.1; (b) 1.1 with 1.2; (c) 1.1 with 1.3; (d) 1.1 with 2; (e) 1.1 with 3; (f) 1.1 with 4; (g) 1.2 with 1.2; (h) 1.2 with 1.3; (i) 1.2 with 2; etc.

[2] The polymarker alleles are denoted by letters. For example, the LDLR polymarker, has two possible alleles (A and B), and three possible genotypes (A,A; A,B; and B,B). The HBGG polymarker has three alleles (A, B, and C), and thus has six possible genotypes (A,A; A,B; A,C; B,B; B,C; and C,C).

*fication and Typing Kit Procedures Manual* 21 (Dec.1993); Cell-mark Diagnostics, *Interpretation of HLA DQa Test Results* 1 (Mar. 25, 1992) ("Those dots equivalent to or stronger than the [control] dot are considered positive."). The testing kits were designed to measure only the presence or absence of certain alleles. That point cannot be overemphasized.

At Cellmark, two scientists read the results of the strips and independently record the results that they observe. The results are then photographed, and the photographs are reviewed by a third person. Dr. Word testified that the strips should be read "as soon as they are developed because that is the appropriate time to read them." Indeed, the strips should be read immediately, even before they are photographed, because the dots become less intense, quickly fade, and even disappear. The State's expert emphasized that "the blue dots don't last very long on the strips."

The polymarker and DQ–Alpha testing kits, as noted, were designed only to reveal the presence or absence of a particular allele. The State, however, went further than just determining the presence of the various DQ–Alpha and polymarker alleles. Its experts also performed a procedure known as "dot-intensity analysis."[3] That procedure is untested and unapproved by the scientific community.

Although potentially useful for detecting errors in traditional polymarker and DQ–Alpha testing, dot-intensity analysis was used in this case to narrow further the class of persons who possibly could have contributed to the blood found at the crime scene. In effect, dot-intensity analysis, as applied in this case, purported to

---

[3] The State's expert called this technique "association of alleles." In the scientific literature, however, association of alleles is a phrase used to describe something else, namely, the interaction among or dependence between different alleles. *See, e.g.,* Bruce Budowle, Jenifer Lindsey, Jacqueline DeCou, Barbara Koons, Alan Giusti, & Catherine Comey, *Validation and Population Studies of the Loci LDLR, GYPA, HBGG, D7S8, and Gc (PM loci), and HLA–DQa Using a Multiplex Amplification and Typing Procedure,* 40 *J. Forensic Sci.* 45, 53 (Jan. 1995) ("*F.B.I. Study* "). The more accepted terminology is "dot-intensity analysis."

quantify the intensity of those alleles present in a sample. The State hypothesized that by examining the relative intensities of the dots obtained in the DQ–Alpha testing and the polymarker testing on a mixed sample, one could determine the relative presence of certain alleles. Once the relative presence of the alleles was determined, one could "subtract" the alleles from a known contributor to the sample and thereby reveal the unknown contributor's genotype.

To a certain degree the subtraction principle is a method of elimination and is used in analysis even without dot-intensity analysis. For example, if the test of the HBGG marker revealed the presence of all three possible alleles (A, B, and C) in a mixture containing DNA from two persons and if one of the contributors has a genotype of "A,B," then we know the other contributor must have a genotype with at least one C allele (*i.e.*, the person could be genotype "A,C," "B,C" or "C,C"). Dot-intensity analysis, however, goes beyond that relatively straight-forward process. It purports not only to establish the presence of alleles, but also to quantify those alleles that are present.

Dot-intensity analysis is based on a single premise. It assumes that if the testing strip reveals a brighter blue dot for one of the alleles than for the other alleles that the strip indicates are present, then the brighter dot means that that allele is present in greater amounts than the other alleles. Using the same example, if the HBGG marker test strip revealed the presence of all three alleles (A, B, and C), if the A dot is brighter than the B or C dot, and if the first contributor has a genotype of "A,B," the second contributor is assumed to have the "A,C" genotype. That is because the only genotype that would reveal more A alleles than B or C alleles when combined with the known genotype of "A,B" would be "A,C." Applying that analysis, the result would not be merely that the unknown contributor has at least one C allele and therefore could have possible genotypes of either "A,C" or "B,C" or "C,C"; rather, that analysis would conclude, because of the

assumed presence of added or extra A alleles, that the contributor in fact has the "A,C" genotype.

For dot-intensity analysis to work, when alleles are present in the same amounts, the dots on the strips must be of the same intensity. So, in a sample containing a single individual's DNA, the dot intensities that are obtained in the results should be "relatively balanced." Dr. Word, testified that "[p]olymarker testing strips are designed to show an equal dot-intensity when the DNA came from a single individual." For example, if a single individual's enhanced DNA is applied to the polymarker test strip containing the allele dots for the GYPA marker and that test strip shows that the individual has the A and the B alleles for the GYPA marker, then the A and B allele dots on the GYPA marker test strip should be of equivalent intensity. The reasoning behind that assumption is that an individual has two alleles for each marker, and that those alleles are equally represented (or, phrased differently, the DNA strand will contain one of each allele—one from each parent—paired on the strand).

The fundamental assumption of dot-intensity analysis is that when it is applied to determine the genotypes of a blood sample and a dot-intensity imbalance occurs, the imbalance is caused by the relative imbalance in the amount of alleles present. The State's experts, however, offered other explanations for why imbalances may occur. First, there are some variances among different individuals and in the different alleles that may cause slight intensity differences even in a single individual's sample. Second, in mixtures, "relative probe intensities ... within a locus may become imbalanced in the presence of variant alleles or nonoptimal [test] conditions." Third, a manufacturing defect or a defect in the procedures may cause differences in dot intensity. Finally, different dot intensities may arise because a particular allele is present in greater or different strength than another allele, which would be true in a mixture. Despite those other explanations, however, dot-intensity analysis assumes that any intensity imbalances are due to the relative presence of the alleles and that the

relative presence of alleles can be measured by the testing strips even though the strips were designed to disclose only the presence or absence of alleles.

## B.

Several samples were tested in this case: a dry blood sample taken from defendant, a sample from a towel found at the crime scene and thought to contain only the victim's blood, and a sample taken from a boxspring in the victim's apartment and thought to contain a mixture of the victim's and the suspect's blood.[4] No blood sample containing only the suspect's blood was recovered from the scene. Thus, to determine the suspect's genotypes, the victim's genotypes had to be compared to the mixed sample, and what was unaccounted for was presumed to belong to the suspect.

The following chart summarizes the results obtained by Cellmark in the analysis of defendant's known sample (from the swatch created by police with defendant's blood), the victim's known sample (from a towel recovered from the scene), and the unknown mixture (from the boxspring).

**Summary of DNA Evidence [5]**

| Marker | Mixed Sample | Schnaps' Sample | Suspect's Expected | Dot Intensity | Susp.'s w/ Dot I. | Harvey's Sample |
|--------|--------------|-----------------|--------------------|---------------|--------------------|-----------------|
| DQa | 2 & 4 | 2,4 | 2,2; 2,4; or 4,4 | 2 = 4 | 2,4 | 4,4 |
| LDLR | A & B | A,B | A,A; A,B; or B,B | B > A | B,B | B,B |

---

[4] A fourth sample was taken from a piece of bloodied cardboard found at the scene, but this last sample was too degraded to be analyzed and therefore was not introduced in evidence.

[5] The column labeled "Suspect's Expected" refers to the genotype or genotypes one would expect the suspect to have if we assume the mixed sample contains both (and only) Ms. Schnaps's blood and the suspect's blood. The column labeled "Susp.'s w/ Dot I." refers to the genotype one would expect the suspect to have if we make the same assumptions (and some others) and if we use dot-intensity analysis. The column labelled "Dot Intensity" refers to the comparisons that Cellmark made and the results that Cellmark obtained from the testing strips in comparing the relative intensities.

| | | | | | | |
|---|---|---|---|---|---|---|
| GYPA | A & B | A,A | A,B or B,B | A > B | A,B | A,B |
| HBGG | A, B & C | B,B | A,C | A=B=C | n/a | A,C |
| D7S8 | A & B | A,A | A,B or B,B | A > B | A,B | A,B |
| GC | A, B & C | A,C | A,B; B,B; or B,C | A>B & C | A,B | A,B |

This table shows that without using dot-intensity analysis, but considering both the DQ–Alpha and polymarker results, defendant cannot be ruled out as a contributor to the mixed sample if the sample also contains Ms. Schnaps's DNA (compare "Suspect's Expected" column with "Harvey's Sample" column). In some instances, however, the results are not particularly helpful because almost no persons are excluded as contributors. For example, the LDLR marker results show that a person with any of the three possible LDLR genotypes (A,A; A,B; or B,B) could have contributed to the mixed sample. On the other hand, even without dot-intensity analysis, the results from the HBGG marker show that the suspect must have a particular HBGG genotype (A,C).

Using dot-intensity analysis, the State argued that it was able to define much more narrowly the genotypes of the suspect. Analyzing the LDLR, the GYPA, the D7S8, and GC markers and using dot-intensity analysis, the State claimed that only persons with the exact genotypes for those four markers as defendant could have contributed to the sample (compare "Sups.'s w/ Dot I." column with "Harvey's Sample" column).

The State did not point to the results of dot-intensity analysis for either the HBGG marker or the DQ–Alpha marker. As for the HBGG marker, the State argued that dot-intensity analysis was unnecessary because the subtraction principle revealed that the suspect must have the A,C genotype. The State did not explain why, when dot-intensity results were analyzed, the results (equal dot intensities for the three alleles) did not comport with the State's theory. Further, the State did not explain whether or not dot-intensity analysis was possible for the DQ–Alpha marker, but the results of comparing dot intensities (equal intensities for

the 2 and 4 alleles) would not support the State's assertion that defendant fit the genetic profile of the suspect.

## II

The principal disagreement that I have with the majority concerns the general acceptance of dot-intensity testing. Dot-intensity analysis was the essential evidence relied upon by the State to demonstrate that defendant was in all likelihood the actual person whose blood contributed to the mixed sample found at the scene. The majority properly, if reluctantly, recognizes that dot-intensity testing, as a scientific method, must meet the standard of general acceptance even if DQ–Alpha and polymarker testing are themselves found to be generally accepted scientific tests. The majority, however, misconstrues the distinctive and distinguishing features of dot-intensity testing as a method of analyzing DNA, denigrates many of defendant's challenges to the testing as not going to the reliability of the procedure, but rather only to its weight, and then, on an embarrassingly deficient record, summarily concludes that the novel scientific procedure passes muster under our long-standing precedent. Dot-intensity analysis as used here—a procedure never before used in any court case, successfully documented in any laboratory, or validated in any scientific study or published literature—has not been shown to be an established and reliable procedure. Further, no foundation for dot-intensity analysis exists in the record, and the results obtained clearly show that such evidence is grossly unreliable. Finally, the analysis rests on a combination of assumptions that renders the evidence so unpersuasive and speculative that it is inadmissible under *New Jersey Rule of Evidence* 402.

## A.

The polymarker and DQ–Alpha testing kits were designed solely to determine the presence or absence of certain alleles. Dot-intensity analysis, however, purports to determine more. It purports to quantify the alleles that are present and thereby to

identify the specific alleles contributed by each donor to the DNA mixture. The majority only grudgingly rejects the State's argument that dot-intensity analysis is nothing new and that no independent basis for its admission need be established. Without discussion, it recognizes, without really appreciating, that that difference requires an independent foundation for admissibility. *Ante* at 175, 699 *A*.2d at 624. Notwithstanding its concession, the majority then erroneously devalues and mischaracterizes defendant's challenges to the evidence—challenges to its competency—as merely going to Cellmark's performance of the polymarker test and as "concern[ing] not the admissibility, but the weight of the evidence." *Ante* at 178, 699 *A*.2d at 625. That conclusion derives from a distortion of defendant's claims and from a serious misunderstanding of the distinctive nature and purposes of dot-intensity analysis. Whether dot-intensity analysis is a proper interpretive procedure that is scientifically grounded and sufficiently reliable clearly goes to its admissibility as well as its weight.

Defendant's claims concern the reliability of dot-intensity testing. Defendant specifically challenges "the reliability of th[e] test kit, its reliability in dealing with a mixed blood sample and the reliability of the propounded technique [dot-intensity analysis] for interpreting the results of a test on a mixed blood sample." In fact, defendant's exact claim on this appeal is that dot-intensity analysis is not generally accepted within the relevant scientific community. As noted in defendant's brief, the dot-intensity "method of interpretation [was] not supported by Dr. Shaler, Dr. Blake, the FBI or even the research study conducted by Roche Molecular Laboratories, manufacturers of the kit in question." Such challenges do not, as the Court asserts, go only to "Cellmark's performance of the polymarker test," *ante* at 178, 699 *A*.2d at 625, and thus do not concern merely the weight of the evidence.

In order to avoid admitting that defendant actually challenged the reliability of dot-intensity analysis, the majority cites four

cases in supports of its inaccurate assertion that defendant's challenges to the accuracy of dot-intensity analysis go only to the weight to be attached to such evidence. *Ante* at 178–181, 699 *A.*2d at 625–626. Those cases, however, *State v. Marcus,* 294 *N.J.Super.* 267, 683 *A.*2d 221 (App.Div.1996); *Fishback v. People,* 851 *P.*2d 884 (Colo.1993); *State v. Schweitzer,* 533 *N.W.*2d 156 (S.D. 1995); and *State v. Kalakosky,* 121 *Wash.*2d 525, 852 *P.*2d 1064 (1993), do not support the majority's assertion.

Two of the cases cited by the Court, *Marcus* and *Fishback,* concern interpretation of "autorads." Autorads are the x-ray type results obtained from RFLP-type DNA analysis. To compare RFLP results and to determine whether a match exists, autorads must be analyzed and compared. In fact, the obtaining and interpretation of autorads is a part of the RFLP process, and both courts found that RFLP testing, including the obtaining and interpretation of autorads, was generally accepted. *Marcus, supra,* 294 *N.J.Super.* at 278–79, 683 *A.*2d 221 (noting that "[t]he seventh step in the RFLP analysis involves the interpretation of the 'autorads' ... to determine whether the DNA print patterns of each of the probes match"); *Fishback, supra,* 851 *P.*2d at 888 (same). Thus, unlike dot-intensity analysis, autorads, as found by both courts, are a generally accepted method of presenting RFLP results, and the interpretation of autorads to reach conclusions regarding the inclusion or exclusion of a person as a DNA contributor is generally accepted. The only relevant disputes in those cases concerned "the ability of an expert to interpret the *extra* bands on an autorad." *Marcus, supra,* 294 *N.J.Super.* at 291, 683 *A.*2d 221 (emphasis added). In other words, the dispute was not about what autorads purported to show but only about what to do with anomalous results. Notably, in *Marcus,* the State's experts even "testified that the reading of autorads containing apparent extra bands ... is a generally accepted aspect of the field of DNA analysis." *Id.* at 290, 683 *A.*2d 221. The issue here is not whether the reverse dot-blots obtained on the poly-marker strips can reveal the presence of alleles in the mixture—they can. At issue is whether an interpretation made of those

strips that goes beyond what results that the strips were designed to show—the presence of alleles—is generally accepted as scientific evidence. *Cf. Lowe, supra,* 954 *F.Supp.* at 411 (finding that a switch to a new *"technique* for viewing band lengths [i.e. autorads] ... [that] has absolutely no effect on the validity of the overall methodology [i.e. RFLP]" still must be evaluated "to ensure reliability").[6] Thus, unlike "an expert's ability to perceive an abnormality on an x-ray," which concededly "is a matter within the province of the jury," *Marcus, supra,* 294 *N.J.Super.* at 291, 683 *A.2d* 221, here we must decide, by analogy, whether a doctor's interpretation of an x-ray can be admitted without restrictions when he testifies to a condition that the x-ray was not designed to reveal. Therefore, while a doctor's diagnosis of a broken bone from an x-ray may be admissible because it is based on a generally accepted interpretation of a generally accepted test, the doctor's diagnosis of cancer from that same x-ray ought not to be admitted unless and until the doctor can establish that such a diagnosis from an x-ray is generally accepted.

Nor does the *Fishback* case support the State's assertion that dot-intensity analysis was properly admitted despite the absence of independent validation. The court in *Fishback, supra,* clearly acknowledged that "both the theory and techniques underlying novel scientific evidence [like the DNA test there at issue] must be generally accepted...." 851 *P.2d* at 891. The court also observed that "[a] standard requiring acceptance of only one or the other could lead to the illogical admission of evidence because the theory underlying that evidence is generally accepted even though the techniques for implementing it are highly suspect or contro-

---

[6] The *Lowe* court did not decide "who wins th[e] semantic debate" over whether the change in technique for reviewing autorads must independently be found generally accepted, but instead ruled that an examination of the *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.,* 509 *U.S.* 579, 113 *S.Ct.* 2786, 125 *L.Ed.*2d 469 (1993)] factors to ensure reliability was necessary. *Lowe,* 954 *F.Supp.* at 411.

versial." [7] *Ibid.* Here, the soundness of the dot-intensity analysis is at issue, not whether such a procedure was done in a technically correct fashion.

The other two cases on which the majority relies are similarly unhelpful to its position. In *Kalakosky, supra,* the court rejected a defendant's challenge to DNA results based on the specific laboratory procedures utilized. 852 *P.*2d at 1072. The defendant argued that human errors during the procedures rendered the results unreliable; specifically, the defendant alleged that the DNA samples had been accidently spilled together and that the record of the results had been mislabelled. The court correctly found those issues to be questions of fact, not challenges to the admissibility of DNA testing. Indeed, the defendant did *not* challenge the accuracy of the results if the process had been correctly performed. *Id.* at 1072–73. Defendant here, by contrast, challenged the use of dot-intensity analysis accurately to obtain particular results even if the process were performed in a technically correct manner.

The Court also cites the *Schweitzer* case, which concerned a dispute over an expert's statistical conclusions on the DNA test results, not the performance of the DNA tests or the interpretation of those results. Unlike in this case, the defendant there "d[id] not dispute the scientific principles upon which [the expert's] conclusions were based." [8] *Schweitzer, supra,* 533 *N.W.*2d at 159.

---

[7] The *Fishback* court went so far as to demand that the statistical frequency analysis performed in the case be subject to the test of general acceptance for admissibility. *Id.* at 893 & n. 18. Even that was not done here. *See* discussion *infra* part one, section IV.

[8] Although the Court cites *Schweitzer,* it refuses to measure the statistical evidence at issue here against the same standard the court applied in *Schweitzer. See* discussion *infra* at part one, section IV.C. Specifically, in *Schweitzer,* the court recognized that even a statistical expert's opinion must be found to be reliable, relevant, and based on scientifically valid principles before such evidence could be admitted. 533 *N.W.*2d at 159.

New Jersey case law also compels a finding that dot-intensity analysis requires independent validation. Repeatedly and consistently, this Court has held that it is not just the scientific principle but the "technique" or "mode of analysis" used by the expert that must have a sound scientific basis. *E.g., State v. Kelly,* 97 *N.J.* 178, 210, 478 *A.*2d 364 (1984); *State v. Cavallo,* 88 *N.J.* 508, 517, 443 *A.*2d 1020 (1982); *State v. Hurd,* 86 *N.J.* 525, 536, 432 *A.*2d 86 (1981); *State v. Cary,* 49 *N.J.* 343, 352, 230 *A.*2d 384 (1967). The application of that principle in *Cavallo, supra,* 88 *N.J.* 508, 443 *A.*2d 1020, highlights the fallacy of the State's position that dot-intensity analysis needs no independent validation. We found in *Cavallo* that although "[t]here is substantial support for the general acceptance of psychiatric witnesses in court . . . the issue here is not the reliability of psychiatric testimony relating to an individual's psychiatric condition. Rather, the question is the reliability of psychiatric testimony on the likelihood that an individual behaved in a particular manner on a specific occasion." *Id.* at 522–23, 443 *A.*2d 1020. The issues that the Court held must be established prior to admission of the testimony were: "(1) whether psychiatrists agree that rapists share particular mental characteristics and (2) whether psychiatrists can ascertain if an individual possesses those characteristics by examining him." *Id.* at 523, 443 *A.*2d 1020. The Court in *Cavallo* was obviously concerned with the state of scientific knowledge on each step of the processes presented in the case. Justice Pollock himself reiterated that principle last term in *State v. Fertig,* 143 *N.J.* 115, 668 *A.*2d 1076 (1996). In that case, writing for an unanimous Court, he rejected a *per se* rule either permitting or disallowing hypnotically-refreshed testimony, and ruled that such testimony would be admissible only if certain conditions that ensured the reliability of the process and the results were followed. *Ibid.* The Court today appears to depart from the standard accurately and clearly stated in the *Fertig* case, determining now that so long as the underlying scientific test or methodology is valid, then any "interpretation" purportedly derived therefrom seemingly is admissible, even if the

reliability of that interpretive procedure itself has not been demonstrated.

The United States Supreme Court also has rejected the State's the notion that interpretations of scientific tests need not be independently admissible. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 *U.S.* 579, 113 *S.Ct.* 2786, 125 *L.Ed.*2d 469 (1993), the leading case governing the admission of scientific evidence in federal courts, the Court recognized that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.* at 591, 113 *S.Ct.* at 2796, 125 *L.Ed.*2d at 482. In fact, an expert's opinion must be based on the "methods and procedures of science," not on "subjective belief or unsupported speculation." *Id.* at 590, 113 *S.Ct.* at 2795, 125 *L.Ed.*2d at 481. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Ibid.*

In following *Daubert*, courts have held that "each step, from initial premise to ultimate conclusion" must be examined. *Hall v. Baxter Healthcare Corp.*, 947 *F.Supp.* 1387, 1401 (D.Or.1996). "In other words, this court need not accept, as scientifically reliable, any conclusion that good science does not permit to be drawn from the underlying data but which, instead, constitutes 'unsupported speculation,' or, . . . a 'leap of faith.' " *Ibid.* The Third Circuit recently confirmed such precedent:

> *Daubert*'s requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.
>
> [*In Re Paoli R.R. Yard PCB Litig.*, 35 *F.*3d 717, 745 (1994), *cert. denied*, 513 *U.S.* 1190, 115 *S.Ct.* 1253, 131 *L.Ed.*2d 134 (1995).]

*See generally* David E. Bernstein, *The Admissibility of Scientific Evidence After Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 15 *Cardozo L.Rev.* 2139, 2164 (1994) (noting that under *Daubert*'s two-part test, "[o]nce a court has determined that the underlying

studies or data relied upon by an expert witness are reliable and trustworthy, the remaining question is whether the expert has properly extrapolated from those studies or data"). Another federal court's example of this principle sheds light on the problem with State's analysis:

For instance, there may be times where an expert relies on published literature and widely accepted, tested theories in forming her opinion, and her ultimate conclusion is clearly relevant to an issue in the case. Yet, if those published theories and studies purport to prove XYZ, and from them, the expert concludes ABC, it may be that the expert's reasoning process itself is not scientifically valid.

[*Cavallo v. Star Enterprise*, 892 *F.Supp.* 756, 761 (E.D.Va.1995), *aff'd in relevant part and rev'd in part*, 100 *F.*3d 1150 (4th Cir.1996), *petition for cert. filed*, 65 *U.S.L.W.* 3666 (U.S. Mar. 19, 1997) (No. 96–1493).]

Here, the "XYZ" in the example is polymarker testing; the unsupported "ABC" conclusion is that dot-intensity analysis can be performed on polymarker testing results.

The majority utterly ignores a second related underlying issue in dispute. The issue is not only whether it is possible theoretically to perform dot-intensity analysis, but also whether the polymarker test kit was designed to and was capable of reliably measuring dot intensities as a basis for determining not only the presence or absence of alleles but the relative quantity of alleles present. *Cf. Romano v. Kimmelman*, 96 *N.J.* 66, 80, 474 *A.*2d 1 (1984) ("Once the showing of general acceptability has been made, courts will take judicial notice of the *given instrument's reliability* and will admit in evidence the results of tests from the instrument without requiring further proof.") (emphasis added) (citing *State v. Johnson*, 42 *N.J.* 146, 171, 199 *A.*2d 809 (1964)). For example, it has long been undisputed that radar beams directed at a moving object can accurately gauge the speed of the object. The issue we considered in *State v. Dantonio*, 18 *N.J.* 570, 115 *A.*2d 35 (1955), was whether a "radar gun" could reliably measure the speed of a vehicle. Similarly, in *Romano, supra*, 96 *N.J.* 66, 474 *A.*2d 1, and *State v. Downie*, 117 *N.J.* 450, 569 *A.*2d 242, *cert. denied*, 498 *U.S.* 819, 111 *S.Ct.* 63, 112 *L.Ed.*2d 38 (1990), the issue was not whether the amount of alcohol present in a person's breath reflected the amount of alcohol in his or her blood, but rather whether the

testing device reliably could measure the amount of alcohol on someone's breath so as to be useful as a forensic tool. An examination of the ability of the polymarker test kit reliably to interpret mixtures is thus necessary.

### B.

The majority's conclusion that dot-intensity analysis passes the general-acceptance test is most remarkable. First, not even the State has the temerity to suggests that it does; rather, the State wrongly argued that "[i]nterpretation of the PM [polymarker] strips, and the resulting conclusions, are matters for the jury to resolve in deciding the weight of the evidence and not for the court to decide as a matter of law." Having been forced to reject the State's argument, the majority struggles in vain to sustain the use of this evidence. In order to find that this procedure—a procedure never before utilized in any court case, never successfully documented in any laboratory, and hardly even discussed in any publication or conference—passes muster, the Court wreaks havoc on our precedent and grossly distorts the record. Although the Court appears to pay homage to our vital precedents in this area, *see ante* at 172–174, 699 A.2d at 622–623, its application of those cases to the sparse facts here is a marked and aberrational departure from principle.

Before turning to the application of the general acceptance test, a brief reexamination of our precedent is necessary to understand the scope of the majority's blunder. The admissibility of all evidence, but particularly scientific evidence being used in a criminal proceeding, must be "clearly established." *State v. Haskins*, 131 *N.J.* 643, 649, 622 A.2d 867 (1993); *Romano, supra*, 96 *N.J.* at 90, 474 A.2d 1; *Johnson, supra*, 42 *N.J.* at 171, 199 A.2d 809. Such a high standard is justified because freedom—indeed life—is at stake. *State v. Cary*, 99 *N.J.Super.* 323, 333, 239 A.2d 680 (Law Div.1968), *aff'd*, 56 *N.J.* 16, 264 A.2d 209 (1970).

Scientific evidence is admissible only if the analysis used has "a sufficient scientific basis to produce uniform and reasonably reli-

able results so as to contribute materially to the ascertainment of the truth." *Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364; *see Romano, supra,* 96 *N.J.* at 80, 474 *A.*2d 1; *Cavallo, supra,* 88 *N.J.* at 520, 443 *A.*2d 1020; *Hurd, supra,* 86 *N.J.* at 536, 432 *A.*2d 86. In *Rubanick v. Witco Chem. Corp.,* 125 *N.J.* 421, 593 *A.*2d 733 (1991), this Court explained that "general acceptance. . . . entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience." *Id.* at 436, 593 *A.*2d 733; *see Windmere, Inc. v. International Ins.,* 105 *N.J.* 373, 378 n. 2, 522 *A.*2d 405 (1987) ("[A] technique must pass from the 'experimental' stage and reach a 'demonstrable' stage before a court will recognize the approach.").

In general, there are three ways to prove that evidence is generally accepted and therefore reliable:

(1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance.

[*State v. Harvey,* 121 *N.J.* 407, 427–28, 581 *A.*2d 483 (1990) (*Harvey I* ) (quoting *Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991).] [9]

---

[9] Although the "general acceptance" test still governs the admission of scientific evidence in this situation, I am not convinced that such a high standard would justify the exclusion of similar evidence proffered by a defendant in a capital prosecution.

The notion of different standards for admission by the prosecution and the defense is common in criminal law in general and death-penalty jurisprudence in particular. For example, the State has the burden of proving guilt beyond a reasonable doubt, and yet no burden can be shifted to the defense. In capital cases, the State must prove each aggravating factor beyond a reasonable doubt to the satisfaction of each juror before any one juror can consider the factor. In contrast, mitigating factors need only be found by one juror. Similarly, a capital defendant may offer "without regard to the rules governing the admission of evidence at criminal trials," evidence on any mitigating factor, *N.J.S.A.* 2C:11–3c(2)(b), yet the State is more restricted in what evidence it may introduce. *See*

Dot-intensity analysis does not come close to meeting those standards for the admission of scientific evidence. Dot-intensity analysis never has been successfully performed on any DNA sample anywhere, be it in an experiment or in an actual case. Not surprisingly then, no court case, no publication, and no scientist ever has concluded that dot-intensity analysis can and does work reliably and consistently.

So how can the majority possibly claim that such a novel scientific testing procedure is reliable? Despite its ultimate conclusion, it really does not. For example, in the one paragraph of the majority's opinion devoted to the expert testimony on the general acceptance of dot-intensity analysis, the best the majority can do is to say that one scientist said that, in some (ill-defined) circumstances, unbalanced dot intensities *may* indicate differing relative presence of particular alleles. *Ante* at 182–183, 699 *A.*2d at 627–628. As for publications, the majority notes that "three

---

State v. Gerald, *113* N.J. *40, 103, 549* A.*2d 792 (1988);* State v. Davis, *96* N.J. *611, 621–23, 477* A.*2d 308 (1984).*

Nor is a lower hurdle for admission of scientific evidence that exculpates a defendant a novel idea. This Court previously has suggested such a possibility. In *Windmere, supra,* 105 *N.J.* 373, 522 *A.*2d 405, the Court noted that voiceprint identification, while not admissible when offered by the State in a criminal trial as evidence of guilt, "is at least a reliable method to eliminate a person as the unidentified speaker." *Id.* at 383, 522 *A.*2d 405; *see also id.* at 383 n. 5, 522 *A.*2d 405 ("Similarly, in *State v. Prudden,* 212 *N.J.Super.* 608, 617, 515 *A.*2d 1260 (App.Div.1986), the court, while rejecting the use of footprint techniques to identify a defendant, recognized that the techniques were nevertheless sufficiently reliable to exclude a person as the guilty party."). *See generally Davis, supra,* 96 *N.J.* at 621, 477 *A.*2d 308 ("We have recognized that standards of proof may vary depending upon the litigational context.") (citing *Romano, supra,* 96 *N.J.* 66, 474 *A.*2d 1; *In re Polk License Revocation,* 90 *N.J.* 550, 449 *A.*2d 7 (1982)); *State v. Millett,* 272 *N.J.Super.* 68, 98–99, 639 *A.*2d 352 (App.Div.1994) (recognizing that a criminal defendant may present evidence "if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case") (citing *State v. Sturdivant,* 31 *N.J.* 165, 179, 155 *A.*2d 771 (1959), *cert. denied,* 362 *U.S.* 956, 80 *S.Ct.* 873, 4 *L.Ed.*2d 873 (1960)); David McCord, *But Perry Mason Made It Look So Easy!: The Admissibility of Evidence Offered by a Criminal Defendant to Suggest that Someone Else Is Guilty,* 63 *Tenn. L.Rev.* 917 (1996) (advocating lower standard of admissibility in such circumstances).

articles discuss dot-intensity analysis." *Ante* at 181, 699 *A.*2d at 627. Although the majority claims that "[n]ot one [of those articles] states that dot-intensity analysis is unreliable," *ibid.*, even it does not claim that any of the articles actually states or implies that dot-intensity analysis is in fact reliable. In the category of judicial opinions, the best the majority can say is that a single federal district court in New Hampshire, utilizing the more lenient federal standard, "recently accepted as reliable ... the *premise* underlying this interpretive method." *Ante* at 184, 699 *A.*2d at 628 (emphasis added). One ambiguous opinion tendered by the State's witness, three off-topic publications that make mention of the technique, and one equivocal bit of dicta do not add up to general acceptance.

Worse, though, the majority is forced to bend the record to obtain even those shreds of support. In fact, as has been and will be iterated and detailed, no court ever has accepted dot-intensity analysis, no scientist ever has defended dot-intensity analysis as a reliable and nonsubjective scientific method, and no literature or professional conference cited by the parties supports such a test.

Not even the State's scientists defended dot-intensity analysis as a reliable, nonsubjective scientific method. Dr. Word and Ms. Cooper both admitted that the procedure is fraught with errors, and they both repeatedly noted that the results are utterly subjective.[10] Dr. Word conceded that although "in many cases interpretations can be made of the mixtures [using dot-intensity analysis, this] certainly [can]not [be done] in all circumstances." During the hearing and at trial, she defined neither in what circumstances it could be done nor in what circumstances it could

---

[10] An additional problem arises as a result of the subjectivity of the interpretations. Because the dot intensity must be viewed immediately after the completion of the testing and while the test strips are still wet and because the strips deteriorate quickly, the results cannot be preserved or even fully captured by photos, thus effectively rendering the subjective interpretations immune from critical evaluation.

not be done. In a letter to the prosecutor, she provided a few more details: "It is generally known to forensic scientists that it is *usually impossible* to determine the types of the individual donors if the DNA contains a mixture from 3 or more individuals using the [DQ–Alpha and polymarker] kits. *This may also be true for mixtures of DNA from only 2 sources.* However, for 2 source samples, it is *sometimes possible* to determine the types of each of the donors if there are intensity differences detected." Letter from Dr. Word, Cellmark Diagnostics, to Mr. Corbin, Assistant Prosecutor, at 2 (Oct. 18, 1994) (emphasis added).

In fact, the extent of Dr. Word's testimony on dot-intensity analysis was remarkably sparse, filling only a line or two of the transcript of her direct examination. In that brief testimony, she properly opined that unbalanced dot intensities *could* be an indication of a mixture. From that, she apparently decided—without any explanation or evident support—that she could draw conclusions regarding relative presence of alleles. She went on to admit on cross-examination, however, that many other reasons could explain the intensity differences: "[T]here's [sic] several possibilities that could give me these dot intensity differences." In fact, she attributed some dot-intensity differences to conditions other than different relative amounts of alleles. Thus, the majority's characterization that "the testimony of the State's expert supports the general acceptance of dot-intensity analysis," *ante* at 180, 699 *A.*2d at 626, is exaggerated.

Moreover, Dr. Word's testimony must be considered with and balanced against the testimony of other experts. Ironically, the principal supporter of the admissibility of polymarker testing in the first case in the nation to admit such testing was Dr. Robert Shaler. *See Morales, supra,* 643 *N.Y.S.*2d at 218. Dr. Shaler, called as a defense expert here, sharply denounced dot-intensity analysis as being "scientifically indefensible" at this time. Thus, not even he, a proponent of the use of polymarker testing in courts and a renowned expert in the field, viewed such analysis as reliable.[11]

As the Court appears to recognize, the scientific literature even discussing—much less endorsing—the validity of dot-intensity analysis is scant. *Ante* at 181, 699 *A*.2d at 627 ("[T]hree articles discuss dot-intensity analysis."). In fact, no literature or professional conference cited by the parties supports the evidence. *Cf. ante* at 181, 699 *A*.2d at 627 ("Not one [article] states that dot-intensity analysis is unreliable. The articles go no further than to express caution when interpreting the results through dot-intensity analysis.").

For example, the Federal Bureau of Investigations, in a widely respected and relied-upon analysis, found that "[b]ecause of the potential for unbalanced allele dot intensities and the limitations for detecting some mixed samples containing equivalent amounts of DNA, *caution should be exercised when interpreting evidentiary samples that potentially may be from more than one donor.*" *F.B.I. Study, supra,* 40 *J. Forensic Sci.* at 52 (emphasis added). That study, undertaken to determine "the limitations of the use of [the] new [polymarker] test," *id.* at 45, thus found that even interpretations of the simple presence or absence of alleles should proceed cautiously when mixed samples are involved. In exercising that caution, the F.B.I. did not draw any conclusions from dot-intensity imbalances. The study even found that imbalances existed where none were supposed to exist.[12] *Id.* at 48–49 & fig. 4.

---

[11] In a similar vein, the first New Jersey case admitting PCR testing relied on the testimony, expertise, and testing procedures of Dr. Edward Blake. *Williams, supra,* 252 *N.J.Super.* at 381, 599 *A.2d* 960; *see also Dishon, supra,* 297 *N.J.Super.* at 278, 687 *A.2d* 1074 (discussing PCR testing). Dr. Blake was a consultant for the defense in this case. He resoundingly criticized the State's analysis.

[12] The F.B.I. was unable to determine the percentage of test runs afflicted with unbalanced dots "because the determination of unbalanced intensity is somewhat subjective." *Ibid.*

The only other available study (only in prepublication format at the time of the hearing below) did not conclude that dot-intensity analysis was sufficiently reliable to warrant its use in an actual criminal case. *See* George Herrin, Nicola Fildes, & Rebecca Reynolds, *Evaluation of the AmpliType PM DNA Test System on Forensic Case Samples,* 39 *J. Forensic Sci.* 1247, 1251 (Sept.1994). That study does not bolster the reasoning or conclusion of the majority, despite the majority's extended citation of it. *Ante* at 182–183, 699 *A.*2d at 627–628. The article does state the proposition that when an examination of the HBGG marker reveals the presence of the A, B, and C allele in a mixed sample (from two contributors) and when the known contributor is genotype A,A, we can conclude that the suspect is genotype B,C. Such a conclusion is presumed from the *accepted* testing tenet for determining the presence or absence of alleles, and the use of the simple subtraction principle that dictates that if all three alleles are present, and if the victim contributed only one type of allele, the other two alleles must have come from the suspect. The conclusion does *not* involve, depend on, or validate dot-intensity analysis—that is, the attempt to infer the presence of extra or additional alleles from intensity or "quantity" of alleles already present. One need not look to the intensity of the dots to reach that conclusion. That accepted method, however, was not the analysis that Cellmark performed on the markers in this case.

The State's and majority's use of the initial study done by Roche and six other laboratories and the validation work by Cellmark was misguided. Those studies had little to do with dot-intensity analysis. At most, the studies found that unbalanced dots *could be* "a valuable asset" for determining the *existence of a mixture.* Fildes & Reynolds, *supra,* 40 *J. Forensic Sci.* at 285. The study, however, did not test the validity of that approach, nor did it even suggest that the presence of specific alleles could be determined by examining dot intensities. The publication concluded that "[t]he potential for sample mixtures in forensic casework analysis has always required careful and thoughtful interpretation. Individual laboratories will need to develop their own policies for

the interpretation of mixtures based on their experience and case history information." *Id.* at 284. The article does not suggest that any policy for interpreting mixtures has been developed, is scientifically reliable, or has earned general acceptance.

Although the Court asserts that Cellmark has developed such policies to interpret mixtures, *ante* at 181, 699 *A.*2d at 627, the Court does not indicate how it reached that conclusion, and it cites to no authority that would evidence its acceptance or reliability. Nothing in Cellmark's own exhaustive diagnostic manual considers the application of dot-intensity analysis to interpret mixtures. In fact, noting in the record suggests that Cellmark had developed such policies. Rather, the manual states only that the polymarker test results are either positive or negative on the testing strips, indicating the presence or absence of a particular allele. Cellmark Diagnostics, *Interpretation of HLA DQa Test Results, supra,* at 1.

There is nothing in the entire literature or record to suggest that the polymarker test kit can do anything more than identify alleles and *potentially* show that a mixture exists in certain circumstances. Certainly, no evidence indicates that a determination of the relative presence of different alleles reliably and consistently can be made by examining polymarker testing strips from a mixed sample. Indeed, as we noted in a different context during our original review of this case, the State "did not provide evidence [for which] anyone in the scientific community other than [the State's expert] [her]self vouche[d]...." *Harvey I, supra,* 121 *N.J.* at 428, 581 *A.*2d 483. There is simply nothing in the record to suggest that any scientist has ever in fact undertaken dot-intensity analysis successfully to determine the allele makeup of donors to a mixed sample.

The majority also relies on post-trial publications as "enhanc[ing] the acceptance of dot-intensity analysis." *Ante* at 183, 699 *A.*2d at 627. Whether post-trial extra-record publications can be relied on to support general acceptance is discussed later, *see infra* at 177–181, 699 *A.*2d at 625–626, but even the few relevant post-trial publications do not support the Court's conclusion. The

NRC Report, in the one line devoted to dot-intensity analysis, merely states that "[i]n *some* cases, it *might* be possible to distinguish the genetic profiles of the contributors to a mixture from differences in intensities of . . . dots in a dot-blot typing." *NRC Report, supra,* at 129 (emphasis added). The panel indicated only that it might be a marginally-helpful step that was worthy of further investigation; the scientists certainly did not suggest that dot-intensity analysis was in any sense reliable and admissible in court, though they advocated for the admission of virtually every other type of DNA analysis currently being undertaken. Dr. Word's own publication and study, performed years after the admission of the evidence here, simply concludes that "[b]ased on these studies, the PM kit can be expected to detect readily mixtures of DNA *that fall within the criteria listed* . . . and the studies *support the notion* that relative dot intensities are a linear function of the number of copies of alleles contributed by each individual in the mixture." Charlotte J. Word, Teryl M. Sawosik, & David H. Bing, *Summary of Validation Studies from Twenty–Six Forensic Laboratories in the United States and Canada on the Use of the AmpliType PM PCR Amplification and Typing Kit,* 42 *J. Forensic Sci.* 39, 46 (forthcoming 1997) (emphasis added). No testimony was adduced here about whether the mixture "fall[s] within the criteria," nor does Dr. Word's "notion" about dot-intensity analysis equate with a finding of general acceptance. In fact, in her conclusion, Dr. Word merely stated that the data she obtained supported the finding that dot-intensity analysis could *detect* mixtures. *Ibid.* Noticeably absent from her conclusion was any statement that dot-intensity analysis could effectively and reliably *interpret* mixtures.

Nevertheless, the majority, in concluding that dot-intensity analysis is generally accepted, appears to rely on the literature's tentative and ambiguous assertions that such testing might theoretically be possible. *E.g., ante* at 181, 699 *A.*2d at 627 (noting that "three articles discuss dot-intensity analysis" and that "[n]ot one states that dot-intensity analysis is unreliable," but ignoring fact that not a single article or judicial opinion states that dot-

intensity analysis *is* reliable); *ante* at 181, 699 *A.*2d at 627 (speculating that the "esoteric" nature of dot-intensity analysis may explain the lack of publications); *ante* at 184, 699 *A.*2d at 628 ("No published article ... rejects dot-intensity analysis[,] ... [so] the trend supports acceptance of the test."). The Court, of course, cannot possibly reconcile its statements with our long-standing standards that scientific evidence must be "clearly established," *Haskins, supra,* 131 *N.J.* at 649, 622 *A.*2d 867, and that "general acceptance.... entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience," *Rubanick, supra,* 125 *N.J.* at 436, 593 *A.*2d 733. The Court's opinion, reflecting an impossible struggle to document an insupportable conclusion, constitutes more words written about dot-intensity analysis than previously written in every publication, study, court opinion, and thesis combined. Although dot imbalances may well indicate the existence of a mixture, the use of those imbalances has not been refined and stabilized in a testing methodology that reliably, consistently, and clearly can be used to determine the genetic makeup of the contributors. Such analysis at this time remains in a speculative and penumbral realm, still far distant from scientific reliability.

### C.

In determining whether dot-intensity analysis is sufficiently reliable to warrant its general acceptance, we can be informed by its application in this case. The evidence adduced in this case discloses that dot-intensity analysis does not yield consistent results. Moreover, to the extent that the State argues that it is consistently reliable, the results obtained would be inconsistent with defendant being the murderer.

Dr. Word testified that the sample from the boxspring contained the 2 and the 4 allele for the DQ–Alpha marker. She also noted that the victim's DNA sample revealed that the victim had a "2,4" genotype for the DQ–Alpha marker. She further testified that

the dot intensities on the DQ–Alpha test strip were "fairly, roughly equal," indicating, according to the dot-intensity analysis theorem, that the 2 and the 4 alleles were present in roughly equal amounts. That being so, and the victim's DQ–Alpha genotype being "2,4," we would expect the suspect's genotype also to be "2,4." Cellmark, however, determined that defendant's genotype is "4,4."

If the sample contained the victim's blood ("2,4") and defendant's blood ("4,4"), the intensity of the "4" dot should be significantly stronger than the intensity of the "2" dot if the dot-intensity theorem is valid. That was not the case. Dot-intensity analysis thus apparently would foreclose defendant as a possible contributor to the blood mixture found at the scene.

The majority appears unconcerned about that contradiction. First it notes that "the record contains no discussion of the application of dot-intensity analysis to the results of the DQ Alpha test," *ante* at 180, 699 *A*.2d at 626, and then—without support—it changes its tune by saying that such analysis does not work, *ante* at 189–193, 699 *A*.2d at 631–632. We are forced to speculate whether or not dot-intensity analysis works on either the DQ–Alpha testing strips *or* on the polymarker testing strips, because there is insufficient evidence to establish its reliability and to support the general acceptance of the technique on either of the testing kits. The majority evades that inconsistency simply by deciding that whether or not dot-intensity analysis works on the DQ–Alpha is irrelevant to its analysis of the general acceptance of dot-intensity analysis of the PM probes. As the majority correctly points out, however, the DQ–Alpha testing procedure is factually similar to the polymarker testing procedure. *Ante* at 161, 699 *A*.2d at 617. Nothing in the record suggests that the slight differences between DQ–Alpha testing and polymarker testing would affect dot-intensity analysis.

Moreover, as acknowledged by Dr. Word during the pretrial hearing, the DQ–Alpha marker was retested using the PM testing strips. *See also United States v. Shea*, 957 *F.Supp.* 331, 334

(D.N.H.1997) (noting that the polymarker testing kit utilized in this case amplifies the polymarker loci as well as the DQ–Alpha locus); Herrin, Fildes, & Reynolds, *supra*, 39 *J. Forensic Sci.* at 1247 (noting that the AmpliType PM PCR amplification and typing kit amplified the five polymarkers and the DQ–Alpha marker). It is the polymarker testing strips that the State and the majority argue are capable of showing significant dot imbalances. For dot-intensity analysis to be valid, the analysis must work on the polymarker strip and with the DQ Alpha dot blots on that strip. There is no explanation in the record or the literature as to why the results for this particular marker would be any less conclusive than for the five polymarker markers.

Recognizing that dilemma, the majority then digs up extra-record authority for why dot-intensity differences may be irrelevant on the DQ–Alpha probes. *Ante* at 179–180, 699 *A.2d* at 625–626. Amazingly, the majority reads the authority as questioning dot-intensity analysis on the DQ–Alpha probe, yet it uses almost the exact same authorities and same ambiguous language in support of its claim that dot-intensity analysis on the polymarker loci is generally accepted. For example, the strongest support for the accuracy of dot-intensity analysis—on any loci—comes from a study done on the DQ–Alpha probes. *See* Edward Blake, Jennifer Mihalovih, Russell Higuchi, Sean Walsh, & Henry Erlich, *Polymerase Chain Reaction (PCR) Amplification and Human Leukocyte Antigen (HLA)-DQα Oligonucleotide Typing on Biological Evidence Samples: Casework Experience*, 37 *J. Forensic Sci.* 700 (1992). That study notes that with DQ–Alpha testing, "mixtures can be identified and interpreted based on relative dot intensities" in certain circumstances. *Id.* at 706. That is the only study on any loci to conclude that dot-intensity analysis can *interpret,* and not just *identify,* mixtures. The support for concluding that dot-intensity differences matter on the DQ–Alpha probes is much stronger than the support for the majority's conclusion that dot-intensities matter on the polymarker probes. The bias of the majority's reading of the authorities is starkly evident.

Other testing strips for the polymarker markers themselves indicate that dot-intensity analysis is subjective and does not work properly. The polymarker testing of the HBGG marker revealed that the boxspring mixed sample had all three possible alleles for that marker: A, B, and C. Dr. Word and Ms. Cooper testified that the dot-intensity test revealed that the three alleles were "roughly balanced" and of the "same intensity." Assuming the mixture came from only two individuals (an assumption that must be true for the State's analysis to work) and assuming that the mixture contains roughly equal amounts from each individual (another required assumption), there is no possible combination of geno-types that would have resulted in equal amounts of the three different alleles.[13] In fact, if defendant's blood (with HBGG genotype "A,C") and the victim's blood (with HBGG genotype "B,B") were in a mixture, dot-intensity analysts would assume that the B dot would be brighter on the testing strip. It was not.

One possible explanation for that apparent inconsistency is that homozygous genotypes (where the two alleles composing the geno-type are the same) may show up on the test strips as having the same intensity as single alleles. However, even that speculative explanation suffers, because it defies the logic of the polymarker testing, which separates the genotypes (including homozygous ones). In any event, that explanation has been cast into doubt by a study that showed that "the allele dot of a homozygous profile is *more* intense than the dots of a heterozygote profile." *F.B.I. Study, supra,* 40 *J. Forensic Sci.* at 12 (emphasis added). There-

---

[13] The six possible combinations that would involve all three found alleles are: (1) "AA, BC"; (2) "AB, BC"; (3) "AB, AC"; (4) "AB, CC"; (5) "AC, BC"; (6) "AC, BB." Genotype pairs (1) and (3) have more A alleles than B or C alleles. Genotype pairs (2) and (6) have more B alleles than A or C alleles. Genotype pairs (4) and (5) have more C alleles than A or B alleles. In none of the possible combinations are the alleles present in roughly equal amounts.

The fact that Dr. Word testified that "the possible combinations could be only AA and BC, AB and CC, or AC and BB," *ante* at 166; 699 A.2d at 619, raises serious questions abut the accuracy of her testimony. No one can seriously doubt that there exist six—not three—possible combinations.

fore, the results of the polymarker test for the HBGG marker should have shown a B dot that was brighter than the A and C dots if defendant's blood was a part of the mixture. The test did not show that result. The Court, for its part, continues to disregard the fact that such results undermine the reliability and hence the admissibility of dot-intensity analysis.[14]

Other results also indicate the problems with dot-intensity analysis. Each individual, we know, has two alleles (which together compose a genotype) for each particular marker. Therefore, if a sample of DNA were extracted and analyzed using the described testing procedures, and if the dot-intensity thesis is correct, a sample composed of just one individual's DNA should reveal, on the marker being examined, equal dot intensities for the alleles of that person. In other words, a person's DNA sample that had the A,B genotype for the GYPA marker should show equal dot intensities for the A and B alleles and should be blank for the C allele dot. That was not so in this case.

On defendant's sample, both experts for the State, Dr. Word and Ms. Cooper, admitted that "[t]here's a possible intensity difference ... with GYPA" and that "[the A dot] is somewhat darker than the B." That "variance," Dr. Word stated, is a common one, particularly among African Americans. That "variance," and any other such variances that the State opts to acknowledge, may explain the result obtained here, but the variances destroy the integrity of dot-intensity analysis.[15] To the degree that there are naturally occurring variances in dot intensi-

---

[14] Instead, the Court reserves discussion of the issue for post-conviction relief proceedings. *Ante* at 180–182, 699 *A*.2d at 626–627.

[15] Although completely outside the record in this case, it is worth noting that in a different capital trial in this State, a trial court refused to admit evidence of a polymarker test because the defendant had shown that variances occur not only at the GYPA loci, but also at the GC loci. *See State v. David Cooper*, No. 93–10–01627 (trial court's unpublished opinion captioned "Admissibility of DNA Evidence"), at 19–20. No such evidence was presented here.

ties that cannot be predicted prior to the analysis, dot-intensity analysis disintegrates as a reliable and useful test.

A real-life example demonstrates the problem. The GYPA results from the mixed sample showed the A dot as darker than the B dot and show no color reaction at the C dot. Ms. Schnaps's sample showed her genotype for the GYPA marker to be A,A. Thus, the other contributor to the sample could be either genotype A,B or B,B. Based on the fact that the A dot was darker than the B on the mixed sample, the State concluded that the suspect must be genotype A,B, because otherwise the A and B dots on the mixed sample would have been of equal intensity. The point is simply that variances, like the one at the GYPA marker that caused the A dot on defendant's strip to be brighter than the B dot, upset the analysis. Taking that example, if A dots for the GYPA marker are sometimes more intense than B dots even when equal amounts of the A and B alleles are present (as must have been true in defendant's unbalanced sample), then the suspect here could have had either genotype A,B or B,B. Both possibilities could reveal, when mixed with an A,A genotype (Ms. Schnaps's), a more intense A dot than B dot. Hence, dot-intensity analysis is useless unless somehow the variances are factored into the analysis. Variances were not accounted for here. In fact, the State concluded that the suspect must have GYPA genotype A,B—a result that, due to the variance at this exact marker, is not necessarily accurate.[16]

The example also demonstrates the problems with not knowing the precise amounts of DNA that each person contributed to the mixture. If the victim's blood was in heavier concentration than

---

[16] The Court, although recognizing that defendant argued that "variances . . . destroyed the integrity of the dot-intensity analysis," *ante* at 178, 699 A.2d at 625, never addresses the argument. Indeed, the Court merely reaffirms that variances, not laboratory errors, account for the anomalous dot intensities. *Ante* at 179, 699 A.2d at 626. Precisely because the strange results cannot be accounted for by laboratory error is why they call into doubt the reliability of dot-intensity analysis.

the suspect's blood, then the A dot may be more intense than the B dot for the mixed sample regardless of whether the suspect's genotype is B,B or A,B. Thus, the Court's assertion that Cellmark made only two assumptions in its analysis, *ante* at 164, 699 A.2d at 618, is also incorrect.

Besides the dot-intensity differences on the polymarker strip at defendant's HBGG marker, a possible disparity was also spotted on the GC locus. Further, examining the victim's polymarker strips, the defense expert found a clear imbalance in the GC marker, and imbalances in the control [17] on the GYPA marker. In total, of the six strips where dot intensities can be compared [18] and where no dot-intensity imbalances are supposed to exist because the alleles are present in equal amounts, two markers show clear imbalances, two other markers show slight imbalances, and two markers show no imbalance. The accuracy rate of this procedure would then hover somewhere around or below the fifty-percent range.[19]

---

[17] Each PM testing strip has a control dot that helps the tester to tell if the PCR enhancing and the PM test itself were performed correctly. For readings to be valid, the dot intensity of the alleles present must be brighter than the dot intensity of the control dot.

[18] Dot imbalances cannot be compared when the genotype being examined has two of the same alleles (*i.e.*, "homozygous," for example, the "B,B" genotype) because only one dot on the strip will turn blue. Therefore, out of the five PM markers that both defendant and the victim had (for a total of ten markers), four were homozygous and could not be compared.

[19] We can check for improper imbalances only in the samples containing a single person's DNA. In the mixed sample, the State assumes that all imbalances are due not to variances and the like, but to different contributors to the mixture. As previously noted, one of these, the HBGG marker, can be examined, because logic tells us that if two pairs of alleles make up the mixture, and three types of alleles are found present, the three types of alleles present cannot be in equal proportion. One of the three types of alleles must be present in twice the strength as the other two types of alleles. The results, however, showed that the dot intensities for all of the alleles were balanced. This is yet another unexplainable result.

The problems found here are not problems unique to this case. The F.B.I. study found similar difficulties with dot imbalances where there were supposed to be none. *F.B.I. Study, supra,* 40 *J. Forensic Sci.* at 12–13 ("The exact percentage of samples that exhibit unbalanced allele dot intensities is difficult to determine because the determination of unbalanced intensity is somewhat subjective."). The F.B.I. study concluded that the dot-intensity imbalances were not a problem because "none of these observations of unbalanced alleles resulted in an incorrect type." *Id.* at 13. As previously noted, however, the F.B.I. was not trying to interpret the relative presence of alleles from mixed samples where incorrect intensity imbalances would affect the conclusions. In short, the imbalances did not affect the conclusions that the F.B.I. was willing to draw, but such imbalances would deconstruct the dot-intensity analysis in this case, which sought to determine the relative presence of certain alleles.

Dr. Shaler accurately summed up the problems with dot-intensity testing: "[It] is a flawed system in that the dot intensities are already unbalanced[.] [T]hey can't use un[ ]balanced alleles to derive conclusions regarding types present or not present." He further noted that Cellmark technicians got "differences in dot intensities when they're supposed to be equal and since they're starting off with something which is unbalanced and they end up with something which is unbalanced. . . . [Y]ou can't do that." In sum, the patent unreliability of dot-intensity analysis requires its exclusion. *See Hurd, supra,* 86 *N.J.* at 536–37, 432 *A.2d* 86 (noting that expert testimony must be excluded if there is not even a reasonable likelihood that such testimony was reliable).

Not only do the results obtained here establish the gross unreliability of this evidence, but the entire practice of visualizing and weighing dot intensities to determine the makeup of a mixture is unavoidably subjective. A subjective test, especially one that is immune from later challenge, should not be admissible evidence in these circumstances. The standard for the admissibility of scientific evidence is designed to ensure that the testing procedure

"relies primarily upon objective factors for reaching a conclusion, with subjective factors playing only a minimal role in the analysis." *Windmere, supra,* 105 *N.J.* at 385, 522 *A.2d* 405. Even the State seems to have understood the problem. In questioning Dr. Shaler, the prosecutor noted:

> PROSECUTOR: Now, would it be fair to say that the review of any of these polymarker dots or alleles the intensity is a subjective opinion of an individual, correct?
>
> DR. SHALER: Pretty much.
>
> PROSECUTOR: So depending upon the individual they may have different interpretations?
>
> \* \* \* \*
>
> DR. SHALER: I don't feel these kinds of interpretations are reliable. Nobody to my knowledge has undergone a blind examination to test their abilities to make these kinds of intensity difference decisions.

Ms. Cooper, one of the State's experts, also admitted that "intensity difference[s] . . . can be subjective."

The subjective nature of this proof is shown by the evidence here. Cellmark's own laboratory technicians could not agree on whether or not some dot intensities were imbalanced. In analyzing the sample taken from the boxspring, one of the two technicians found three of the dot-intensity results to be imbalanced while the other reader found four of the strips to show imbalances. The defense expert found five of the strips to be imbalanced. No court can accurately assess those conclusions, because the dots fade and begin to disappear almost immediately.[20] With such gross disparities in an admittedly subjective test, the Court cannot conclude that dot-intensity analysis is reliable.[21]

---

[20] No evidence was introduced about the relative decomposition rates for the different allele dots. While different degeneration rates may explain the contradictory readings, they would render dot-intensity analysis even more unreliable.

[21] The subjective nature of dot-intensity analysis is particularly troubling here, where the laboratory performing the tests knew what results it wanted to obtain from this novel procedure prior to its testing. Cellmark, even before the performance of dot-intensity analysis, knew defendant's genotype and set out to

## D.

Even if dot-intensity analysis were presumed to be generally accepted, the evidence should have been rejected here because the assumptions underlying it were so numerous, complex, problematic, and potentially flawed as to render it substantially more confusing and prejudicial than probative in this specific context. *See N.J.R.E.* 403; *Cavallo, supra,* 88 *N.J.* at 520, 443 *A.*2d 1020 (holding that expert evidence, even if admissible under *N.J.R.E.* 702, must be excluded if it poses the danger that "prejudice, confusion and diversion of attention exceeds its helpfulness to the fact finder"). Expert testimony, especially testimony such as this complex DNA evidence, must be scrutinized with particular care because of the "aura of special reliability and trustworthiness" that surrounds it. *State v. Berry,* 140 *N.J.* 280, 299, 658 *A.*2d 702 (1995) (quoting *United States v. Young,* 745 *F.*2d 733, 765–66 (2d Cir.1984), *cert. denied,* 470 *U.S.* 1084, 105 *S.Ct.* 1842, 85 *L.Ed.*2d 142 (1985)). Such scrutiny is even more important in a capital case. *See State v. Johnson,* 120 *N.J.* 263, 296–99, 576 *A.*2d 834 (1990) (finding, in a capital case, blood-spatter evidence to be more prejudicial than probative).

For dot-intensity analysis to work, the blood being analyzed must come from two and only two persons. One of those persons must be the victim (or a different known (or typeable) person), and the other contributor must be the suspect. The victim's blood and the suspect's blood must be present in roughly equivalent amounts, and the two blood samples, when mixed, must not interact or affect one another. Those assumptions are logical leaps that may or may not be justified in a particular situation.

establish that his blood was a contributor to the sample. Cellmark's partiality can be seen in its original calculation of the odds that a person would have the same markers as those recovered from the sample. Cellmark used defendant's markers in its original calculations even though its own testing did not establish that those particular markers (specifically, the DQ–Alpha one) were the only ones that could have contributed to the sample. A far better procedure would have been to conduct dot-intensity analysis first or to use different testers for determining defendant's genotypes and for performing dot-intensity analysis.

Here, however, it is not possible to establish the validity of the assumptions because they were not even defended by the State.

If one assumes that dot-intensity analysis works, one must conclude that in the present case, the dot-intensity results obtained for the mixed sample in the HBGG marker preclude the possibility that only two people contributed to the sample. Dr. Word testified that she could not tell whether the boxspring sample contained blood from more than two sources. She erroneously opined, however, that "[t]he dot intensities fit together nicely for there being two sources." Nevertheless, she conceded that, "[t]here are probably some combinations of three sources that you could fit together to give us these same results."

Although her analysis was correct, her assumption that the dot intensities fit together was erroneous. As previously noted, the results from the HBGG marker (balanced dot intensities for the A, B, and C alleles) do not comport with the State's conclusions that the blood was a mixture of defendant's DNA (HBGG genotype "A,C") and the victim's DNA (HBGG genotype "B,B"). *See* discussion *supra* at 164–168, 699 *A.*2d at 618–620. One way that the HBGG test strip dots for the A, B, and C alleles could be balanced is if three individuals contributed to the DNA sample. The three individuals could be the victim ("B,B"), the defendant ("A,C"), and a third person ("A,C"). Two individuals could not have produced the results obtained unless a different assumption the State made was wrong.[22]

The State assumed that the two contributors to the sample contributed roughly equivalent amounts of blood and DNA. Relaxing that assumption, explains the anomalous HBGG result in that the suspect actually contributed twice the amount of DNA to the

---

[22] The "only two contributors" assumption is also cast in doubt by the findings of the State regarding faint dots on the test strips. Those faint dots, according to the State's expert, indicate other contributors. To the extent that the faint dots are erroneous readings due either to manufacturing defects in the testing kits or performance errors by the technicians, the faint dots cast doubt on the validity of the dot-intensity analysis.

sample as did the victim. The relaxation of that assumption, however, renders other results suspect. Moreover, the need to speculate only highlights the fact that the assumptions made by the State, while necessary to the validity of the dot-intensity analysis, are suspect and even provably wrong. Moreover, altering assumptions to fit the results obtained assumes defendant's guilt, rather than establishing his guilt. The assumptions, however, must be established independently of the results.

One other assumption warrants brief discussion because the State actually found problems with it. For dot-intensity analysis to be valid, one must assume that the DNA samples from two different people do not affect each other when mixed together. But, Dr. Word admitted that relative probe intensities become imbalanced in the presence of variant alleles. As previously noted, a variant allele was found in defendant's GYPA marker. *See* discussion *supra* at 166–168 & n. 14, 699 *A*.2d at 619–620 & n. 14. Despite that fact, the State relied on the GYPA dot-intensity result. Moreover, a variance probably existed at the GC loci as well. *See Cooper* DNA Opinion, *supra*, at 19–20.

Those assumptions bear directly on the admissibility, not merely the weight, of dot-intensity analysis. A full hearing on the assumptions and the entire validity of the dot-intensity analysis should have been held. That hearing was necessary to explore the inconsistencies in both the State's experts' comments and in the actual results obtained. The uncritical admission of this evidence in a capital trial without even remotely establishing its validity is an egregious wrong.

### E.

The burden is on the proponent of evidence clearly to establish its admissibility. *Windmere, supra*, 105 *N.J.* at 378, 522 *A*.2d 405. Although the majority claims to recognize that rule, *see ante* at 171, 699 *A*.2d at 622, it continually ignores that burden and notes that defendant did not challenge the evidence, that defendant did not present more favorable evidence, or that defendant based his

conclusions on the same evidence, *ante* at 178, 179, 191, 699 *A.*2d at 625, 626, 632. The fact that defendant did not adequately or effectively challenge the evidence does not relieve the State of its burden of clearly establishing the admissibility of novel scientific evidence. Nor is the trial court relieved of its obligation to weigh and to determine the admissibility of the evidence prior to its admission.

Most surprising is the Court's admission that this evidence is "esoteric." *Ante* at 183, 699 *A.*2d at 628. Esoteric and novel scientific evidence should undergo the most rigorous scrutiny because that is the evidence that is least likely to have been subject to the type of testing and peer review that we demand of all scientific evidence.

In fact, it is our court's obligation, in reviewing the admission of novel and complex scientific evidence, to assure itself that such evidence is reliable and generally accepted. *See, e.g., Kelly, supra,* 97 *N.J.* at 214, 478 *A.*2d 364 (recognizing such an obligation and acknowledging that the Court has power to order the trial court to conduct additional hearings to evaluate the claims of competing experts and to determine the reliability of the scientific evidence). As such, we must undertake a de novo review of that aspect of the record and can supplement the record with judicial opinions, scientific articles, and our own analysis. *See Lindsey v. People,* 892 *P.*2d 281, 289–90 (Colo.1995) (ruling that admission of novel DNA evidence "is a question of law" subject to de novo review); *Brim v. State,* 695 *So.*2d 268, 274 (Fla.1997) (holding that trial court's ruling admitting DNA evidence is subject to de novo review and is "reviewed as a matter of law rather than by an abuse-of-discretion standard"); *People v. Miller,* 173 *Ill.*2d 167, 219 *Ill.Dec.* 43, 60–62, 670 *N.E.*2d 721, 738–40 (1996) (McMorrow, J., specially concurring) ("[T]rial court decisions regarding the threshold question of whether a scientific technique has achieved general acceptance in the relevant scientific community should be subject to de novo review."), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 1338, 137 *L.Ed.*2d 497 (1997); *Taylor v. State,* 889 *P.*2d 319, 331–

32 (Okla.Crim.App.1995) (noting that the court conducts "an independent, thorough review" and does not "simply ask whether an abuse of discretion was committed"); *State v. Lyons,* 324 *Or.* 256, 924 *P.*2d 802, 805 (1996) ("Notwithstanding the usual deference to trial court discretion, we review that ruling on the admissibility of scientific evidence de novo.") (internal citations omitted); *State v. Cauthron,* 120 *Wash.*2d 879, 846 *P.*2d 502 (1993) ("We review the trial court's decision to admit or exclude novel scientific evidence de novo."); *see also State v. Alberico,* 116 *N.M.* 156, 861 *P.*2d 192, 204–06 (1993) (refusing to abandon abuse-of-discretion standard for admission of scientific evidence, but recognizing that such a standard "lends itself to the criticism that it will lead to inconsistent results in lower courts throughout the state"). The Florida Supreme Court, in adopting the reasoning of Justice McMorrow of the Illinois Supreme Court, *see Miller, supra,* 219 *Ill.Dec.* at 61, 670 *N.E.*2d at 739 (McMorrow, J., specially concurring), recently explained why this was so: "Foremost is the fact that the general acceptance issue transcends any particular dispute." *Brim, supra,* 695 *So.*2d at 274 (citing *Jones v. United States,* 548 *A.*2d 35, 40 (D.C.App.1988)).

The majority accepts that our review of this evidence is de novo when such evidence is admitted against a criminal defendant. *Ante* at 165–168, 699 *A.*2d at 619–620. Indeed, the Court frequently relies on post-hearing judicial opinions, articles, and analyses to shore up its position. *See, e.g., ante* at 177, 699 *A.*2d at 625 ("Based on the record, as well as on posttrial publications and judicial opinions, we conclude that the trial court correctly allowed [such evidence]."); *ante* at 183, 699 *A.*2d at 627 ("Recent publications enhance the acceptance of dot-intensity analysis."); *ante* at 175, 183, 699 *A.*2d at 624, 627 (relying on NRC's post-trial report to support position); *ante* at 175–176, 699 *A.*2d at 624 (citing posttrial cases to support general acceptance of polymarker testing).

Despite the majority's acceptance of de novo review, the majority carefully circumscribes such review to exclude all of the evi-

dence that does not support its ruling. *See, e.g., ante* at 180, 699 *A.*2d at 626 (noting that "the record does not reveal whether dot-intensity analysis can be performed on a DQ Alpha test," but ignoring evidence that it can be); *ante* at 181–182, 699 *A.*2d at 626–627 (acknowledging that the HBGG result obtained for the mixed sample is unexplainable by dot-intensity analysis, but refusing to explore inconsistency until post-conviction-relief proceedings); *ante* at 183–184, 699 *A.*2d at 628 (recognizing that dot-intensity analysis "provides an opening for cross-examination and contradictory expert testimony," but refusing to remand the case for a hearing to develop such evidence); *ante* at 193, 699 *A.*2d at 633 ("It is too late in the proceeding for defendant to insist that the State should have presented statistical evidence that defendant now believes would have been helpful at trial."); *ante* at 194, 699 *A.*2d at 633 (noting that "[o]n this record, the dissent's arguments are particularly unpersuasive," but ignoring the weight of contrary precedent); *ante* at 200, 699 *A.*2d at 636 (rejecting defendant's claim in part because he missed his "opportunity to challenge the State's statistical evidence, to present his own evidence, [or] to argue to the jury"). In fact, the majority even strikes from the record contrary evidence because it determines that when evaluating scientific evidence "[a]n appellate court ... generally confines itself to the record." *Ante* at 201, 699 *A.*2d at 637; *see also ante* at 202, 699 *A.*2d at 637 ("The place to introduce expert testimony is at trial. . . .").

Accepting post-hearing evidence that only supports one side of the argument is indefensible. As Justice McMorrow noted,

[t]he majority cannot have it both ways. If trial court decisions concerning the general acceptance of novel scientific evidence cannot be reversed absent an abuse of discretion, then upon review, only material which was part of the trial record should be considered by this court. If, on the other hand, the majority believes that it is proper to rely on scientific articles and court cases which were not part of the trial record to determine whether a novel scientific technique has become generally accepted in the relevant scientific community, then the majority must acknowledge that the standard of review is not a simple abuse of discretion standard.

[*Miller, supra,* 219 *Ill.Dec.* at 60, 670 *N.E.*2d at 738 (McMorrow, J., specially concurring).]

Dot-intensity analysis is a separate scientific technique that must be generally accepted prior to the evidence being used against a defendant in any criminal trial, and most especially in a capital prosecution. From what little we know about the analysis, it is not generally accepted or reliable. The procedure enjoys no support aside from Dr. Word's equivocal statements. In any event, the technique should have been excluded here because of the number of questionable and provably wrong assumptions that were made. Those assumptions render the evidence in this case substantially more confusing than clarifying and more prejudicial than probative.

### III

The trial court prevented defendant from effectively challenging the reliability of both the polymarker testing procedure and Dr. Word's theory regarding dot-intensity analysis. Specifically, the court did not permit defendant to examine the scientific experts on Cellmark's validation studies or to elicit testimony from defendant's own expert on the F.B.I. study. Cellmark's validation study showed that not even Cellmark, the laboratory responsible for performing the prosecution's DNA testing, conducted tests on the reliability or accuracy of the dot-intensity analysis. *See* discussion *supra* at 161–163, 699 *A.*2d at 617. The F.B.I. study concluded that dot imbalances occurred when they were not supposed to occur and that, therefore, the F.B.I. would not perform or rely on dot-intensity analysis for casework. *See* discussion *supra* at 160–161, 699 *A.*2d at 616–617. The majority acknowledges the trial court's error in limiting examination on the F.B.I. study, but finds the error to be harmless, and inexplicably finds no error in the limitation on cross examination regarding Cellmark's study.

The majority's reasoning is particularly troubling because of its previous decision to allow into evidence the "esoteric" dot-intensity analysis without much, if any, support from the scientific community. The majority reasons that all of defendant's complaints

about dot-intensity analysis "concern not the admissibility, but the weight of the evidence." *Ante* at 178, 699 *A*.2d at 625. Despite that determination—that defendant's complaints go only to the weight—the majority finds the limitations placed on the defense examination of the experts regarding Cellmark's validation study to be proper because "[t]he issue of Cellmark's validation studies on the polymarker [test] more properly concerns the *reliability* of the polymarker [test]. *As such, the issue goes to the admissibility of the test and not its weight.*" *Ante* at 188–189, 699 *A*.2d at 630 (emphasis added). The contradiction is overwhelming and confounding.

The majority's decision to sanction the limitations placed on the examination into these subjects is not reasonable under any circumstances. The fact that experts dispute whether a particular scientific technique has gained general acceptance is relevant and material not only to the admission of the evidence, but also to the weight that the jury should attach to the evidence, even if the technique in question is found admissible.

Admissibility and weight of scientific evidence may overlap. This Court repeatedly has noted that general acceptance does not mean unanimous acceptance. *E.g., Windmere, supra*, 105 *N.J.* at 379, 522 *A*.2d 405; *State v. Tate*, 102 *N.J.* 64, 83, 505 *A*.2d 941 (1986); *Kelly, supra*, 97 *N.J.* at 178, 478 *A*.2d 364. To the extent that a scientific technique, although generally accepted, does not enjoy unanimous acceptance, the party attacking the evidence must be permitted to inform the jury that the technique does not enjoy full support. To hold otherwise, as the Court does today, would be to immunize scientific techniques from attack and to mislead the jury into believing the infallibility of the techniques.

The weight of the evidence is a matter for the jury to decide. *Cavallo, supra*, 88 *N.J.* at 520, 443 *A*.2d 1020. " '[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion.' " *State v. Martini*, 131 *N.J.* 176, 264, 619 *A*.2d 1208 (1993) (*Martini I* ) (quoting *Glenpointe Assocs. v. Township of Teaneck*, 241 *N.J.Super.* 37, 54, 574 *A*.2d 459 (App.

Div.), *certif. denied,* 122 *N.J.* 391, 585 *A.*2d 392 (1990)), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995). Indeed, "[t]o determine the credibility, weight and probative value of an expert's opinion, one *must* question the facts and reasoning on which it is based." *Ibid.* (citing *Johnson v. Salem Corp.,* 97 *N.J.* 78, 91, 477 *A.*2d 1246 (1984)) (emphasis added).

An expert's credibility always can be attacked using treatises or other authorities on the subject. *See Jacober v. St. Peter's Med. Ctr.,* 128 *N.J.* 475, 486, 608 *A.*2d 304, *modified in part on other grounds,* 130 *N.J.* 586, 617 *A.*2d 1213 (1992). That is especially true when the expert has relied on the literature in forming his or her opinion. *Id.* at 494, 608 *A.*2d 304 (noting that "juries should not be insulated from the literature that experts use in formulating their opinions"). Indeed, without such evidence, the factfinder would be inhibited "from assessing the credibility of an expert's opinion by reference to that opinion's support in the relevant literature." *Ibid.; see also Blitz v. Hutchinson,* 252 *N.J.Super.* 580, 594–95, 600 *A.*2d 485 (App.Div.1991) (finding error in the refusal of trial court to permit cross examination of expert about an article on which he had relied but which contradicted the party's position). Under those well-established standards, the trial court's limitations on defendant's challenges to this evidence were erroneous.

The Court, as noted, does find error in the trial court's refusal to permit questioning on the F.B.I. study. Yet it finds the error to be harmless. *Ante* at 189, 699 *A.*2d at 630. The majority comes to that conclusion while recognizing that the "polymarker evidence was an important link in tying defendant to the crime." *Ante* at 155, 699 *A.*2d at 613–614. The dot-intensity analysis added the steel to the links that chained defendant to the crime. Without the dot-intensity analysis, the DNA evidence would have been ambiguous and possibly inadmissible under *N.J.R.E.* 403. Yet, the majority maintains that an error going to the very foundation of the dot-intensity analysis was harmless. *Cf. Williams v. State,* 342 *Md.* 724, 679 *A.*2d 1106, 1120–22 (1996)

(holding that limitations on cross examination of state's DNA expert was prejudicial error, and that challenges to "the reliability of the testing procedures used by Cellmark.... could have been vital to the jury's determination of how much weight to give to the PCR test results").

The dot-intensity analysis was used by the State to narrow drastically the number of individuals who could have contributed to the blood mixture found at the scene. The technique permitted the State to argue that far less than one percent of the population had the types of DNA markers found at the scene. (Actually, as will become evident, the State erroneously argued that only one out of 1,400 persons had those markers. The correct figure, according to the State's own expert, even using dot-intensity analysis, is far more inclusive.) Without dot-intensity analysis, at least ten percent of the African–American population could have contributed to the blood found at the scene.[23]

The majority finds the error harmless because "the jury knew that some scientists questioned the validity of dot-intensity analysis." *Ante* at 189, 699 *A.*2d at 631. That assertion is simply wrong. The jury knew of only one person who challenged the method—defendant's own witness, Dr. Shaler. The jury did not know that anyone not hired by the defense did not support the evidence. Indeed, the jury was led to believe that at least the other two scientists from whom the jury heard, Dr. Word and Ms. Cooper, as well as the laboratory performing the tests, Cellmark

---

[23] Without dot-intensity analysis, the contributor to the blood mixture could have had any LDLR genotype (100% of the population); two of three GYPA genotypes (approximately 77% of African Americans); the "A,C" genotype for the HBGG marker (approximately 27% to 32% of African Americans); two of three possible D7S8 genotypes (approximately 66% of African Americans); and three possible GC genotypes (approximately 89% of African Americans). *F.B.I. Study, supra,* at 50 (table 3). Using the product rule (and assuming the accuracy of the rule, assuming the accuracy of the numbers, and assuming no margin for error—all flawed assumptions, *see* discussion *infra* part one, section IV), 15% of African Americans share those markers.

Diagnostics, accepted the technique.[24] In reality, the F.B.I.'s study (undertaken by six experienced forensic scientists) lends no support to and flatly contradicts the assumptions of dot-intensity analysis. In fact, no scientist in any study has supported dot-intensity analysis. The jurors did not possess that information. Had they known, they may well have rejected as speculative, unsupported, and unreliable, the technique used by the State. Had the genetic evidence been rejected, a conviction would have been improbable.

Errors that are "clearly capable of producing an unjust result" demand reversal. *R.* 2:10–2. Where, as here, the party objects to the ruling and is precluded from introducing material evidence, the test is the sufficiency of the error "to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971); *see also State v. Bey,* 112 *N.J.* 45, 94, 548 *A.*2d 846 (1988) (*Bey I* ) ("[T]he inquiry concerns whether the error contributed to the verdict or the sentence."). Here, the evidence of defendant's guilt was clearly not "overwhelming." *Cf. State v. Tirone,* 64 *N.J.* 222, 227, 314 *A.*2d 601 (1974) (finding error not capable of having produced an unjust result because of the overwhelming evidence of the defendant's guilt). Certainly, where, as here, the error infects the most substantial evidence admitted at trial and where the error has the effect of precluding a meritorious attack on the very foundation of that evidence, the error cannot be said to be harmless.[25]

---

[24] In fact, Cellmark did not stand by the technique with any sort of validation study and Dr. Word, the State's own expert, testified pretrial that the technique is only "sometimes possible" even when there are only two contributors to the mixture and is impossible when there are more than two contributors. She neglected to mention in what circumstances such analysis is possible. *See* discussion *supra* at 161–163, 699 *A.*2d at 617.

[25] Additionally, this error might have prevented the penalty-phase jury's formation of "residual doubt" and thus influenced the death sentence meted out. *See State v. Marshall,* 148 *N.J.* 89, 172, 690 *A.*2d 1 (1997) (*Marshall III* ) (recognizing concept of "residual doubt" and its potential impact on penalty-phase delibera-

## IV

The State used the results of dot-intensity analysis to narrow the class of individuals who could have contributed to the blood found at the scene. The quantification and definition of that class is critical in forensic DNA testing. The persuasiveness of DNA testing is not simply to determine whether a defendant can be included or excluded from the class of persons having the same genetic markers as the DNA recovered from the scene, but also to determine the size of the class of individuals sharing those markers. From the percentage of the population having certain DNA markers, one can determine how probable or improbable it is that the defendant's blood was the blood found at the scene. By creating a population-frequency database and then analyzing the results, DNA testing can reveal the percentage of individuals who share a particular genetic marker. The State, here, went even further. The State determined the percentage of individuals having each of the six markers analyzed in the polymarker and DQ–Alpha testing and then multiplied the results together ostensibly to reveal the percentage of the population sharing all six of the markers. The State asserted that only one in 1,400 African-Americans shared the genetic markers of the blood found at the scene. The State's figure is wrong; the analysis is misleading, flawed, and unreliable. The entire statistical evidence was improperly admitted without foundation and without a hearing.

### A.

Dr. Word, a genetic scientist, testified about frequency data and frequency calculations. Frequency data was obtained by testing certain population groups and determining how often the different genotypes for the DQ–Alpha and the five polymarker markers occur. Frequency calculations are then performed by multiplying

tions); *State v. Harris*, 141 *N.J.* 525, 580, 662 *A.*2d 333 (1995) (Handler, J., concurring in part and dissenting in part) (noting jurisdictions that recognize "residual doubt").

the frequencies of the various genotypes together. So if a particular polymarker marker genotype is present in twenty percent of the population and a different polymarker marker genotype is present in fifty percent of the population, by multiplying twenty percent by fifty percent, Cellmark would conclude that only ten percent of the population shares those two genotype markers. This calculation is called the "product rule."

In this case, Cellmark used data collected from its own laboratory and from Roche laboratory. Cellmark's database came "from individuals in our laboratory and ... from paternity casework blood samples." Cellmark compiled separate databases for Caucasians and for African–Americans. Cellmark's database contained fifty African–Americans, Roche's contained 100.

Applying the product rule to the types of markers defendant possessed (the five polymarker marker genotypes and the DQ–Alpha genotype), Dr. Word and Ms. Cooper concluded that defendant's particular genotypes were shared by one in 1,400 African–Americans. Using Cellmark's own data, but excluding the figure for the DQ–Alpha marker, the product rule reveals that approximately one in 170 African–Americans would share defendant's genotypes for the five polymarker markers.

Without using the dot-intensity analysis to limit the possible genotypes, Dr. Blake, one of defendant's experts, used the product rule to limit the African–American population sharing the suspect's DNA characteristics to one in forty-seven. Dr. Word admitted that Dr. Blake's analysis was correct if one "totally ignore[s] the [dot-]intensity differences."

### B.

The one–in–1,400 figure held up by the State is plainly and simply misleading and wrong. In summation, the State encouraged the jury to use the product rule and asserted that the jurors should conclude that only one in 1,400 African–Americans had the same DNA type as that found at the crime scene: "That is excluding one thousand three hundred and ninety-nine people

*from that sample.*[26] That's excluded over ninety-nine point seven three ... of the entire population of the world." [27] (emphasis added).

Although the State was correct that defendant had that DNA type, the State is flat out wrong in asserting that the blood recovered from the scene revealed the "4,4" DQ–Alpha genotype. To get the one–in–1,400 figure, the State relied on dot-intensity analysis. Finding the DQ–Alpha "4,4" genotype to be present in 11.9% of African–Americans,[28] the LDLR "B,B" to be present in

---

[26] The prosecutor had previously explained this sample as having been the mixture taken from the boxspring at the crime scene. The prosecutor's error in calculation relates back to his earlier error in stating that Cellmark's testing of the boxspring sample revealed that the suspect had a "4,4" DQ Alpha genotype:

> "Tested the boxspring matress [sic] and came up with DNA that [Ms. Cooper at Cellmark Diagnostics] believed was a mixture from two different sources.
> Initially they do—I put the chart up here Ms. Cooper used, DQ Alpha strip and come back with a type of four, four and I marked that up here, four, four.
> She indicated the percentage of people in the population, the entire population, that have that four, four, is 17 percent.
> So you can exclude 83 percent from the entire population of the world just by that DQ Alpha."

In fact, the testing revealed that the suspect had either a "4,4" genotype, a "2,4" genotype, or a "2,2" genotype. One could not "exclude 83 percent" of the population from having contributed to the sample.

[27] The majority incorrectly states that "[t]he prosecution did not present the one–in–1400 figure to prove the percentage of African Americans whose genetic compositions could be comparable with the PM/DQ Alpha profile of the box-spring sample." *Ante* at 192, 699 A.2d at 632. Even if the majority were correct, which the above-quoted statement by the prosecutor flatly shows not to be the case, the one in 1,400 figure would be irrelevant. *See infra* at 285–286, 699 A.2d at 679.

[28] At trial, Cellmark actually used the figure of 17%. That figure represents the presence of this genotype within the entire population. Remarkably, the State never mentioned the 11.9% figure at trial except during its calculation of the one–in–1,400 number. Arguably, using the lower percentage was incorrect. *See Cooper* DNA Opinion, *supra*, at 6–8 (recognizing danger of subgrouping and requiring use of "ceiling principle" under which frequency of alleles is capped at

56% of African–Americans, the GYPA "A,B" to be present in 50%, the HBGG "A,C" in 27%, the D7S8 "A,B" to be present in 45%, and the GC "A,B" genotype to be present in 17% of African–Americans, the State concluded that only one in 1,400 African–Americans shared those genotypes. The State's calculations were correct ($.119 \times .56 \times .50 \times .27 \times .45 \times .17 = 0.0006882$, which in turn equals 1/1,453). However, even assuming the figures were entirely accurate, the State's calculations were flawed.

The State, relying on Cellmark's figures, found that 11.9% of African–Americans have the "4,4" DQ–Alpha marker. Defendant has the "4,4" DQ–Alpha marker. However, the blood found at the scene could have come from someone with DQ–Alpha marker that was either "2,2" or "2,4" or "4,4." (Indeed, as discussed earlier, *see supra* at 165, 699 *A*.2d at 619, using the dot-intensity analysis, one would expect the suspect to have the "2,4" DQ–Alpha genotype.) Even Cellmark recognized that the suspect contributing to the mixture must have a DQ–Alpha genotype of either a "2,2" or "2,4" or "4,4." Letter from Dr. Word, Cellmark Diagnostics, to Mr. Corbin, Assistant Prosecutor, at 3 (Oct. 18, 1994). Therefore, even Cellmark, although originally providing the one–in–1,400 figure, revised its numbers, in response to the criticisms by the two defense experts. The revised numbers *from Cellmark* were that one in 170 African–Americans shared the blood type as found at the scene (assuming the blood type was a mixture from two individuals, one being the suspect and one being the victim). *Id.* at 5.[29]

---

maximum rate of allele's presence in any single subgroup); *see also NRC Report, supra,* at 35–36 (discussing ceiling principles).

[29] The majority suggests that the correct figure is somewhat above the approximately one in 666 that the defendant calculated could be the appropriate figure instead of the one in 1,400. *Ante* at 192, 699 A.2d at 632. The majority fails to realize that the defense was not advocating the one–in–666 figure but was rather using it to demonstrate the fallacy of the State's figure. In any event, if the one–in–666 figure is misleading in any way, it is misleading in a manner that helps the State. The defense's calculation did not even include the percentage of individuals who share the "2,2" DQ–Alpha genotype—a percentage that, even by

The State was not content with just using the one–in–170 figure and improperly used the rejected and flawed one–in–1,400 figure. That figure is wrong because it was based on a DQ–Alpha genotype of "4,4" instead of being based on the three DQ–Alpha genotypes that Cellmark admitted could be the suspect's. By using only the figure for the "4,4" genotype, all the State was calculating was the population that shared Harvey's DNA markers. The State was not calculating the percentage of the population that shared the DNA markers of the blood found at the scene and identified as the suspect's. It is this latter figure that is relevant.[30]

The majority finds the one–in–1,400 figure material because "[s]o described, the one–in–1400 evidence was relevant to show that defendant's relatively rare composite genotype could not be excluded by the PM/DQ Alpha tests as a contributor to the box-spring sample." *Ante* at 193, 699 *A*.2d at 632. The majority's reasoning is not sound. The fact that defendant had a "relatively rare composite genotype"—a fact not established anywhere in the record—does not inform the jury one bit. Under the majority's reasoning, if an exceedingly rare genotype is found in only one person in the world and if the sample recovered from the crime scene was determined to contain alleles that could be found in virtually everyone in the world including that person, the State, according to the majority, would be able to highlight how rare that person's blood is to show that it is somehow more likely that that

---

the majority's analysis, should have been included. No evidence was adduced at trial concerning what that figure was. The Court's conclusion that "[i]t is too late in the proceeding for defendant to insist that the State should have presented statistical evidence that defendant now believes would have been helpful at trial," *ante* at 193, 699 *A*.2d at 633, is not tenable. Defendant, being sentenced to death, has every right to demand that the State's statistics be reliable.

[30] Excluding the DQ–Alpha population frequency from the calculations, one in 173 African–Americans would share the other five DNA markers with defendant. More importantly, only one in 173 African–Americans (defendant being one of them) would share the DNA markers of the blood found at the scene.

person's blood contributed to the common sample. The fact that the defendant had a "rare" genotype does not make it more likely that he, rather than someone with a common genotype who also fit the DNA profile, contributed to the sample. The National Resource Council has recognized the prevalence of this type of error and has emphasized that "[u]sually the subgroup to which the suspect belongs is irrelevant, since we want to calculate the probability of a match on the assumption that the suspect is innocent and the evidence DNA was left by someone else." *NRC Report, supra,* at 29. "The proper question is," according to the NRC, "What is the probability that a randomly chosen person, other than the suspect, has the genetic profile of the evidence DNA?" The probability is, by the State's expert's own calculations, no more than one in 170.

### C.

Even had the State used the correct figures in calculating the number of people who could have contributed to the DNA material found at the scene, the use of the unmodified product rule in making those calculations was erroneous. The use of the unmodified product rule in calculating population frequencies from DNA loci is unsupported by the scientific and legal authorities.

While the product rule is clearly generally accepted as an accurate theoretical proposition, the issue is whether the product rule can be applied to individual DNA frequencies. *See Cauthron, supra,* 846 *P.*2d at 514–15 (holding in regard to admission of DNA statistical evidence and product rule calculations that "[t]he expert must show more than the theory. For the evidence to be admitted, the theory must be valid in its application."); *State v. Carter,* 246 *Neb.* 953, 524 *N.W.*2d 763, 780 (1994) (adopting same approach). A famous example serves to demonstrate why the important issue before us is the product rule's application to the given situation and not the rule's theoretical soundness. In *People v. Collins,* 68 *Cal.*2d 319, 66 *Cal.Rptr.* 497, 438 *P.*2d 33 (1968), the prosecutor applied the product rule to the facts of that

case to argue that the odds that the eyewitnesses improperly identified the suspect were one in 12 million. The prosecutor noted that the probabilities of a man with a mustache was only twenty-five percent, the odds of a black man with a beard was only ten percent, the odds of a girl with a ponytail was only ten percent, the odds of a girl with blond hair was thirty-three percent, the odds of seeing a partly yellow automobile was ten percent, and the odds of seeing an interracial couple in a car was only .1 percent. Because the witnesses observed such occurrences and because the defendant was linked to such occurrences, the prosecutor argued that the odds that the defendant was not involved in such occurrences was one in 12 million. *Id.* at 501, 438 *P.*2d at 37, *cited in Shea*, 957 *F.Supp.* at 336 n. 12. The fallacy in the example is that the characteristics observed were not independent. For product rule calculations to be reliable, admissible, and relevant, the proponent of the evidence must establish the independence of the variables used in the calculation.

Because of the importance of establishing independence of the variables, virtually every one of the 100 or so published cases, including three cases from this State, that have discussed the rule's application to DNA analysis have included a hearing to examine and test the independence of the variables. These cases are far from unanimous in their conclusions. The reason behind the differing results is simple: A debate has been long raging in the scientific and legal community over the application of the product rule to DNA analysis. *See NRC Report, supra,* at 25–36, 89–204.

In 1992, the National Research Council issued its first report of the evaluation of forensic DNA evidence. The NRC concluded that the variables—even if based on reliable, random, and sufficiently large samples—were not fully independent. Specifically, the NRC concluded that the variables were neither in "Hardy–Weinberg Equilibrium" nor in "Linkage Equilibrium." Without getting overly detailed about the scientific principles behind Hardy–Weinberg and Linkage Equilibrium, for our purposes it is

sufficient to say that because population mating is not completely random, because different subpopulations may have different frequencies of certain alleles, and because of different population structures, the unmodified product rule, which takes into account none of these phenomena, may not be reliable. This was recently made clear by one federal court:

> The product rule can be applied reliably ... only if the estimate of allele frequencies is reasonably accurate and the conditions in the population approximate what are known as Hardy–Weinberg equilibrium and linkage equilibrium.... Hardy–Weinberg equilibrium and linkage equilibrium are rarely attained in real populations, most significantly because real populations are finite and contain subgroups that are perpetuated by non-random mating. Accordingly, debate about whether the product rule can be used reliably often focuses on the power of the statistical methods used to detect deviations from Hardy–Weinberg equilibrium and linkage equilibrium and the adequacy of the measures that are used to account for potential deviations.
>
> [*Shea, supra,* 957 *F.Supp.* at 336–37.]

Thus, the debate has been over the method of determining the deviations and the size of the deviations from the product rule.

Finding that the two principles of equilibrium were violated and that many of the databases being used were not entirely accurate, the 1992 NRC report recommended the use of the "ceiling principle" or the "interim ceiling principle" in calculating frequencies to be used in courtrooms. These principles essentially provided a lower limit of the overall population frequencies even assuming the violations of the equilibrium rules. *See NRC Report, supra,* at 35–36, 156–59.

Although some courts came to accept the ceiling principles, the NRC rapidly found itself under attack for advocating their use. Scientists complained that the rules were overly conservative and recommended instead the use of different modified product rules that would not so dilute the power of the population statistics. By last year, the NRC had abandoned advocating for the ceiling principles. *Id.* at 35. The NRC, however, has continued to reject an unmodified product rule and has instead provided several alternative formulas all of which provide conservative estimates of profile frequencies. The recommended adjustment to the product rule that is relevant to the DNA analysis conducted here is the

factor-of-ten adjustment. *Id.* at 34 ("We conclude that, when several loci are used, the probability of a coincidental match is very small and that properly calculated match probabilities are correct within a factor of about 10 either way."); *id.* at 156 ("[T]he uncertainty of a value calculated from adequate databases (at least several hundred persons) by the product rule is within a factor of about 10 above and below the true value."). Applying such a modified product rule to the data in this case reveals that as many as one in seventeen people may share the DNA characteristics of the blood found at the scene.

Because of the widespread acceptance of the deficiencies with the product rule in calculating genetic profile frequencies, the vast majority of courts have permitted only modified versions of the product rule to be admitted. *See, e.g., Shea, supra,* 957 *F.Supp.* at 341–43 (holding that product rule is only reliable and admissible under *Daubert* if the rule is modified to account for likely uncertainties caused by population substructuring and random error; allowing product rule when calculated using NRC's recommended factor of ten estimated value); *Lowe, supra,* 954 *F.Supp.* at 407–08 (finding modified product rule, using the factor of ten calculations, to be admissible); *State v. Johnson,* 186 *Ariz.* 329, 922 *P.2d* 294 (1996) (finding modified ceiling principle to be admissible); *State v. Bible,* 175 *Ariz.* 549, 858 *P.2d* 1152, 1181 (1993) (holding product rule *in* admissible because prosecution failed to establish independence of alleles), *cert. denied,* 511 *U.S.* 1046, 114 *S.Ct.* 1578, 128 *L.Ed.2d* 221 (1994); *State v. Sivri,* 231 *Conn.* 115, 646 *A.2d* 169 (1994) (remanding for hearing on admissibility of modified product rule); *United States v. Porter,* 618 *A.2d* 629, 643 (D.C.App.1992) (finding interim ceiling principle to be admissible, but remanding for additional hearings); *Brim, supra,* 695 *So.2d* at 273 (finding ceiling principle, but not unmodified product rule, potentially to be admissible pending a hearing); *Caldwell v. State,* 260 *Ga.* 278, 393 *S.E.2d* 436, 443–44 (1990) (finding unmodified product rule *in* admissible based on evidence of departure from Hardy–Weinberg equilibrium); *Commonwealth v. Lanigan,* 413 *Mass.* 154, 596 *N.E.2d* 311, 314–16 (1992) (finding product-rule estimates by Cell-

mark to be *in* admissible; noting in dicta agreement with ceiling principles); *Commonwealth v. Curnin,* 409 *Mass.* 218, 565 *N.E.*2d 440 (1991) (rejecting Cellmark's probability analysis as not being generally accepted at that time); *State v. Bloom,* 516 *N.W.*2d 159 (Minn.1994) (recognizing problems with unmodified product rule and finding product-rule calculation modified by ceiling principle to be admissible); *Carter, supra,* 524 *N.W.*2d at 776–83 (ruling that unmodified product rule is not generally accepted and therefore is *in* admissible based on violation of Hardy–Weinberg proportions); *State v. Vandebogart,* 139 *N.H.* 145, 652 *A.*2d 671 (1994) (finding product-rule estimate using ceiling principle to be admissible after finding unmodified product-rule calculations to be *in* admissible); *State v. Campbell,* 691 *A.*2d 564 (R.I.1997) (finding that product rule calculated using ceiling principle to be admissible); *State v. Morel,* 676 *A.*2d 1347, 1356 (R.I.1996) (permitting modified ceiling principle); *State v. Streich,* 163 *Vt.* 331, 658 *A.*2d 38 (1995) (finding unmodified product rule to be *in* admissible, and insisting on use of ceiling principles before such evidence can be used); *State v. Jones,* 130 *Wash.*2d 302, 922 *P.*2d 806 (1996) (finding interim ceiling principle to be generally accepted); *State v. Copeland,* 130 *Wash.*2d 244, 922 *P.*2d 1304 (1996) (finding product rule admissible only if independence of alleles is established).

Because the State never established the independence of the loci used in its product rule calculation—indeed, because the State cannot possibly establish the total independence of the loci—the unmodified product rule calculations used here to convict defendant were improperly admitted.

### D.

The State's figures are misleading in another way. The population numbers are based on samples, not on the entire population. Therefore, the figures represent not the frequency with which the genotypes actually occur in the population, but the frequency that, based on the samples, we would expect with a reasonable degree

of certainty the genotypes might occur. The samples, even by Cellmark's calculations are not 100% accurate, yet the prosecutor presented them as such.

We do not even need a statistician to inform us that small samples do not represent to a certainty, the actual population. At best, assuming the database was sufficiently large and random, it may be an accurate sampling of the population, thus permitting us, with a reasonable degree of confidence, to predict the actual frequencies within the population as a whole. *See State v. Marshall*, 130 *N.J.* 109, 211–12, 613 *A.*2d 1059 (1992) (*Marshall II*) (discussing statistical sampling and noting that statisticians would expect the actual results to differ from the sample by standard deviations), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993); *Harvey I, supra*, 121 *N.J.* at 427, 581 *A.*2d 483 (recognizing that a confidence interval provides information on the accuracy of an expert's opinion). Although the NRC endorses the use of sampling, when match probabilities are estimated from such a database, "such calculations are subject to uncertainties." *NRC Report, supra*, at 33. The NRC opined that "[t]he accuracy of the estimate will depend on the genetic model, the actual allele frequencies, and the size of the database." *Ibid.*

The databases used here were neither random nor large enough to be an accurate sampling of the population, even to a reasonable degree of certainty. The National Resource Council, perhaps the most impressive advocate for the introduction of DNA population-frequency statistics in criminal cases, concluded that "an adequate database [has] *at least* several hundred persons." *NRC Report, supra*, 33 (emphasis added); *see also Lowe, supra*, 954 *F.Supp.* at 409–10 & n. 10 (noting that even the government's experts testified that an adequate database had at least several hundred persons). Cellmark's African–American database for the polymarker markers contained only fifty people and Roche's just 100 people. Moreover, if the databases are not random, a larger sample size is usually required. We know nothing about Roche's, but Cellmark's was certainly not random. Dr. Word admitted

that the database was based in part on "individuals in our laboratory" and paternity cases Cellmark already had in the laboratory. The group used was obviously "selected," even though the criteria implicit in that selection are unknown. Although the selective or non-random aspects of a database might sometimes be excused, where as here, the genes measured are either functional or linked with functional genes, *see NRC Report, supra,* at 118–19, a confidence interval must be provided. It is essential that the population sample be truly random in order to negate the possibility that the results are idiosyncratic. The lack of randomness and the small size inhibits the reliability of the databases.[31]

Even in our original review of this case we recognized that the burden is on the State to show that the statistical figures it presents to tie defendant to the blood found at the scene must be "considered authoritative in the forensic-serology community." *Harvey I, supra,* 121 *N.J.* at 431, 581 *A.2d* 483. In fact, the Court held that an "in-house study was an insufficient ground for [the State's expert] to testify about the [percentages of matches]." *Id.* at 430, 581 *A.2d* 483. Despite our warning in this very case that such evidence was a prerequisite to admission, that testimony was clearly lacking.

### E.

We can only speculate about exactly how defective the State's analysis is here because the trial court failed to hold the required hearing on the admissibility of this evidence. The majority disregards our previous teachings that trial courts have an independent

---

[31] The Court's citations to two publications, which reported statistical results from samples of only ninety-four and 116 persons, *ante* at 193, 699 *A.2d* at 632, is amiss. There is no suggestion that samples of such small size have been found sufficiently reliable to be used in a criminal trial. *Cf. Government of Virgin Islands v. Byers,* 941 *F.Supp.* 513, 520 (D.V.I.1996) (noting that a DNA profile database "of only 750 Caucasians" is "quite small"). In any event, those studies at least included individuals chosen at random.

obligation to ensure the reliability of evidence and to hold a hearing on the admissibility of the evidence when necessary. Indeed, the Court today finds that it cannot review this issue because it strikes from the record what it considers to be the only evidence indicating the need to provide confidence intervals, *ante* at 200, 699 *A.*2d at 637, and because it refuses to remand the case for an evidentiary hearing on the matter. *Cf. State v. Koedatich,* 112 *N.J.* 225, 283, 548 *A.*2d 939 (1988) (*Koedatich I*) (requiring a searching and scrupulous review of the record in capital cases), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989); *Bey I, supra,* 112 *N.J.* at 93, 548 *A.*2d 846 (same).

The Court's holding is this respect once again marks a broad departure from our precedent. For example, in *State v. Spann,* 130 *N.J.* 484, 617 *A.*2d 247 (1993), this Court held that a mathematical formulation, used to determine paternity from blood-grouping tests, must undergo a hearing as to its scientific validity and acceptance prior to the formula being admitted into evidence in a criminal proceeding. This was done even though the formula had gained acceptance in numerous prior civil cases in the State and had been written about extensively. *Id.* at 505–06, 617 *A.*2d 247. The Court found that "[w]hat is needed is what the trial court will have: examination and cross-examination on that issue." *Id.* at 506, 617 *A.*2d 247. The trial court was instructed to hold a hearing, determine the expert's qualifications, and rule on "the conditions attached to the admission of expert testimony, *i.e.,* 'general acceptance.'" *Id.* at 508, 617 *A.*2d 247. The testimony is only admissible if the hearing shows the evidence to be reliable and generally accepted and if the jury is told how the expert opinion might be affected by other variables in the case. *Id.* at 498–99, 617 *A.*2d 247. The Court concluded that "even if not objected to sufficiently by counsel, the expert's opinion on probability of paternity did not satisfy the most fundamental requirement of expert testimony: its ability to aid the jury in its

deliberations." *Id.* at 498, 617 *A*.2d 247 (citing *Kelly, supra,* 97 *N.J.* at 209, 478 *A*.2d 364).

In *Kelly,* we also recognized that in certain circumstances the prudent course would be to remand the matter to the trial court to take additional testimony about the general acceptance of the scientific evidence. *See Kelly, supra,* 97 *N.J.* at 214, 478 *A*.2d 364 (opting to reverse conviction and order a new trial with a new hearing on the admissibility of the scientific evidence instead of ordering a limited remand, but recognizing that the Court retained the option of ordering "a limited remand ... to the trial court to exercise its discretion, a very broad discretion, on the issue of the expert's qualifications and the reliability of the knowledge proffered").

What is remarkable is not only the majority's disregard for our precedent, but its refusal to recognize that the reasons for requiring an antecedent foundational hearing in this case are much more compelling than in those cases. For example, in *Spann,* the mathematical formulation had gained acceptance, even in courts in this State. Here, New Jersey courts are split on the validity of the product rule for analyzing DNA results. The product rule has even been rejected in the context of DNA evidence in a capital case in this State. *See Cooper* DNA Opinion, *supra,* at 23 ("I further find that the method of statistical calculation used, specifically the product rule method, has not been shown to be generally accepted in the scientific community. Furthermore, the results obtained through use of the product rule are not sufficiently reliable to admit into evidence for consideration by a jury."). Subsequent to the admission of the evidence here, one New Jersey court has endorsed a *modified* product rule that takes into account some of the problems noted herein. *Marcus, supra,* 294 *N.J.Super.* at 284–87, 683 *A*.2d 221. More recently, another court, after "a lengthy *Frye* hearing to determine whether ... the statistical analysis and quantification of the test result was sufficiently reliable to be admitted at trial" found the product rule admissible. *Dishon, supra,* 297 *N.J.Super.* at 260, 281–85, 687 *A*.2d 1074. No court has admitted such evidence without a hearing.[32]

New Jersey has not been alone in requiring mathematical formulations to undergo examination prior to admissibility. Indeed, virtually every court that has permitted similar population database statistics and the product rule formula have required that they be tested for admissibility before the results are admitted into evidence. *See* cases cited *supra* at 193–194, 699 *A.2d* at 632–633. The majority ignores those cases and, in support of its decision to permit this evidence without a full exploration of the many issues surrounding the validity of the product rule in evaluating DNA match probabilities, it confidently asserts that "many other jurisdictions accept the product rule as scientifically reliable." *Ante* at 196, 699 *A.2d* at 634. In fact, most jurisdictions permit only a modified product rule, and the authorities—even ones cited by the majority—are close to being unanimous in ruling that a *Frye*-type hearing must be held before reaching such a determination. *Marcus, supra,* 294 *N.J.Super.* at 288, 683 *A.2d* 221 (finding no scientific consensus on the use of the product rule and holding that the area "remains a legitimate subject for expert testimony"); *Schweitzer, supra,* 533 *N.W.2d* at 158–60; *Fishback, supra,* 851 *P.2d* at 893 & n. 18; *see also* cases cited *supra* at 194–195, 699 *A.2d* at 633–634.

Requiring the establishment of reliability prior to the admission of expert testimony is certainly not unique to DNA statistical evidence. In *Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 605 *A.2d* 1079 (1992), this Court noted that for any type of expert testimony to be admissible, "(1) the intended testimony must concern a

---

[32] Some people have asserted that the product rule was endorsed in New Jersey by the trial court in *Williams, supra,* 252 *N.J.Super.* 369, 599 *A.2d* 960. *See NRC Report, supra,* at 207. However, a careful reading of the opinion in that case reveals that it never addressed whether population statistics are scientifically reliable. The opinion has, therefore, fallen under some criticism. *Carter, supra,* 524 *N.W.2d* at 783 ("An examination of [*Williams*] reveals that the issues of population substructure and the reliability of the population data bases were not addressed; therefore, [the] case[ ][is] not persuasive nor relevant as to [the] validity of . . . statistical methodology.").

subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." *Id.* at 413, 605 *A.*2d 1079. Under the relevant standards of this State, admission of the product rule and population-frequency data was clearly wrong.

As to the third element, sufficient expertise, this Court has noted that an expert must "be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion." *State v. Moore,* 122 *N.J.* 420, 458–59, 585 *A.*2d 864 (1991); *see State v. Odom,* 116 *N.J.* 65, 71, 560 *A.*2d 1198 (1989); *Hake v. Manchester Tp.,* 98 *N.J.* 302, 314, 486 *A.*2d 836 (1985). When the subject matter of the expert testimony "falls distinctly within the province of a particular profession, the witness should generally be a licensed member of that profession." *State v. Frost,* 242 *N.J.Super.* 601, 615, 577 *A.*2d 1282 (App.Div.1990), *certif. denied,* 127 *N.J.* 321, 604 *A.*2d 596 (1990). The expert must "possess a demonstrated professional capability to assess the scientific significance of the underlying data and information." *Rubanick, supra,* 125 *N.J.* at 449, 593 *A.*2d 733. Therefore, in genetic testing where probability statistics are also offered, "[t]he expert should be qualified not only as a geneticist but also as a mathematician." *Spann, supra,* 130 *N.J.* at 519, 617 *A.*2d 247; *cf. Biro v. Prudential Ins. Co.,* 57 *N.J.* 204, 271 *A.*2d 1 (1970) (noting that the danger of wrongly permitting expert testimony is that jurors will give the evidence undue credence because the opinion is offered by an "expert"). In *Odom, supra,* 116 *N.J.* 65, 560 *A.*2d 1198, we emphasized that it was essential that the expertise of the witness coincide with the opinions the expert witness offers.

Dr. Word had no demonstrated ability to delineate the problems with the numbers, nor did she appear to comprehend the inherent unreliability in any statistical sample. Furthermore, she did not provide information from which one could conclude the databases

she utilized were either random or substantial enough to support her assertions. Indeed, the State provided no information regarding the "total lack of 'neutrality' on the part of the assumption[s]" the State asked the jurors to make. *Spann, supra,* 130 *N.J.* at 499, 617 *A.*2d 247. The Court ignores this precedent and rehashes the old standard that "the competency of a witness to testify as an expert is an issue remitted to the sound discretion of the trial court." *Ante* at 201, 699 *A.*2d at 637. Sound discretion does not equate with uncritical acceptance.

The error is exacerbated here by the trial court's rejection of the defense's challenge to the expert. Defendant pointed out that "[o]ne of the checks that the Supreme Court has required [when admitting statistical evidence] is that a mathematician testify. The State has failed to meet that requirement." Defendant also argued that, "[t]he population frequency statistics cited in the State's reports are not sufficiently reliable so as to be generally accepted in the scientific community." Indeed, defense counsel noted that, "[i]n this particular case, the State's testing laboratory failed to perform the compilation and calculation of the population frequency statistics without error." These meritorious arguments were rejected by the trial court and are virtually ignored by the majority today.

In permitting the product rule and the population databases to be used without a hearing on the admissibility of the evidence, the Court turns its back on the long line of precedent in this State and others. Worse, the Court chooses today to do so in a case in which the evidence in question is suspect and, worse yet, where a defendant's life is at stake.

Part Two

I

The trial court erred, understandably, in failing to anticipate our decision in *State v. Mejia,* 141 *N.J.* 475, 662 *A.*2d 308 (1995). In *Mejia,* we held that capital juries must be instructed that they need not be unanimous in determining whether a defendant intended to kill or merely seriously to injure a victim. *Id.* at 481,

662 *A.*2d 308. Only if the jury in this case unanimously found that defendant's intent was to kill, could defendant be subject to the death penalty. *Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792.[33] The issue here is whether the failure to provide the nonunanimity instruction was harmless in that no rational basis existed in the evidence on which a juror could conclude that defendant intended only to commit serious bodily injury. *See Harris, supra,* 141 *N.J.* at 549, 662 *A.*2d 333.

In every other case in which this Court has found such errors to be harmless, *see, e.g., Harris, supra,* 141 *N.J.* at 548–51, 662 *A.*2d 333; *State v. Bey,* 129 *N.J.* 557, 576–80, 610 *A.*2d 814 (1992) (*Bey III* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *State v. Biegenwald,* 126 *N.J.* 1, 16–19, 594 *A.*2d 172 (1991) (*Biegenwald IV* ); *State v. McDougald,* 120 *N.J.* 523, 558–60, 577 *A.*2d 419 (1990); *State v. Hightower,* 120 *N.J.* 378, 412–14, 577 *A.*2d 99 (1990) (*Hightower I* ); *State v. Rose,* 120 *N.J.* 61, 63–64, 576 *A.*2d 235 (1990) (*Rose II* ), the defendant did not request the instruction that we now find it was error for the trial court not to have given. Unlike in any of those cases, here defendant did request that instruction. The trial court failed to deliver the instruction not because it felt the instruction was unwarranted but rather because it erred in its understanding of the law. In such circumstances, and where the jury is making a life-or-death decision, the plain error standard under which all previous cases have been adjudged is inapplicable. Rather, the Court simply should hold the error harmful.

Virtually dispositive of this issue is that we have already determined that the error committed here was actually harmful. In *Harvey I, supra,* 121 *N.J.* 407, 581 *A.*2d 483, we reversed defendant's conviction and death sentence because "[t]he record provid-

[33] That decision subsequently has been abrogated by constitutional and statutory amendments. *N.J. Const.,* art. I, ¶ 12; *L.* 1993, c. 111 (signed May 5, 1993). The abrogation affects only offenses committed since the amendment's enactment. *Mejia, supra,* 141 *N.J.* at 482, 662 *A.*2d 308. Irene Schnaps was murdered in 1985.

ed 'a rational basis for the jury to find that the defendant intended to cause only serious bodily injury.'" *Id.* at 414, 581 *A.*2d 483 (quoting *State v. Coyle,* 119 *N.J.* 194, 209, 574 *A.*2d 951 (1990)). That conclusion was based on five enumerated factors:

1. The State's concession that Harvey's initial intent was to commit burglary, not murder;

2. Harvey's confession that he struck Schnaps only once and in response to being punched in the nose;

3. The State's argument during penalty-phase that some of the fifteen blows inflicted upon Schnaps were intended to injure and cause pain, not to kill;

4. The jury's freedom to reject the pathologist's testimony when other evidence indicated a lack of murderous intent; and

5. The fact that the trial court opted to instruct the jury on lesser and included offenses which did not require murderous intent.

[*Id.* at 413–14, 581 *A.*2d 483.]

The Court unmistakably recognized and stated that defendant's mental state was "clearly in issue." *Id.* at 414, 581 *A.*2d 483. Remarkably, on evidence that is in all pertinent ways but one identical to what was adduced at the first trial, the Court reaches the extreme opposite conclusion today. Not only does the majority find that defendant's mental state was no longer "clearly in issue," but the majority holds that no reasonable juror could possibly conclude that his mental state was in the slightest debatable.

The only difference between the first trial and the retrial is that Harvey's self-serving confession was not admitted at the retrial. The majority views this as "a critical distinction." *Ante* at 150, 699 *A.*2d at 611. In *Harvey I,* that factor was not deemed critical. No reason is offered as to why it has become so critical now. In fact, the difference is not particularly important. All of the pertinent facts contained in Harvey's confession were before the jury in the retrial. Indeed, in the confession, defendant did not assert that he had not intended to murder Irene Schnaps. The majority interprets the confession as containing one fact not before the jury on retrial—that Harvey claims he struck the victim only once. *Ante* at 150, 699 *A.*2d at 611. The confession

does not support the majority's assertion.[34] Moreover, even if Harvey told the police that he hit the victim only once, such a claim was clearly implausible, suggesting, at best, that he did not recall distinctly hitting her more than once or, at worse, that he was lying. The medical examiner testified to numerous skull fractures, a fractured jaw, and a deep laceration on the victim's skull. The medical examiner opined that Irene Schnaps had been assaulted at least fifteen times with a blunt object. Photos of the victim confirmed his assessment. In sum, the absence of the confession does not change the evidence regarding defendant's intent to kill versus his intent to cause serious bodily injury.

The "critical distinction" on which the Court now rests its opinion was only one of five pertinent factors the Court then noted. That factor, as just described, was not especially impressive. The other four factors are equally, if not more important. Defendant entered the victim's apartment without any intent to kill or even to injure her. Even the State concedes as much. The State theorizes, and the evidence supports such a position, that the victim awoke, perhaps because of the noise defendant was making, and found defendant in her bedroom. A struggle ensued. Irene Schnaps's bedroom was left in disarray. During the struggle, the

---

[34] Harvey's confession was never written down or tape recorded by the police officers. At the first trial, Sgt. Rizzo recounted Harvey's confession:

Mr. Harvey stated that he ... was in the area of Hunter's Glen apartments and he was trying sliding glass doors, patio doors seeing which was open and which wasn't. He found one, which happened to be the apartment of Mrs. Schnaps. He went in, he made his [way] back to the bedroom, the master bedroom. He saw an object lying on the bed, he assumed it was a man at first. The person appeared to be sleeping. He had gone through the dresser drawers or the bureau and he had taken some jewelry, including the watch.

At that time Mrs. Schnaps woke up and she went to strike Mr. Harvey. I believe she struck him in the nose causing his nose to bleed. He then responded by striking her with a hammer or what he described as an object like a hammer. He struck her in the head.

From there she fell to an area in the bedroom near a fan. She laid there for some time and then she got up and fell closer to the doorway of the bedroom where she lay.

victim injured defendant enough to cause him to bleed. Defendant struck back, administered several blows to cause pain to the victim and presumably to limit her ability to hurt him. Even the State admits that defendant still did not have the intent to kill the victim. In fact, the State argued, and the jury found, that the first blows were intended not to kill, but to injure and cause the victim pain. The State theorizes, and the majority uncritically accepts, that only after the first blows did defendant form an intent to kill; in that instant between blows, he formed a new intent, and proceeded to kill Irene Schnaps. There is no question that the perpetrator killed Schnaps, but certainly a rational person could find that the State did not prove beyond a reasonable doubt that, in the brief moment between blows, defendant's intent changed from causing pain and disabling injury to causing death.[35] A reasonable juror might find that defendant's intent remained only to cause severe bodily injury.

Certainly that evidence could leave sufficient doubt in one juror's mind. The evidence was at least "minimally adequate to provide a reasonable basis for the jury to hold a reasonable doubt that the defendant intended to cause death." *Mejia, supra,* 141 *N.J.* at 489, 662 *A.*2d 308; *see also State v. Dixon,* 125 *N.J.* 223, 254, 593 *A.*2d 266 (1991) ("The error was not harmless because there was evidence in this case that could have sustained an SBI ... verdict. We do not suggest that such a verdict was likely, but merely that if the jury returned that verdict, the court could not reject it."); *State v. Pennington,* 119 *N.J.* 547, 561, 575 *A.*2d 816 (1990) (noting that this is a "low-threshold"); *State v. Pitts,* 116 *N.J.* 580, 615, 562 *A.*2d 1320 (1989) (same).

The evidence in this case is not like the evidence in *Harris* and related cases in which the Court has held that the error was

---

[35] The Court responds that whether or not that change in *mens rea* occurred in a brief moment "is irrelevant." *Ante* at 152, 699 *A.*2d at 612. If defendant's intent did not change in that brief moment, as is certainly possible—indeed, probable—then the factor is inapplicable. The probability that defendant's assaultive intent did not change to homicidal intent is highly relevant.

harmless. There is no evidence that defendant admitted or stated any intent to kill. *Cf. McDougald, supra,* 120 *N.J.* at 558–60, 577 *A.*2d 419 (noting evidence of defendant's acknowledgement of intent to kill); *State v. DiFrisco,* 118 *N.J.* 253, 571 *A.*2d 914 (1990) (*DiFrisco I* ) (same), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *Pitts, supra,* 116 *N.J.* at 614–20, 562 *A.*2d 1320 (same); *State v. Hunt,* 115 *N.J.* 330, 374–77, 558 *A.*2d 1259 (1989) (same). The weapon used by defendant, a hammer-like instrument, is not like a gun fired at close range into a person; the victim's death is not so assured. *Cf. Hightower I, supra,* 120 *N.J.* at 412–14, 577 *A.*2d 99 (finding no basis for a conclusion that defendant only intended serious bodily injury because defendant shot the victim with a .32–caliber handgun from close range in the chest, neck, and head); *Rose II, supra,* 120 *N.J.* at 63–64, 576 *A.*2d 235 (finding no basis for a charge on serious bodily injury where defendant fired a sawed-off shotgun from inches away into victim's chest). In addition, there is no evidence that defendant took further steps to assure Ms. Schnaps's death from which one could conclude he possessed an intent to kill. *Cf. Hightower I, supra,* 120 *N.J.* at 413, 577 *A.*2d 99 (noting that defendant dragged victim into freezer); *Pitts, supra,* 116 *N.J.* at 618, 562 *A.*2d 1320 (noting that defendant took victim's pulse); *see also Dixon, supra,* 125 *N.J.* at 254, 593 *A.*2d 266 (noting that defendant submerged body in creek, but finding that evidence could have sustained serious bodily injury verdict).

Indeed, there is more evidence here that defendant lacked murderous intent than there has been in many of the cases where this Court has found the error reversible. *State v. Jackson,* 118 *N.J.* 484, 572 *A.*2d 607 (1990), is instructive. In *Jackson,* the defendant stated that he did not enter the apartment of the victim intending to attack or kill her. Rather, on the night of the crime he reacted to a threat by the victim. *Id.* at 491, 572 *A.*2d 607. His reaction was repeatedly to stab the victim; he did so fifty-three times, including eighteen in the genital area. *Id.* at 486, 572 *A.*2d 607. The similarities with Harvey are striking. Like in *Jackson,* there was evidence that defendant entered the victim's

apartment without any intent to harm her. Like in *Jackson,* there was evidence that defendant reacted to a threat by the victim; the evidence indicated that Irene Schnaps was even able to draw defendant's blood. Like Jackson, defendant then proceeded with a vicious and unrelenting attack that left the victim dead.

The majority points to only one bit of evidence in support of its conclusion that this record could not possibly support a reasonable doubt that defendant intended to kill. The majority points to the severity of the wounds. *Ante* at 151, 699 *A.*2d at 612. Standing alone, the severity of the wounds never has been sufficient to support that conclusion when the weapon was something other than a gun fired at close range. *E.g., Jackson, supra,* 118 *N.J.* at 491, 572 *A.*2d 607 ("Not every stabbing wound is intended to kill.").

Another plausible set of circumstances that the majority does not even consider is that even if defendant intended to kill the victim, he formed the intent after he already had killed her. The State asserted that the first blows were meant only to cause pain. The medical examiner also asserted that the victim would have died almost immediately after the blows to the head. He could not say which blow or blows killed her, but he opined that a single blow might have been sufficient. It is logical and possible that defendant kept assaulting the victim even after she fell unconscious and died. In fact, the medical examiner testified that he believed that defendant did exactly that. The medical examiner stated that the victim was probably rendered unconscious, and perhaps died, from the first blow or two. If defendant formed his murderous intent after he had already murdered Irene Schnaps, he would not be eligible for the death penalty. The evidence certainly supports that possibility.

Not only does the majority disregard all evidence contradicting its conclusion, but it even ignores the trial court's view of the evidence. The trial court obviously found this evidence to be ambiguous and inconclusive. In addition to providing a *Gerald* charge, as required by our previous decision, the court instructed

the jurors on the lesser-included offense of aggravated and reckless manslaughter. Those latter offenses would only have been submitted to the jury if the trial court believed that the evidence could support a finding that the defendant had *neither* the intent to kill *nor* the intent to cause serious bodily injury. *See Dixon, supra,* 125 *N.J.* at 255–56, 593 *A.*2d 266 (noting that a lesser and included offense must be charged if rationally based on the evidence).

The trial court's decision to provide a *Gerald* charge was clearly correct. The majority suggests that the *Gerald* charge was not required by our previous decision, because in the absence of the confession, no rational basis existed to support it. *Ante* at 151–152, 699 *A.*2d at 612 ("In [*Harvey I,*] . . . we did not predetermine the need for such a charge in a retrial in which the confession was excluded."). The majority turns *Harvey I* on its head. There, we reversed defendant's conviction and death sentence for failing to deliver the *Gerald* charge. 121 *N.J.* at 411, 581 *A.*2d 483 (noting in the very first paragraph of the opinion that "[b]ecause the trial court's jury instruction . . . did not comply with . . . *Gerald* . . . we reverse the conviction. . . ."). In dicta, we noted that the confession should not have been admitted. *Id.* at 425, 581 *A.*2d 483. Now the majority asserts the later (lesser) error, if corrected, renders the former error harmless. That result defies logic, common sense, and basic fairness.

The majority flagrantly disregards our prior holding in this case, our holdings in similar cases, the facts of this case, and our general requirement that death-penalty cases warrant special consideration. Despite the majority's contentions, a reasonable juror certainly could have concluded that defendant lacked murderous intent; therefore, the trial court was required to instruct the jury that it need not be unanimous on this point, and the failure to so instruct was plain error.

## II

Once again I feel compelled to dissent from the majority's arbitrary and contradictory finding that the evidence adduced at

trial could support the c(4)(f) aggravating factor. *N.J.S.A.* 2C:11–3c(4)(f) (permitting imposition of the death penalty if the murder was "committed for the purpose of escaping detection"); *see State v. Loftin,* 146 *N.J.* 295, 398–408, 680 *A.*2d 677 (1996) (*Loftin I* ) (Handler, J., dissenting); *State v. Hightower,* 146 *N.J.* 239, 280–94, 680 *A.*2d 649 (1996) (*Hightower II* ) (Handler, J., dissenting); *Hightower I, supra,* 120 *N.J.* at 436–38, 577 *A.*2d 99 (Handler, J., dissenting). With this decision, the majority confirms that literally any set of facts can support the c(4)(f) factor and, as construed and applied by the Court, this aggravating factor, rather than narrowing the class of defendants who may be subject to the death penalty, is virtually boundless. The dismissive manner in which this Court addresses the challenge to the factor demonstrates that the majority has become indifferent to the dangers of its expansive interpretation. Additionally, the Court does not attempt to cure the grave error made by the prosecutor when he argued a legally improper, and uncorrected, basis to support the c(4)(f) factor.

## A.

The majority's support for the c(4)(f) factor rests entirely on the fact that there were signs of a disturbance at the crime scene. The evidence on which the majority relies is, in its entirety, that:

> Defendant entered Schnaps's apartment by forcing open a glass patio door. Apparently Schnaps awoke and discovered defendant in her bedroom, which was the only room with signs of disturbance. The jury reasonably could have inferred that defendant decided to kill Schnaps to prevent her from alerting her neighbors, calling the police, and later identifying defendant as the person who intended to rob her. Indeed, when questioned by police, neighbors in the apartment complex denied hearing any noises from Schnaps's apartment.
>
> [*Ante* at 225–226, 699 *A.*2d at 649 (internal citations omitted).]

It is not comprehensible how any juror could conclude that such scant evidence proves, *beyond a reasonable doubt,* that defendant killed Irene Schnaps in order to avoid apprehension and future prosecution for the robbery. Silence in the evidence is never enlightening, no less dispositive. The majority converts silence, mute circumstances, into powerful and deadly proof.

The majority now holds that signs of a struggle support the c(4)(f) factor. Last year, the majority held that the absence of signs of a struggle established the c(4)(f) factor. *Loftin I, supra,* 146 *N.J.* at 378, 680 *A.*2d 677 (noting that with no signs of a struggle, no other motive could explain why the killing took place). Perhaps one should not be surprised by this latest flagrant contradiction; it is just another in a long string of inconsistent and conflicting rulings regarding the c(4)(f) factor. For example, in *Loftin I, supra,* 146 *N.J.* at 377–78, 680 *A.*2d 677, the Court held that the wearing of a mask is evidence supporting the c(4)(f) factor, and in *Martini I, supra,* 131 *N.J.* at 283, 619 *A.*2d 1208, the Court noted that disguising oneself is evidence supporting the c(4)(f) factor, but in *Harris, supra,* 141 *N.J.* at 535–36, 662 *A.*2d 333, the Court found that the wearing of a mask and then the removal of the mask is evidence supporting the c(4)(f) factor. In *Loftin I, supra,* 146 *N.J.* at 377, 680 *A.*2d 677, the Court held that planning a crime where defendant would not be known or recognized supports the c(4)(f) factor, but in *Martini I, supra,* 131 *N.J.* at 283, 619 *A.*2d 1208, the Court held that a victim's knowledge of defendant supports the c(4)(f) factor. In *Loftin I, supra,* 146 *N.J.* at 377, 680 *A.*2d 677, the Court ruled that committing an offense miles from one's home is evidence supporting the c(4)(f) factor, but in *Hightower II, supra,* 146 *N.J.* at 268, 680 *A.*2d 649, the Court found that committing an offense near one's home is evidence supporting the c(4)(f) factor. Lastly, in *Loftin I, supra,* 146 *N.J.* at 318–19, 680 *A.*2d 677, the Court indicated that a robbery at nighttime is evidence supporting the c(4)(f) factor, yet in *Hightower II, supra,* 146 *N.J.* at 268, 680 *A.*2d 649, the Court noted that robbing in daylight is evidence supporting the c(4)(f) factor. It becomes impossible not to conclude under the Court's analyses, that *any* murder—and *every* murder—is committed in order to avoid detection and apprehension.

That trail of contradictory opinions is marked not to underscore the Court's aimlessness, but to show that the majority has imposed no limitations on the aggravating factor; its failure will permit prosecutors to charge the c(4)(f) factor based on any set of

facts. That is limitless discretion, opening the door to arbitrary and capricious sentences, and it is unconstitutional. "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 *U.S.* 231, 244, 108 *S.Ct.* 546, 554, 98 *L.Ed.*2d 568, 581 (1988). Aggravating factors are the key element to narrowing the class of death-eligible defendants. *See Gregg v. Georgia*, 428 *U.S.* 153, 194–95, 96 *S.Ct.* 2909, 2935, 49 *L.Ed.*2d 859, 886–87 (1976) ("[Aggravating factors] provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner."); *State v. Ramseur*, 106 *N.J.* 123, 182–201, 524 *A.2d* 188 (1987). Aggravating factors that fail to narrow the class of death-eligible persons render death sentences under their provisions unconstitutional. *Cf. Gregg, supra*, 428 *U.S.* at 201, 96 *S.Ct.* at 2938, 49 *L.Ed.*2d at 890 (finding that although the "outrageously or wantonly vile" aggravating factor can be construed to serve no limiting purpose, the Georgia death-penalty scheme was not unconstitutional because no evidence existed that the state supreme court would not sufficiently limit the scope of the factor); *Ramseur, supra*, 106 *N.J.* at 197–201, 524 *A.2d* 188 (noting the Court's "power and obligation to narrow imprecise statutory language in order to render [the wantonly vile, horrible, or inhuman aggravating factor] constitutional"). The Court has failed to abide by those vital mandates rendering "imprecise statutory language" even more imprecise and utterly without merit.

## B.

In addition to the lack of probative evidence supporting the c(4)(f) factor proffered by the majority, the only argument ad-

vanced by the prosecutor during summation in support of the factor was improper. The evidence to which the prosecutor pointed did not support the theory that defendant was motivated in committing the murder by an intent to avoid apprehension. Despite the fact that the argument went uncorrected by the trial court, the majority finds the error to be harmless.

The prosecutor argued that the c(4)(f) factor was supported by the fact that defendant concealed and destroyed evidence after the commission of the murder:

> Aggravating factor [c(4)(f)] is ["]was this murder additionally committed in an attempt to avoid prosecution, apprehension?["] Yes, it was. Items were removed not only to be stolen and kept by Mr. Harvey, but items were removed from this apartment to ... prevent detection. I suggest to you bedding. The body of Irene Schnappes [sic] was washed clean in an attempt to prevent the police from locating the individual that committed this offense, Mr. Harvey.

For evidence to support the c(4)(f) factor, it must indicate that the murder itself was "intended to eliminate a potential witness to the crime." *Martini I, supra,* 131 *N.J.* at 281, 619 *A.*2d 1208. Each of the facts argued by the prosecutor related to defendant's actions taken *after* the murder and do not support the conclusion that the murder itself was committed to conceal the robbery offense. New Jersey courts repeatedly have held that the actions of a defendant to conceal the murder are not admissible to support the c(4)(f) factor. *Hightower I, supra,* 120 *N.J.* at 422, 577 *A.*2d 99; *State v. Monturi,* 195 *N.J.Super.* 317, 326–27, 478 *A.*2d 1266 (Law Div.1984). The majority correctly notes, as it must, that the prosecutor's argument was "improper." *Ante* at 223, 699 *A.*2d at 648.

The majority, however, seriously misapprehends the record when it finds that the prosecutor's impermissible representations were cured by the trial court's instruction. The trial court provided *no* curative instruction. The trial court's concluding instructions, although correctly stating the law, were not made in response to the prosecutor's improper remarks and in no way neutralized or cancelled them: the court did not inform or even intimate to the jury that the prosecutor's remarks were erroneous

and were to be disregarded. Rather, as part of a lengthy charge, the court simply observed to the jurors that "[a]ny evidence of action taken by the defendant to conceal the murder itself cannot be used to prove this aggravating factor."

Although in some cases an instruction by the trial court may cure the prejudice done by a prosecutor's improper statement, *see Koedatich I, supra*, 112 *N.J.* at 320–23, 548 *A.*2d 939, a statement of the law, even if correct, made in the final instructions to the jury without any reference to or acknowledgement of the improper remarks is not sufficient. A curative charge should be delivered immediately after the objectionable action and should directly address the error. *See State v. Zola*, 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989); *Koedatich I, supra*, 112 *N.J.* at 324–25, 548 *A.*2d 939. The jurors were never told to disregard the improper remarks and the comments never were withdrawn. The Court now assumes that the jury fully understood that the prosecutor's remarks were wrong and were not to be taken into account, when the trial court, defense counsel, and the prosecutor all failed to appreciate that fact. That is a drastic assumption in view of the stakes—a death sentence that turns solely on whether the jury would be persuaded by the prosecutor's argument. In light of both the absence of substantive evidence supporting the c(4)(f) factor and the prosecutor's improper and gravely misleading argument regarding evidence of the sole aggravating factor, this Court must infer that the jury was influenced by the prosecutor's remarks, and is obligated to find the error harmful.

### III

I also dissent from the Court's ruling on several other points: that the incomprehensible felony-murder charge was harmless error, *ante* at 152–154, 699 *A.*2d at 612–613; that the erroneous jury charge permitting the penalty jury to consider all guilt phase evidence was harmless error, *ante* at 223–225, 699 *A.*2d at 647–648; that the Court's finding that the prosecutor's reference to

"pubic hair" was harmless error, *ante* at 215–217, 699 *A*.2d at 643–645; that permitting the penalty jury to be misled into believing that defendant would be eligible for parole was proper, *ante* at 227–228, 699 *A*.2d at 649–650; and that the aggregation of so many "harmless errors" did not have the effect of denying defendant a fair trial, *ante* at 229, 699 *A*.2d at 650.

### A.

The verdict sheet, which permitted the jury to consider the felony murder count only if it first found defendant guilty of death-eligible murder, was utterly incomprehensible and plainly and starkly wrong. The majority finds error, but holds the error harmless. I disagree; such an error can never be harmless.

In *State v. Purnell*, 126 *N.J.* 518, 601 *A*.2d 175 (1992), this Court vacated a death sentence because the jurors had not been given the opportunity to convict defendant of the noncapital offense of felony murder. The Court noted that:

> We have consistently held that all forms of homicide rationally supported by the evidence, whether they be lesser-included or alternative offenses, should be placed before the jury. To truncate the definitions of the murder statute and thus deny a jury the mechanism to decide which of the forms of murder has been proven is unacceptable.

> [*Id.* at 530–31, 601 *A*.2d 175.]

That principle has been repeatedly reiterated by this Court. *See Mejia, supra*, 141 *N.J.* at 484, 662 *A*.2d 308 (noting that a capital "jury must be given every opportunity to convict of the charge not carrying the death penalty" and disapproving of a sequential charge) (quoting John M. Cannel, *New Jersey Criminal Code, Annotated*, comment 13 to *N.J.S.A.* 2C:1–8(e) (1994)); *Dixon, supra*, 125 *N.J.* at 256, 593 *A*.2d 266 (holding that the felony-murder charge must be submitted to the jury in a capital case where the evidence clearly indicates the appropriateness of the charge).

The Court today finds that the error did not constitute plain error because "[d]efendant has not advanced any plausible version

in which the jury could have convicted him of felony murder without also convicting him of purposeful-or-knowing murder." *Ante* at 154, 699 *A.*2d at 613. The majority poses the incorrect question. The issue, as this Court underscored in *Purnell, supra,* 126 *N.J.* at 532, 601 *A.*2d 175, is whether the evidence could support a felony-murder charge. As this Court previously has recognized in the context of a murder committed in the course of a robbery, it clearly could:

> By relying on the robbery as an aggravating factor, the State necessarily affirmed that proofs existed that provided a rational basis for the jury to choose the death-ineligible option of finding defendant guilty of felony murder. To deprive a capital defendant of a lesser-included alternative murder charge, which arguably would have affected the deliberation of a death sentence, is not constitutionally permissible.

> [*Ibid.*]

The Court acknowledges that "the combination of the jury charge and the verdict sheet led the jury away from rendering a noncapital verdict of felony murder," *ante* at 154, 699 *A.*2d at 613. To conclude that the error was harmless is insupportable.

The Court's conclusion is even more indefensible in light of the facts of *Purnell* itself. In that case, the defendant stabbed the victim fifteen times in the neck, chest, and abdomen. *Purnell, supra,* 126 *N.J.* at 528, 601 *A.*2d 175. Despite the extreme nature of those facts—significantly more extreme and indicative of intent to kill than the facts here—and despite the implausibility of an acquittal of purposeful-or-knowing murder and a conviction of felony murder, we reversed the murder conviction because of the failure to charge felony murder. How the same error that we deemed reversible error in *Purnell* is harmless here defies explanation. The Court should stand by its holding in *Purnell* and not implicitly overrule it by denying that it controls in the circumstances of this case and establishes plain error.

## B.

The trial court incorrectly told the penalty-phase jurors that they could consider "all the evidence presented" in both the

penalty and guilt phases of the trial in determining whether the State had proven the aggravating factors. The majority recognizes that charge was erroneous, but it finds the error to be harmless. I disagree. The charge cannot be considered harmless at least in respect of the c(4)(f) aggravating factor.

Although this Court has long held that trial courts must inform jurors how and to what extent they may use evidence in their penalty deliberations, *see State v. Erazo*, 126 *N.J.* 112, 133, 594 *A.*2d 232 (1991); *State v. Bey*, 112 *N.J.* 123, 183, 548 *A.*2d 887 (1988) (*Bey II*); *see also Bench Manual for Capital Causes*, at 231–32 (Nov. 1, 1996), the trial court here failed to fulfill that obligation. Rather, the court instructed the jurors that:

> [T]he evidence to be considered by you includes that material presented at both phases of the trial, *all* the witnesses and all the physical exhibits.

The court then reiterated that instruction:

> I want to repeat that. The evidence to be considered by you includes the material presented at both phases of the trial, all the witnesses and all physical exhibits.

The majority acknowledges that those instructions were incorrect. *Ante* at 224, 699 *A.*2d at 648. Yet again, though the majority finds the error harmless, this time because, the majority notes, the prosecutor properly directed the jurors attention to the relevant evidence.

Certainly, this error cannot be viewed as harmless in relation to the c(4)(f) factor. As previously pointed out, the prosecutor argued the wrong evidence. *See* discussion *supra* at 210–212, 699 *A.*2d at 641–642. In dismissing the error, the majority attempts to rely on the trial court's instruction to the jury that "[a]ny evidence of actions taken by the defendant to conceal the murder itself cannot be used to prove this aggravating factor." *Ante* at 226, 699 *A.*2d at 649. That comment in no way rectified the error. Nor can the majority point to where the court directed the jurors to what evidence they could properly consider. In fact, the only evidence the jurors were told they could consider in support of the c(4)(f) factor was that noted by the prosecutor. That evidence, concerning defendant's attempts to cover up the murder, however,

could not be used to support the factor. *Supra* at 210–212, 699 *A.*2d at 641–642. Despite that fact, the majority holds that "[t]he court's instructions, when viewed against the background of the prosecutor's summation, sufficiently informed the jury of the evidence concerning the aggravating factors." *Ante* at 229, 699 *A.*2d at 651. When the improper charge is "viewed against the background of the prosecutor's [improper and misleading] summation," one cannot rationally conclude that the error in the charge was harmless.

### C.

In *Harvey I, supra,* 121 *N.J.* at 407, 581 *A.*2d 483, this Court took pains to advise the prosecutor that any reference at retrial to the hair found at the crime scene should not include the information that the hair was a pubic hair. The Court observed that "[w]hether it might have come from his head, his chest, or his pubis is irrelevant in the absence of allegations of a sexual encounter. On retrial the prosecution should refrain from referring to the hair as a 'pubic hair.'" *Ibid.* Despite that warning, the prosecutor elicited comments from his investigator that "a pubic hair control" was taken from the victim, and the investigator testified that he had also obtained a "[p]ubic hair sample from the sus—"before he was interrupted. Although the Court claims that "[t]he State never characterized the hair found in Schnaps's apartment as a public hair," *ante* at 220, 699 *A.*2d at 646, I credit the jury with being able to draw the logical inference that if the State obtained public hair samples from the victim and the suspect, then the State intended to use those samples in comparison with a pubic hair found at or near the scene. In addition, the investigator noted, and the prosecutor highlighted that probability in a diagram, that the police recovered as evidence from the scene a "pair of light gray panties inside out with stains." Lastly, the investigator testified that "oral, vaginal, and anal swabs [were] taken from the victim at the time of the autopsy."

Those innuendos of sexual assault had no place in this trial. There was no allegation of sexual assault and certainly no such charge against defendant. The hints of sexual assault that the prosecutor purposefully injected into this capital-murder trial were not only erroneous, but because of our prior ruling, bordered on contemptuous. The prosecutor's intent can be gleaned from the diagram he prepared and used at trial. The diagram included only eight of more than forty items seized as evidence. One of the eight items highlighted was the panties. The other items—the empty watch box, the open pocketbook, the empty jewelry case— had clear relevance, while the panties were at best marginally relevant and substantially more inflammatory.

Although, normally, I would be content to find that such an error was harmless, especially because of the trial court's instructions and the dearth of objections from defense counsel, I cannot find so here because we already have warned the prosecutor in this very same case about this same evidence.

### D.

I continue to maintain that capital juries should be informed of the actual period of parole ineligibility that defendants face if they are sentenced to life imprisonment instead of death. *See Loftin I, supra,* 146 *N.J.* at 420–31, 680 *A.*2d 677 (Handler, J., dissenting); *see Simmons v. South Carolina,* 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L.Ed.*2d 133 (1994). The jury here was erroneously informed that defendant would be eligible for parole in 2014. The prosecutor even asked the jurors whether they felt that was "sufficient punishment."

Prior to the imposition of the sentence here, defendant had accumulated an aggregate sentence of sixty-five years with a thirty-two-and-a-half year parole bar for several unrelated offense. Furthermore, defendant's prior sentence would be extended because of his violation of parole. There was no way that defendant was going to be paroled in 2014 or anytime soon thereafter.

The majority finds that there was no error in falsely informing the jury that defendant could be paroled in 2014. The majority reasons that the prosecutor was unable to discuss defendant's true prospects for parole because he could not inform the jury of defendant's prior convictions. *Ante* at 231, 699 *A.*2d at 652. Although it would be impermissible to inform the jury of defendant's prior convictions, informing the jury that defendant would die in prison long before he even had the opportunity for parole would not tell the jury that defendant had those convictions.

Our capital sentencing scheme is premised on the principle that juries must be informed of the legal effect of their findings. *Mejia, supra,* 141 *N.J.* at 485, 662 *A.*2d 308 (citing *Bey II, supra,* 112 *N.J.* at 164–65, 548 *A.*2d 887). Misleading the jury on material points in a way detrimental to the defendant cannot satisfy the constitutional demands of a valid capital-punishment scheme. The jury should have been told that defendant would never be eligible for parole.

## Conclusion

I have little doubt that when the time comes, this case will eventually be reversed either by this Court or a federal court. The errors are so grave and the efforts of defense counsel so futile that an ineffective assistance of counsel claim must lie. I have reluctantly highlighted only some of the errors here. I fear that someday some court will use this dissent as evidence that those issues were raised either below or before us and were addressed by the Court. The Court's consideration and treatment of the issues, however, is too lacking and meager to justify that conclusion. Because of the ineffective efforts of both trial and appellate defense counsel, most of the issues were not in fact dealt with. However, a scrupulous review of the record may reveal a few of them, even if our discussion is impaired by the failure of the adversarial process. Fortunately, the majority at least recognizes the numerous deficiencies in the record and questions raised by this DNA and statistical evidence and it preserves those issue for post-conviction relief.

The Court, however, is wrong to brush aside the errors and to postpone the inevitable. Nathaniel Harvey cannot be executed on the basis of this record. Despite the length of the majority's opinion, its analysis is unbalanced and uncritical. The Court appears caring and conscientious because it expends so much energy in its appellate review, but, in actuality, that effort is misspent to confirm an insupportable death sentence. In result, the opinion is not principled and should not be the means to seal the death of this defendant. I dissent.

Justice O'HERN, concurs in the opinion and judgment of the Court except with respect to Part II thereof. He would therefore affirm the convictions except insofar as the conviction of murder establishes death eligibility. He joins Part Two, Section I of Justice Handler's opinion on the issue of a non-unanimous verdict.

*For affirmance*—Justices POLLOCK, GARIBALDI, STEIN and COLEMAN—4.

*For affirmance in part; for reversal in part*—Justice O'HERN—1.

*For reversal*—Justice HANDLER—1.